## The State *v.* Martin.

Defects of form only will not render an act null in cases not expressly provided for by law, nor coming within the legal intendment of art. 12 of the Civil Code, as fixed by the jurisprudence of the country from which it was derived.

The blind are not declared by law incapable of contracting; and, as a general rule, all persons have that capacity, except those whose incapacity is expressly declared.

Incapacities and defects of form are *stricti juris.* They cannot be extended from one person to another, nor from one case to another.

A nullity of form in a testament may be cured by lapse of time, or by voluntary execution or ratification, on the part of the heirs of the testator.; and, even if enforced, leaves them under a natural obligation to execute the will. C. C. 3507, 1751.

A blind person may make a valid olographic testament.

A party will not be allowed to deny under one plea a fact alleged by him in another.

Natural incapacities, such as the alleged incapacity of a blind person to make an olographic will, are not questions of law, but matters *en pais,* dependent on the circumstances of each case.

Where parties attack a will on the ground that it contains a tacit *fidei-commissum,* it is not indispensible, under the rule of the civil law, that they should establish a pact between the testator and the legatee ; it is enough that they establish, with certainty, by direct or circumstantial evidence, the intention of the testator that the legacy, or a part of it, should enure to the person for whose benefit the *fidei-commissum* was established, and that the instituted heir has discovered that intention, and has executed, or intends to execute, it.

The fisc cannot annul a testament for defects of form, although the heirs may do so.

APPEAL from the Second District Court of New Orleans, *Canon,* J. The petition alleges, that *François Xavier Martin,* who resided in the city of New Orleans, died on the 10th December, 1846, leaving an estate estimated in the inventory at $396,841 17. That *Paul Barthélemy Martin,* a brother of the deceased, caused himself to be recognised as the executor, under a pretended olographic will, dated 21 May, 1844, and has taken possession of his estate.: That the said pretended olographic will is void and of no effect, for this, that when it was made, *François Xavier Martin* was physically incapable, on account of blindness, of making an olographic will: That the estate of the deceased goes to heirs domiciliated out of any State or Territory of the United States.: That by the 4th sec. of a statute of 26 March, 1842, a tax of ten per cent is imposed upon all successions, and every part thereof, going to persons domiciliated out of any territory or State of this Union.: That the succession is liable to the tax imposed by that statute : That the tax amounts to $39,608 41. The prayer of the petition is that *P. B. Martin* be cited ; that the pretended olographic will be declared null and void, so far as the interests of the State are concerned ; that judgment be rendered in its favor for the said tax, to be paid by privilege ; and for general relief.

The defendant excepted to the petition, on the ground : That the State has no right of action against the respondent, as set forth in the petition, and cannot contest, in its own name, the validity of the olographic will of the deceased, because it has no direct interest in his succession ; that if the said testament be voidable for the reasons alleged, which is denied, it can only be set aside by those on whom the estate would have devolved in case the will had not been made. In case this exception should be overruled, defendant answered : That the will is in due form and valid; that it has been duly proved and ordered to be ex-

STATE
*v.*
MARTIN.

ecuted; that by it he is instituted sole heir of the deceased; that the deceased has left no heirs to whom any portion of his property is reserved by law; and that the respondent, as sole instituted heir, is, by the death of the testator, seized of right of all the property and effects of his succession. He prays that the will may be declared valid, and that he may be quieted in his possession.

A supplemental petition alleges that the deceased, for the illegal purpose of depriving the State of the ten per cent allowed to it by law on all successions opened here, and going to persons not citizens and not domiciliated in the State, bequeathed, by an olographic will on file in the court, the whole of his property to his brother, *P. B. Martin*, a resident of New Orleans : That the latter was appointed universal legatee and sole heir of the deceased, with the understanding and agreement between him and the deceased, that the property thus bequeathed, or a part of it, should go to his other heirs, or to other persons, all foreigners and residents of France, or that all of said property should be divided between all his heirs in the same manner as if no disposition *mortis causa* had been made: That this was the motive which the deceased had in view in making the defendant his sole heir : That this, of itself, renders said olographic will null and void, as made contrary to law and public order, and to evade especially the statute of 1842 : That all substitutions and *fidei-commissa* are prohibited by law : Wherefore petitioner, not abandoning any of the grounds heretofore taken, assigns the above as additional reasons why the said olographic will should be declared null and void.

The defendant excepted to the supplemental petition as containing a different cause of action from that set forth in the original petition, and inconsistent with it, and which cannot be cumulated with it. He prayed that plaintiff might be compelled to select his ground of action. In case this exception should not be sustained, he answered, denying generally all the allegations in the supplemental petition, and especially that the will of the deceased was made with the intention, and for the purposes, alleged.

*F. Grima*, a witness for the State, says : He was well acquainted with Judge *Martin* for many years, and more intimately since the last eighteen years. For the last ten or twelve years he was in the habit of stopping once or twice a week at witness' office, when on his way to and from court. It is to witness' knowledge that Judge *Martin* has been blind since 1838 or 1839 ; thinks he was able to read writing in 1838 ; at the time he made his will he could not read. Judge *Martin* often spoke to witness of his relations in Europe, and of some that were dead. Several days before Judge *Martin's* departure for France, he told witness he was going to write his will; and the day before he left for Europe he came to witness' office, and told witness that he had written his will, and also told him the contents. Judge *Martin* never spoke to witness of his heirs in France, except in 1833, when he told him he had written a will, and told him of several dispositions he had made. He stated he had left a portion to a sister then living, and a portion to his brother now living, and the balance to nephews and nieces of his: this was in 1833. The judge spoke to witness several times of making wills and different dispositions. In 1839, he again spoke of doing so, and of leaving all to his brother, who would take his place and stand in his stead towards his relations. The judge was in the habit of sending, from time to time, drafts of 1,000 and 2,000 francs to his old sister, who died in 1840. He has told witness, speaking of his nephews and neices, that if they would consent to come to Louisiana, he would purchase for them a plantation worth $150,000 ; but that they must settle here and work for themselves. This was at different periods before and since his return from France. He said that he desired that when he died, his property should be taken care of, and that was the reason he would wish to leave it to his brother ; and the only fear which he had was that after his death his property would be sold by

his brother. This statement was since he made this will. The only surviving relations of the judge are a brother, two nephews and a neice. Has never heard the judge complain of any of his relations, and has spoken to witness of one of his nephews as a man of merit. From what Judge *Martin* told witness of purchasing a plantation for his relatives, he should judge he wished them more good than harm. Witness never heard the judge speak of the law of 1842; but witness spoke to the judge of that law, concerning its constitutionality, relative to the succession of *Magère.* The judge thought the law perfectly constitutional. Witness never heard Judge *Martin* say that he left the whole of his estate to his brother to evade the tax of ten per cent, but always heard him say it was that his brother might replace him as head of his family. He never heard him say that he had given any directions to his brother relative to his other relations in France. Witness being asked whether he has any knowledge resulting either from conversations he might have had with Judge *Martin* or his brother, or from other facts he might have been apprised of, which induces him to believe that a portion of that fortune which he left his brother was to go to his other relations now in France, answers: Knows of no fact from which he might deduce that belief; and from the statement made to him by Judge *Martin,* he cannot infer that any portion of the property left to his brother was directed by him to be given to any person. Witness knows that since the death of Judge *Martin,* and since *P. B. Martin* has been put in possession of the estate of his brother, he has furnished a list, and put the same in the hands of a broker, to sell a portion of his property ; and he has told witness that he had the intention of selling all the property and leaving Louisianna. Witness supposes he will return to France. *P. B. Martin* is not married. Judge *Martin* never told witness that he had requested his brother, or written to him, to come to Louisiana. He only appeared to fear his brother might sell the property. Mr. *P. B. Martin* is a native of France. He has been here twice ; the last time he came here in 1836 or 1837. He was formerly a resident of Naples, and was a merchant there ; thinks he is a citizen of the United States, but is not positive. Witness has seen *Blanche N. Martin.* She told him she had come here to take care of her uncle, Judge *Martin,* at his request; and said he had requested her to come out here, when he was in France. She expressed no disappointment at the will of her deceased uncle, and said she knew the contents before and would respect it.

*H. A. Bullard,* a witness for the State, says that : He was well acquainted with Judge *Martin* ; that when he went to France in 1844 he was totally blind. He has frequently seen him write, sign writs of error, licenses, and sometimes bank checks. Since 1836, has never seen him write more than to sign his name. Knows that he wrote an opinion in August, 1834, at Baton Rouge, at which time his sight was quite dim, when he wrote further than the paper and on the table; so that when the clerk came to examine the opinion, a part was on paper and a part written on the table. Witness says it was necessary, in all cases where the judge had to sign, to place a pen in his hand, and to direct him where to sign. It was not necessary to hold his hand. He sometimes signed his name well. He could not tell if he had ink in his pen or not. He could not read what he had written, nor has he read any thing since 1836, or at latest 1838. Being shown the will of Judge *Martin,* witness says the testator could not have read it; it is written in his hand-writing ; believes the testator could have written the will by means of bars to confine the edges of the paper or other mechanical means, or by feeling the edges; but thinks he required assistance to take his pen and get the ink. Witness was present when the will was opened. It was folded in the form of a letter. Thinks that the testator could have folded the will by feeling, but does not know about the sealing. The testator told witness, upon one or two occasions, when they had cases before them growing out of the ten per cent tax, that it was a tax which might easily be evaded. Witness never had any conversation with Judge *Martin* relative to the disposition of his property. Has no recollection of Judge *Martin's* ever having revealed to him the manner by which the ten per cent tax might be evaded, nor does he believe he had the intention of evading it himself. When he spoke of it, it was as a general question. Judge *Martin* may have said that the tax might be evaded by testamentary disposition ; thinks he spoke of it several times, but it was not in reference to himself, but to cases before the Supreme Court. It was only on those occasions that he spoke of it ; he never spoke of it afterwards. Witness believes that he was on good terms with his relations in France.

*A. Morphy,* a witness for the State, says, that he was on the bench with Judge *Martin.* He thinks he has been blind since 1837 or 1838; he was blind in 1839 when witness went on the bench. He could not read any thing. During Judge *Martin's* last years he had different persons to write his opinions. Witness has only seen him sign his name to writs of error, orders, licences, &c. Thinks on one occasion he wrote an order in Rapides in these words, "Let it it be granted;" but has no distinct recollection; it was two or three words. Witness being next to Judge *Martin* on the bench, generally directed the judge where to sign his name. Sometimes he placed, or touched, the judge's hand, to direct him, where to sign, and sometimes he only put his finger on the paper to direct him and always gave him a pen supplied with ink. When there were orders &c., to be signed, the judge always directed witness to see that the pen was well supplied with ink. Witness being shown the will of testator and asked how many pens full of ink it would take to write it, says he thinks it would take four or five. Witness does not think that Judge *Martin* could have gone to a table, and taken paper and ink and a pen, and have written a will such as the present, without the assistance of some person. Witness says it would be indispensable for some one to tell him when the ink had run out of the pen, as he was unable himself to discover it, and to show him where he left off, in order that he might be able to commence writing again. In the opinion of witness, without the assistance of a rule, or something placed on the margin of the paper, Judge *Martin* would not have been able to know where to commence or where to stop. Witness says that Judge Martin told him that he had written the present will with the assistance of a rule, but as to how he was assisted by it, or how he used it, witness is unable to say. Witness has heard Judge *Martin* speak of his relations in France, since his return in 1844. Previous to his going to France he appeared a little vexed because his relations would not leave France and come and settle in this country, but there was nothing of ill feeling; he mentioned his proposition to buy a plantation if they would come here and settle. Witness has heard Judge *Martin* speak of the tax, but it was when the question was before them. Witness thinks he mentioned that the law might be evaded. Judge *Martin* made the remark about the ten per cent tax at a meeting of judges to consult, in cases before them, but whether it was at the time the ten per cent tax was before them, or on some other occasion, or in conversation at those meetings, he is unable to say. Witness says the testator never intimated to him an intention of evading the law; but, some time after the arrival of his brother, he told witness that he had induced his brother to come and reside here, and intended to appoint him his legatee, stating that in that way his estate would not be subjected to the tax. Witness understood from this conversation that Judge *Martin* intended to make his brother universal legatee, and that he would receive all his property as such; he could infer nothing else; * * * * * * that making his brother universal legatee, he would stand in his stead towards his relations in France; but never heard him say he intended to leave any thing to them, nor that his brother would act well towards them. Judge *Martin* never told witness that he had put his brother under any obligations as to the ulterior disposition of his property. Witness says that the testator could not have read the will after having written it; but the same is written by Judge *Martin,* and his signature is genuine.

The record shows that it was admitted that the deceased was blind when he went to France and at the time of making his will.

*E. Simon,* a witness for the State, says that he was on the bench with Judge *Martin.* Has seen him sign his name since witness was first on the bench. Witness thinks he has seen him write, one, two, or three words; thinks also that he was assisted in putting his hand to the paper; but cannot recollect where or when. Judge *Martin* required assistance whenever he signed his name to licenses as he always signed first, and it was necessary to place his hand on a line opposite the first seal of the license. It was also necessary to fill his pen with ink, and to put the paper, not under his eyes, but under his nose. Witness being asked if Judge *Martin* could have gone to a table where there was paper, pens, and ink, and have written such a document as the will in question without assistance, answers—he could not. If Judge *Martin* had paper, ink and pens before him to write, witness thinks it would be necessary

for some one to fill his pen with ink and give it to him; and when the ink in the pen was exhausted, it would be necessary for some one to replenish it. He thinks it would also be necessary for some one to show him where to write as was formerly done in the Supreme Court; and also to show him where he left off, when the ink in his pen became exhausted. Witness thinks it would be necessary to point the pen to where the line is to be commenced. He thinks that when he arrived at the margin or end of the line, it would be necessary to inform him, that he might stop. Witness being asked if he thinks the will in question was written as above detailed, answers: He thinks so; but that he was not present. Witness has been told several times by the testator that he intended to dispose of his estate in favor of his brother, and that he had appointed witness his executor, in case of the absence or death of his brother. When Judge *Martin* spoke to witness about his succession, it was previous to his going to France, when he sent for witness to know if he would act as his executor as he had appointed his brother his universal legatee, stating that, in case of absence or death, he had appointed witness his executor. Witness promised him to accept the appointment. Witness heard the testator often speak of the disposition in favor of his brother, saying that his principle was "that a man ought to leave his estate to his nearest relations; and not give any thing to strangers; that amongst his relations he would select those living, nearest to him; and that if he had none here, he would still leave his estate to his relations however distant, in preference to strangers." This sentiment Judge *Martin* expressed to witness several times in conversation. When witness, in April, 1846, was going to Attakapas, Judge *Martin* applied to him to enquire if there was a plantation for sale, intending to give $100,000 to two nephews whom he had in France, and whom he expected here. Witness promised him to do so. On witness' return he called to know if witness had made any enquiry about it. Witness answered that there was none for sale there at that time. He then replied, "I am glad of it; my nephews will not come, and they shan't have my money." Witness has often heard Judge *Martin* complain of the ten per cent tax, and he often told witness that as he could not give any property to his relations who were not here without subjecting his estate to that tax, he would leave it all to his brother. One day, in a conversation which witness had with Judge *Martin*, he mentioned to him that he had a niece here, and asked why he would not leave her any thing. The judge answered that she was well off; was worth $60,000 francs; and that was enough for a woman. Witness never had any directions from Judge *Martin* as to how he was to act as his executor. Witness never was told by Judge *Martin* to whom he intended leaving his estate than his brother.

This witness being re-called, stated further: That he and Judge *Martin* had many conversations about the succession, amounting to this: That he would leave his estate to his brother, as then it would not be subject to the tax; that this was his main object in calling his brother to this country; but he never told witness any thing that could authorize him to say that his estate would go to any person else. Witness was impressed with the idea, that Judge *Martin* did not absolutely intend to disinherit his other relations; that as he intended to dispose in favor of his brother in order to avoid the effect of the tax, this was not sufficient to destroy the ordinary order of things; but witness repeats that he knows of no fact that would authorize him to say so. It is only his own impressions, nor did witness ever tell the testator what his (witness') impressions were, as it was none of his business. Witness says that Judge *Martin* was much pleased when his niece came here, and always appeared to him to feel the affection towards her due from an uncle to a neice. She came here a year ago last December. *P. B. Martin*, came here about 1837 or 1838, and has been here ever since.

*H. D. Ogden*, a witness for the State, deposed that in the latter part of 1841, he was Judge *Martin's* amanuensis, and remained as such for five or six months; during this time witness saw Judge *Martin* frequently sign his name, but does not recollect seeing him write any thing more. Whenever he had letters to write, he gave witness the subject matter; witness wrote the letters, and read them to him, and the judge would then sign them. Witness being asked, if pens, paper and ink were placed on a table, whether Judge *Martin* could go to it and write such a thing as the will exhibited to him, answers—that, without some assistance, does not think he could. His reasons for believing so are that when Judge *Martin* had to sign his name, witness was obliged to take his hand

and show him where he was to sign; and where he let it go, he would either sign running up or down, and sometimes he would run off the paper. From the way witness has seen him sign, his writing running sometimes up and sometimes down, he thinks the lines would cross one another, and therefore he could not have written the will without assistance. Witness says he generally gave Judge *Martin* the pen with ink in it; but supposes that he might have dipped the pen in the ink himself. Does not think, from merely feeling, judge *Martin* could tell when the ink in his pen was exhausted. Witness says that Judge *Martin* could not have known where to commence the lines in the will without assistance, or without placing some object on the paper to guide him.

*Greiner*, a witness for the plaintiff, stated that he was the secretary for the deceased from the fall of 1836 till sometime in 1840, and has often written for him since. When the deceased spoke to witness about his family, he spoke of them kindly. He often spoke of his sister.' He gave her $700 per annum. When the ten per cent tax of 1842 was before the legislature the judge asked witness frequently about what stage it was in, and as to the prospect of its passing, and was apprehensive it would pass. He said it was an unjust law and only known in Louisiana, and appeared to be uneasy about it; he also said it was a very foolish law. Witness is acquainted with the judge's niece. She came here about a year ago. Has heard the judge speak highly of her, and say that he enjoyed life better since her arrival than he had before. The judge appeared to like his neice very much, and seemed to be very attentive to make her comfortable and happy, and enjoy herself. Has also heard the judge speak of his brother, but cannot say he cared more for him than he did for his niece. When Judge *Martin* removed from St. Phillip street to his late residence, *P. B. Martin* was very much opposed to the change; they sometimes had high dissensions about it; the brother did not like the change, because it was too far. When Judge *Martin* returned from France he spoke to witness in very high terms of his relations. He always had a strong regard for his relations, and never heard him say any thing against them, either before or since his return from France.

*Moore*, a witness for the State, deposed that he has a list of property from defendant to sell. The list was pretty much of the whole property left by the late Judge *Martin*. Defendant told witness that his intention was to realize the property and to leave the State. This was at the time he proposed to have the property sold, some five or six weeks since.

*Grailhe*, a witness for the defendants, deposed that he became acquainted with defendant here in the spring of 1830; met defendant in Kentucky in the summer of 1830. Witness and defendant were together in Lexington, where defendant was studying english. After their return to New Orleans, in the fall of 1830, witness continued to see defendant in this city; and, in the course of a conversation which witness had with Judge *Martin* at that period, he heard that defendant had been sent to Lexington by Judge *Martin* in order to acquire a knowledge of the english language so that he might do the judge's business.

*Guyol*, a witness for the defendant, deposed that he had known the deceased since 1834. That he was his notary. That since Judge *Martin's* return from France he came to the office with notes written by himself on a sheet of paper, which he handed to witness and requested them to be read. These notes were to complete a judgment began by *Mr. Denis*, and which witness finished under the dictation of Judge *Martin*. They were probably about half a sheet of notes, all written by Judge *Martin*. Witness read them easily, because he was used to the judge's hand writing; cannot recollect of what these notes were, whether authorities or not, as he paid no attention to them; does not recollect how many words there were. There may have been a word in a line, there may have been six lines, or ten. Witness did not count them. Thinks the notes could have been read, but not easily except by a person acquainted with the writing, as letters were sometimes on top of one another, and a letter missing, and words written crookedly. Judge *Martin* was at witness' office every day nearly, and told witness of the contents of his will long before his death; told him that he had left every thing to his brother, because, he said, he was of the same habits and the same way of thinking as himself, and would do for his relations in France as he himself had done—that he would be a second, "soi-même envers sa famille." That about two months previous to his death he came to witness' office and appeared very uneasy. Witness asked him what was the matter. He said he was troubled; that his *brother*

would not remain here; that when he would be dead he would sell all his property and sacrifice it, and return to France, and that it worried him a great deal.

*Visinier*, a book-keeper in the Bank of Louisiana, introduced by the defence, stated that since Judge *Martin* became blind, three and a half or four years ago, he came to the bank and drew a check. He requested the witness to place the paper on the table in order that he might draw the check. Judge *Martin*, about that time, gave a receipt for a note which he wished to withdraw from bank, and, as he had not his bank-book with him, he gave a receipt drawn up and signed by himself. About that time the judge drew checks and signed them. When Judge *Martin* drew the check above alluded to in the bank, witness did not read it to him, nor did the judge request it to be read.

The following interrogatories were propounded to the defendant:

1. State the names of the heirs of your late brother *F. X. Martin*, supposing that he had died intestate.

2. State their degree of relationship, parentage, residence and citizenship.

3. State what portion of the property of your late brother would have fallen to your share, in case he had made no will.

4. State whether your late brother left any children or descendants. If yea, state their name or names, and their country and residence.

5. State whether it was not understood between your late brother and yourself, that a portion of the fortune which you were to inherit from him should go to his other heirs, or to some of said heirs.

6. State whether you do not consider yourself morally and in duty bound to him to transmit a portion of said fortune to his other heirs, or some of his heirs, or some other persons whom he mentioned to you.

7. State whether your late brother has or has not given you any instructions or directions, verbal or written, how to dispose of the property he bequeathed to you, and what were those instructions and directions.

8. Was it not his intention, though he may have left to you no positive instructions or directions, that you should transmit, give or remit the property he left you, or part of the same, or a sum of money to his other heirs or some of them, or some other persons? If yea, state the names and the amount.

9. State whether it is not your intention to transmit, give or remit, now or at a future time, or at your death, the property he left you, or part of the same, to his other heirs or some of his heirs. If yea, state the names and the amount.

These interrogatories were answered by the defendant as follows:

To 1st interrogatory, he answered: Comme je suis le plus ancien de la famille, ce serait d'abord moi. Je me nomme *Paul Barthélemi Martin*. Ensuite les représentants de mon frère, *Joseph Vincent Martin*, qui sont *Amélie Martin*, *Eugène Martin*, et *Adolphe Martin*. Ensuite les représentants de ma sœur, *Angélique Martin*, décédée veuve *Salony*, qui sont *Alfé Salony et Jules Salony*.

To the 2d, he answered: *Amélie Martin* est la niece de feu *François Xavier Martin*. Elle est née à Marseilles, et se trouve présentement à la Nouvelle Orléans; son domicile est à Marseilles; *Eugène* et *Adolphe Martin* sont les neveux de feu *François Xavier Martin*; ils sont nès à Marseilles; y sont domiciliés et y résident. *Alfé* et *Jules Salony* sont aussi les neveux de feu *François Xavier Martin*. Ils sont tous les deux nés à Marseilles; ils y sont domiciliés. *Alfé* réside à Marseilles, et je crois que *Jules* est dans ce moment ci en voyage en Italie. Je suis né à Marseilles et je réside à la Nouvelle Orléans, et je suis français.

To the 3d, he answered: Je suppose que cela serait reglé par le Code de la Louisiane.

To the 4th, he answered: Mon frère n'a jamais été marié; je n'ai jamais oui dire que mon frère avait des descendants.

To the 5th, he answered: Il n'y a eu aucun entendu entre mon frère et moi à ce sujet. Il m'a laissé son héritier, et c'est à moi à disposer de son bien comme je l'entendrai.

To the 6th, he answered: Je ne me considère aucun autre devoir que de faire ce que mon cœur me dira. Je prendrai dans mon cœur ce que je ferai un jour, ou ce que je ne ferai pas.

To the 7th, he answered: Mon frère m'a donné la dessus, ni instructions, ni directions aucunes.

STATE
v.
MARTIN.

To the 8th, he answered: Mon frère ne m'a rien déclaré là dessus—mon frère m'a dit: "Je te fais mon héritier, et de disposer de sa fortune ; que c'était à moi.

To the 9th, he answered : Je n'ai la dessus d'autre intention que celle de disposer de ma fortune selon ma volonté. La dessus je dis que je ne me crois pas obligé de faire dans ce moment ci un testament public. Je ferai mon testament comme je l'entendrai.

The will of the deceased, and all the proceedings connected with the probate thereof and the succession, were offered in evidence by the defendant.

There was a judgment below annulling the will, and declaring the State entitled to the amount claimed. The defendant appealed.

*Elmore,* Attorney General, for the State. The exceptions were properly dismissed. The first, that the State had no interest in the succession, takes for granted the whole matter in dispute. So long as the will is maintained, it may be true that the State has no interest in the succession ; but if the will be annulled, its interest becomes apparent, and the very object of the suit is to get at that interest. The State has the same interest in setting the will aside that any of the heirs have. So long as the will stands they receive nothing from the estate—but the moment it is broken they receive as if no will had been made ; the principle is the same, so far as the State is concerned. But the moment the will is broken, that part of the succession going to foreign heirs becomes liable to the tax of ten per cent.

The exception to the supplemental petition insists that the two petitions are inconsistent. The supplemental petition sets forth an additional ground why the will should be annulled. There is no inconsistency between the allegation to be found in the original petition, that the will was void on account of a physical incapacity in the testator at the time of making it, and that in the supplemental petition, that there was a secret understanding between the testator and executor, that the estate should be divided among the heirs without reference to the manner of distribution pointed out in the will itself. Both may be true.

A blind pers n is incapable of making an olographic will. See Duranton, v. 1, p. 161, no. 136. Grenier, v. 1, sec. 5, no. 281, p. 503. Rogron, Commentary on art. 978 Code Nap. Coin-Delisle, on the same art. p. 408. It is admitted that by the spanish law a blind person is incapable of making an olographic will. As to the common law, on this point, see Swinburne on Wills. p. 2, s. 11, p. 166. Jacob's Law Dict. vol. 6, pp. 430. 1 Lovelace on Wills, Law Library, vol. 15, pp. 141–2. Because the Code does not expressly say that a blind man is incapable of making an olographic will, though the whole spirit and reason of the law is against it, it is insisted that this incapacity does not exist. But the Code contains general principles, and was never intended to provide for each particular case, as it may arise. Such a construction is to be given to it, as will make it consistent with reason and itself. It is indispensable that a testator should know what disposition he is making of his estate, when he makes his will. Now, it is impossible that the testator, in this case, could have known the contents of his will. He could not read, and it was never read to him. If so, how could he know what disposition he was making of his estate ? The defendant will answer, that it was written by the testator, and the presumption will be, from that fact, that he knew its contents. That would be the presumption where the testator could read—because the law would presume that a testator, before executing his will, after having written it, would read it over before signing, to see if he had written it as he intended. But that presumption ceases when the testator is blind. He thinks his will contains certain dispositions, because certain ideas were in his mind at the time he was writing it—and he thinks that, by means of pen and ink, he has been enabled to transfer to paper the ideas that were passing through his mind at the instant he was writing. But how does he know—how can he know, whether his pen has been a faithful reflector of the operations of his mind ? How does he know but that his hand may have refused its office, and, instead of tracing particular words, have substituted other words, altering the sense of the writing, or have omitted words indispensable to convey the meaning. Persons in the possession of sight, and most skilful in the use of the pen, frequently use words not intended, and omit others, by which the meaning is entirely distorted. But in such a case it is competent for them to correct their errors—by the use of the eyes they can detect the omissions and correct them. But with the blind there is no

such power. The evidence supports the decision of the lower court on the point that the will was not entirely written, dated, and signed with his own hand.

The evidence establishes the fact that the testator made his brother his universal heir, for the mere purpose of avoiding the payment of the tax imposed by the stat. of 1842. The will was consequently *in fraudem legis*, and can have no effect so far as the State is concerned. *Mitchell* v. *Smith*, 1 Binney, 119. *Davis* v. *Holbrook*, 1 A. R. 176. *Booth* v. *Hodgson*, 6 Term R. 409. 2 Hovenden on Frauds, p. 19. Comyn on Contracts, p. 53. *Law* v. *Hodgson*, 11 East. 300. *Bravo* v. *Turner*, 7 Term Rep. 630. *Wheeler* v. *Russel*, 17 Mass. 280. *Mitchell* v. *Smith*, 1 Binney, 116. *Biddis* v. *James*, 6 Binney, 326. 3 Merivale, 471. *Armstrong* v. *Toler*, 11 Wheaton, 258–975. *Gravier* v. *Carraby*, 17 La. 125.

*E. Musson*, on the same side, argued at length the question of the capacity of a blind person to make an olographic will.

*J. F. Pepin*, on the same side. I. As regards the interest of the State, it is self-evident. If the will be declared null and void, it receives a large sum of money, otherwinse nothing. If the State has an interest, it has a right to bring suit. C. P. 15. But it is contended that the State has no right to avail itself of the nullity which results from the non-compliance with the formalities required by law in the making of wills. That the nullities complained of are relative, and not radical or absolute. That by absolute nullities, are meant those which can be set up by all persons interested; by relative nullities, those which can only be set up by the persons in whose favor they are established; and that the nullity complained of, is a relative nullity, of which we cannot take advantage. I contend that the nullity complained of is absolute, and such as renders the will absolutely null and void. The formalities required in a will are matters of strict law, and it is null and void if they are not complied with. C. C. 1588, 19, 1543, 1553. *Sterling* v. *Gros*, 5 La. 100. *Gaude* v. *Baudoin*, 6 La. 722. *Lewis's Heirs* v. *His Executors*, 5 Ib. 387. *Stafford* v. *Villain*, 10 La. 319. *Hebert's Heirs* v. *Legatees*, 11 La. 361. *Brittain* v. *Richardson*, 3 Rob. 79.

We find the same doctrine, both in the roman and the french law. See Pothier's Pandectes de Justinian, vol. 10, p. 389, book 28, tit. 1, art. 3.

" Si un testament est fait suivant le droit, disent Dioclétien et Maximien, et que l'héritier soit habile à le recevoir, on ne peut pas le rescinder en vertu de nos rescrits. Mais il n'est permis à personne d'en retrancher des formalités qui doivent y être observées. C'est pourquoi les mêmes empereurs disent dans un rescrit : Chacun a la faculté de disposer de ses biens par testament, mais en observant certaines formes ; il n'est pas permis de rien changer à ces formes prescrites par le droit public. Il en est tellement ainsi que la faveur du prince n'en peut pas dispenser. C'est pourquoi, Valens, Valentinien et Gratien disent dans un rescrit, par rapport au testament fait en faveur du prince, ou par le prince lui-même : L'empereur et l'impératrice eux-mêmes ne pourront instituer que d'apres les règles communes ; et il en sera de même par rapport aux codiciles et aux fideicommis qui seront faits suivant le droit. Et comme l'ont ordonné les anciennes lois, l'empereur et l'impératrice pourront faire des testamens et les rétracter." " Alexandre dit également : ' Suivant plusieurs constitutions, l'empereur ne peut pas revendiquer une succession en vertu d'un testament imparfait : car en effet, bien que la loi ait affranchi le souverain des formalités, rien ne lui convient cependant mieux que d'observer les lois.' A plus forte raison 'le fisc ne peut pas s'emparer des biens de celui qui voulait laisser sa succession à l'empereur.' Un testament où l'on n'a pas observé les formalités nécessaires est tellement nul que Paul a répondu 'que l'on ne pouvait pas même demander en vertu du fidéicommis exprimé dans un testament qui n'était nullement conforme au droit."

As to the old French law, Claude de Ferrière, in his Commentaires des Coutumes de Paris, art. 289, vol, 4, p. 99, des Testaments, Glose cinquième, says.: " L'omission de l'une des solemnités requises, cause la nullité d'un testament. Nos coutumes ont introduit plusieurs solemnités requises dans les testaments, pour les rendre valables en sorte que l'omission d'une seule rend les testaments nuls. Ces formalités ont été introduites pour empêcher les suggestions et les fraudes qui se pourraient commettre dans les testaments." No. 30, p. 118 : " Les solemnitiés requises par les coutumes, sont tellement essentielles que par le défaut d'une seule les testamens sont nuls, pour quelque cause et raison que ce soit."

STATE
v.
MARTIN.

Antoine D'Espeisses, Œuvres Complètes, vol. 2, tit. 1, s. 4, De la Forme du Testament, says : " Non soulement il est requis pour la validité d'un testament, que le testateur ait la faculté de tester, qu'il en ait eu la volonté, et qu'il parachève son testament, mais de plus qu'il l'ait fait en la forme prescrite par les lois. Les lois ont donné une forme certaine, ou des solemnités aux testamens, de la moindre desquelles il n'est pas permis de se départir."

Pothier, Des Donations Testamentaires, chapter 1, says : " Le testament est un acte qui appartient au droit civil, et qui pour être valable doit être fait selon les formes prescrites par les lois" ; and see also Pothier, chap. 5, sec. 2. Furgole, Testa. chap. 3, no. 12.

As to the law under the Code Napoléon, (see Duranton, vol. 8, p. 484, l. 3, sec. 5,) who says: " Si le législateur a permis aux citoyens de régler la dévolution de leurs biens, comme ils l'entendraient, et de faire ainsi en quelque sorte une loi sur leur patrimoine, dont l'exécution n'aurait lieu qu'après leur mort, il n'a voulu du moins sanctionner ce droit qu'autant que ceux qui en useraient, rempliraient ponctuellement les conditions et les formalités qu'il a jugées utiles, indispensables même, pour attester avec certitude leur volonté à cet égard. En conséquence, il a décidé par l'art. 1001 du Code, de la manière la plus absolue et la plus générale, que, 'les formalités aux quelles les divers testaments sont assujétis par les dispositions de la présente section et de la précédente, doivent être observées, à peine de nullité.' " See also Merlin, verbo Testament, sec. 2, part 4, art. 2. Coin-Delisle, chap. 5, Des Dispositions Testamentaires. Solon, Traité des Nullités, chap. 9, nos. 426 et 427. Perrin, Traité des Nullités, nos. 118 à 122. Solon nos. 441, 442, says : Un acte radicalement nul, peut être attaqué par ceux même qui n'ont que l'action en nullité relative, ainsi décidé par une nullité de mariage poursuivie par des collatéraux. Rolland de Villargues, verbo Nullité, no. 43, says: Une théorie à la fois simple et vraie est celle-ci, toute nullité est absolue, lorsque la loi la prononce sans restriction ni limitation. If it be true then, as is asserted by all these writers, that a will without the formalities required by law, is altogether worthless, how can it be pretended, that the nullity complained of is relative and not absolute, and that the State has no right to avail itself of it ?

II. As to the second exception, that the grounds taken by the State in the supplemental petition, cannot be cumulated with those of the original petition. The supplemental petition does not change the nature of the action. It adds new grounds why the will should be declared null and void. The nature of the action is not changed by the supplemental petition. The original grounds are that the formalities required by law in the making of olographic wills, have not been complied with. The supplemental ones, that it is also null and void on the ground that there has been a fidei-commissum. 4 La. 298. 8 N. S. 488. And in both cases, the prayer is the same, to wit : that the will be declared null. Thus, it has been decided that in a suit for the possession of a slave, if plaintiff dies pending the suit, his heirs, in the supplemental petition making themselves parties, may amend by stating new facts, if they conclude with the same prayer as in the original petition. Rochelle v. Alvarez, 8 N. S. 171. It is a general principle, that amendments to the pleadings should be permitted for the furtherance of justice and avoidance of costs, whenever the prayer is the same as in the original pleadings.

III. I now come to the merits of the case, and will examine the first point. Can a blind man make an olographic will ?

The olographic will is derived from the Romans, as shown in the Novel 4, de Testamentis, of the Emperors Theodosius and Valentinian, "ut quisquis per holographam scripturam supremum maluerit ordinare judicium, habeat liberam facultatem: et si holographa manu testamenta condantur, testes non sunt necessarii." This novel was not long in force, though many of the Romans continued to make olographic wills. Pliny in his Epistle 16, book 2, speaks of it. Justinian, however, in the law, Hac consultissima, established the necessity of witnesses in all kinds of wills, except in the case of a father disposing of his fortune in favor of his children, and thus formally abrogated the use of olographic wills. We see, however, that in many countries the use of olographic wills was continued. The Visigoths, expressly admitted them. Book 2, tit. 5, chap. 15 of their laws. " Manu propriâ scribat ea quæ ordinare desiderat: dies quoque et annus habeatur in his evidenter expressus: deinde toto scripturæ textu conscripto, rursum auctor ipse subscribat."

In France, it was admitted by the customs of most of the provinces. In the year 1629, by an ordinance of Louis XIII, it was permitted to make olographic wills, in all the kingdom of France. But this ordinance was not enforced by some of the parliaments, and among others the parliament of Paris, and at last came the ordinance of Louis XV, which says, in speaking of olographic wills, art. 20 : " Les testaments, codiciles et dispositions à cause de mort, en forme olographe, seront entièrement écrits, datés, et signés de la main de celui ou de celle qui les aura faits." Art. 970 of the Nap. Code is copied therefrom, almost verbatim : " Le testament olographe ne sera point valable, s'il n'est écrit en entier, daté, et signé de la main du testateur ; il n'est assujéti à aucune autre forme." Art. 1581 of the Code of this State, is taken from the french Code. "The olographic testament is that which is written by the testator himself. In order to be valid, it must be entirely written, dated and signed by the hand of the testator. It is subject to no other form, and may be made anywhere, even out of the State." Our law is, therefore, as regards olographic wills, the same as the french law, before and after the Nap. Co le.

The most eminent jurisconsults, almost without exception, have, in their commentaries on the ordinances of Louis XIII. and XV, and on the Napoléon Code, taken the same view that we have of this matter. As we have shown, the formalities required in the making of wills are of a strict and essential nature, without which the will is absolutely void. " Une donation entre-vifs, un testament, sont des actes dont tout la valeur est dans la solemnité, et dont toute la solemnité est dans leur forme ; si donc en faisant un testament ou une donation entre-vifs, on néglige les formes qui leur sont propres, qu'est-on censé avoir voulu faire ? Rien. La loi présume qu'on a rédigé un acte défectueux, pour se dérober à des suggestions importunes, en paraissant y céder ; elle présume qu'en faisant semblant de disposer, on n'a réellement voulu faire aucune disposition." Merlin, *verbo* Testament, sec. 2.

An olographic will, to be valid, must be entirely written, dated, and signed by the hand of the testator. This kind of will, say the french writers, is greatly to be favored, because it is less subject than the others to frauds and deceptions. This is true in ordinary cases. But is it so when it is a blind man who may make an olographic will? "Ce testament est celui qui mérite la plus grande confiance ; c'est le testateur lui-même qui y consigne ses volontés ; son étymologie grecque désigne un testament écrit uniquement par le testateur." Grenier, Traité des Donations, no. 226. " Ouvrage du disposant seul (says Vazeille) le testament olographe dans sa simplicité appelle la confiance bien mieux que le testament authentique avec ses formes minutieuses et sévères." Toullier, vol. 5, no. 378 (Paris edition), adds : " C'est la forme des testaments olographes qui est la moins exposée aux surprises, celle qui mérite la plus grande confiance, parce qu'elle est plus particulièrement l'ouvrage du testateur."

See also, Journal du Palais, vol. 1, p. 906, 28 juin 1678, Affaire Demoiselle Blanche de Parant. " La solemnité des testaments olographes est fort simple ; c'est leur simplicité qui fait toute leur solemnité ; une personne qui veut ainsi tester, écrit elle-même sa volonté, elle n'a pas besoin de tous ces termes scrupuleux de nos coutumes, dicté et nommé ; lu et relu, parce qu'elle ne saurait se surprendre elle-même, sa main et son esprit travaillent de concert, elle dicte, elle nomme, elle lit son testament par la même action et au moment qu'elle l'écrit."

Ferrière, Coutumes de Paris, vol. 4, p. 75, sur l'article 289, qui traite du testament olographe, quotes Charondas with approbation, who says : "Les testaments olographes ne sont pas si exposés que les autres espèces de testaments, aux fraudes et suggestions ; c'est pourquoi nos coutumes n'ont requis aucune solemnité, autrement il arriverait le plus souvent que de telles dispositions seraient nulles ; la raison est que ceux qui les font, veulent les tenir secrètes, et empêcher qu'elles ne soient connues de personne. Le célèbre avocat-général au parlement de Paris, Talon, dans son quatre-vingtième plaidoyer, vol. 6, p. 84 de ses œuvres, dit : 'Celui qui fait un testament olographe, doit être certain de ce qu'il entreprend, non seulement dans la qualité des dispositions qu'il renferme, mais aussi dans la forme qu'il lui veut donner.' Le même avocat-général, plaidant une affaire rapportée par Dufrèsne du 30 avril 1625, dit : ' Qu'un testament olographe était un enfant posthume qui ne paraissait jamais qu'après la mort de son père, comme le phœnix, par lequel l'homme revit à soi-même ; que dans ce testament nous consignons nos plus importantes pensées que nous n'avons voulu

STATE
v.
MARTIN.

découvrir à personne.'" See also d'Aguesseau, vol. 3, p. 208, Œuvres Complètes.

The above observations are strictly correct, and can apply only to him, who, making an olographic will, sees what he writes, and reads it when written. But is it true as to a blind man? He cannot make his will in the olographic form, without the assistance of some person, who may impose upon him. He asks for paper, ink and a pen; a sheet of paper is handed to him; how can he distinguish whether it be black or white, whether it be ink or any other liquid which has been brought, whether his pen makes the proper marks on the paper? He requires the assistance of some one to tell him where to commence, where to stop, and to guide his hand in the writing of the will. And when it is all finished, being unable to read it, he cannot discover whether he has not committed an error, or been misled. Who among us has not often, in writing, put one name or word for another, which is, however, afterwards corrected, when reading the original. Why is it that we always read what we have written, if it is not to revise the same, and see that no mistake has occurred? But can a blind man do so? And when his will is made, how can he know, that it will not be taken from the spot where he has placed it, and another paper substituted? Can he with the mere sense of touch discover the deception? These are a few of the reasons which suggest themselves to every mind, and which show that a blind man is really incapable of making a valid will in the olographic form.

We see that according to the roman law, a blind man could make a will but in the nuncupative form. See Pandectes de Justinien, by Pothier, vol. 10, p. 306, lib. 18. " Cæcus testamentum facere potest, quia accire potest adhibitos testes, et audire sibi testimonium perhibentes." Paul. sent. lib. 3. tit. 4, § 4. " Certam autem ac specialem cœcis, testandi formam constituit Justinianus.

See also Domat, vol. 2, book 3, tit. 1, s. 1, nos. 12, 13, who says: "Il y a des testaments de diverses sortes, et qui sont distingués, non par l'essential de leur nature, qui est l'institution d'héritier commune à tous, mais par les différentes formalités que les lois ont établies pour l'usage des personnes qui veulent disposer de leurs biens, selon que ces formalités peuvent convenir ou à la qualité de la personne, ou aux circonstances de l'état où elle se trouve, comme on le verra par les articles qui suivent. Pour ce qui regarde les personnes des testateurs, on peut faire une première distinction des testamens, que peuvent faire ceux que quelques infirmités rendent incapables de certaines manières dont les autres personnes peuvent tester. Ainsi les aveugles, les sourds, les muets, ne sauraient faire leurs testaments que dans les formes qui peuvent leur convenir." Also same book, sec. 3, des Formes ou Formalités nécessaires dans les Testamens, no. 20. "Quoique les aveugles ne puissent écrire, ni lire, ni voir les personnes qui peuvent être présentes à leur testament, ils ne laissent pas de pouvoir tester, de même que les autres personnes, qui ne savent écrire ni lire ; car ils peuvent expliquer et faire écrire leurs dispositions, et déclarer en présence de sept témoins et d'un notaire, que ce qu'ils ont fait écrire, et qui sera lu en présence des témoins et du notaire, est leur testament, qui aura son effet, étant signé des témoins qui sauront signer, et du notaire. Et s'il y a des témoins qui ne sachent ou ne puissent signer, le notaire en fera mention."

Let us refer to the spanish law. " El ciego non puede fazer testamento, fueras ende desta manera (1): deue llamar siete testigos, e vn escriuano publico, e delante dellos deue dezir, como quiere fazer su testamento. Otrosi deue nombrar, quales son aquellos que establesce por sus herederos, e que es lo que manda; e el escriuano deue escriuir todas estas cosas delante los testigos, ó si eran ante escritas, deuen ser leydas delante dellos ; e despues que fueren escritas, e leydas, deue dezir el ciego manifiestamente, como aquel es su testamento. E de si, cada vno de los testigos deue escriuir su nome en aquella carta, si supiere escriuir ; e si non, deuelo fazer escriuir a otro. E tambien el escriuano publico que escriuiere la carta, como los testigos, deuen sellar la carta con sus sellos : e si el escriuano publico non se pudiere auer, deuen auer otro que lo escriua, e que sean con el ocho testigos en lugar del escriuano. E esta guarda deue ser fecha en el testamento del ciego, porque non pueda ser fecho ningun engaño." Partida 6, ley 14, tit. 1, vol. 3, p. 16.

---

(1) Fueras ende desta manera : Probatur hic, cæcum non posse testari in scriptis, ita quod testes et tabellio, nesciant ejus dispositionem : posset enim cæcus, qui testaretur in scriptis, faciliter decipi, et subjici sibi una scriptura pro alia.

"Item adde, quod in testamento cæci requiritur per nostram legem solemnitas quinque testium. Et certe in hoc, nostra lex est valde dubia : an, cum supra locuta sit, tam in testamento in scriptis quam nuncupativo, an in utroque sufficiant quinque testes in testamento cæci ? Pro cujus perfecta declaratione dico et præsuppono, quod cæcus non potest testari in scriptis: quia cum non possit videre et cognoscere litteras suas vel alienas, posset decipi, et faciliter contra eum committi falsitas : sed tantum potest testari nuncupative, et in tali testamento debent intervenire sequentes solemnitates. Prima, quod non possit testari in scriptis. Et sic nostra lex, quæ simpliciter dicit et disponit, quod in testamento cæci requirantur quinque testes, necessario debet intelligi in testamento nuncupativo, quia in scriptis non potest testari ; et licet in aliis personis requirantur quinque vel tres testes, ut supra dictum est, tamen in testamento cæci necessario semper requiruntur quinque, et iste est verus intellectus hujus legis. Sed pulchrum dubium est, an hodie requiratur etiam Tabellio et prædictæ solemnitates, quas supra numeravi vel aliqua earum? Et teneo quod non, cum in nostra lege non ponantur neque requirantur; et si replices, ergo eadem ratione posset testari in scriptis, cum simpliciter et absolute nostra lex loquatur, dicendo, quod in testamento cæci requirantur quinque testes: quia respondeo, quod nullo modo potest testari in scriptis, quia in eo est major ratio prohibitionis quam supra dixi, de jure communi. Item, quia in testamento in scriptis nostra lex requirit septem testes in qualibet persona, etiam si testetur inter filios : ergo in cæco non coarctatur, vel tollitur prædicta solemnitas et numerus testium: unde, cum nostra lex loquatur in testamento nuncupativo et in scriptis, et dicat, quod in testamento cæci requiruntur quinque testes, aperte colligitur loqui tantum in testamento nuncupativo in quo est capax, et non in alio." Gomez, Opera Omni, 3d law of Toro, nos. 51, 52, p, 25.

See also Molina (Madrid edition, 1827), in his commentaires on the law of Toro, vol. 1, p. 74, nos. 69 and 70, who says : " La disposicion que obra en el testamento del ciego, así por derecho civil como por el real de las partidas, de que no pueda testar por escrito, sino nuncupativamente, y la particularidad que por esta ley se observa tambien en el testamento del ciego, escita la duda de si el que no sabe escribir ni leer podrà testar por escrito, ó deberà necesariamente otorgar nuncupativamente su disposicion. El fundamento de esta duda nace de que así como al ciego para remover toda sospecha de fraude no se le permite otorgar su testamento por escrito, à causa de que por la falta de vista ni podia escribirlo por si, ni leer lo que otro hubiese escrito, y quedaria espuesta a fraudes su disposicion, concurriendo en el que, ni sabe escribir, ni leer el mismo peligro de ser suplantada su disposicion por no poder escribir por si, ni leer lo que otro hubiese escrito, parece segun aquel principio legal que donde se halla igual razon debe regir la misma disposicion de derecho, que el que no sabe escribir ni leer esta impedido de hacer su disposicion por escrito, pues à la verdad la unica diferencia que media entre el ciego y el que no sabe leer ni escribir, es que este puede ver materialmente los testigos; pero esta circunstancia ni aumenta la fé y crédito que se les debe dar à sus dichos, ni disminuye el peligro y sospechas de fraude en el que estendio por escrito su disposicion."

" El ciego no puede hacer sino testamento nuncupativo, y en el otorgamiento de él deben intervenir con precision cinco testigos, y no menos, como lo dice expresamente la ley : la qual corrige en quanto à su número la 14, tit. 1, part 6, que manda sean siete, y un escribano público, para que no sea engañado, ni se le suplante una escritura por otra, lo qual no puede suceder al que tiene vista." Febrero Adicionado, vol. 1, part 1, ch. 1, § 1. no. 14.

The olographic will was and is well known in the spanish law ; it was permitted in certain cases, by a royal Cedula of October 1778, mentioned in note A. in Febrero Adicionado, p. 18, vol. 1, no. 20. Long before that time, the Visigoths who founded a kingdom on the ruins of the Roman empire in Spain and in the south of France, admitted in their laws the olographic will, as has been previously shown. This Code of the Visigoths, which had been compiled by persons well versed in jurisprudence from the Theodosian Code, from the enactments of the later emperors, and other sources, remained in force for some centuries. But when we examine the works of the jurisconsults of Spain, who have written since the Cedula of 1778, we do not find any change in their way of thinking as regards the wills of blind men. They state, in general terms, that a blind man cannot make a will except in the nuncupative form, showing clearly that the Cedula did not and could not apply to persons who were af-

STATE
v.
MARTIN.

flicted with blindness. The formalities required in the making of olographic wills, were the same under the french law, before and since the Napoléon Code, and we have already seen that they are the same under our own Civil Code.

A majority of the eminent french lawwriters agree in the fact that a blind man cannot make a valid olographic will.

Ricard, le judicieux et savant Ricard. as Pothier surnames him, says in his Traité des Donations, that a blind man can only make a will in the nuncupative form, by dictating it to his curate or to a notary, and he adds (no. 142) : "Quant aux aveugles, le droit leur a permis de disposer, soit qu'ils eussent apporté cette incommodité en naissant, ou qu'elle leur fut depuis survenu par accident, à condition d'observer toutefois certaines formalités particulières, décrites en la loi Hac consultissima." In nos. 1470, 1474, he writes : De la forme des testamens des aveugles : " Le droit Romain a introduit une quatrième espèce de testamens en faveur des aveugles, que la loi appelle testament nuncupatif."

Denizart, one of the great lights of the law, says in his work, Collection de Décisions Nouvelles et de Notions relatives à la Jurisprudence Actuelle, verbo Testament, no. 160. " Celui qui est aveugle ne peut tester en pays de droit écrit que par la voie du testament nuncupatif. Si c'est en pays coutumier, un pareil testament ne peut être fait que pardevant notaires ou curés, en se conformant à l'art. 21 de l'ordonnance de 1735. Cependant, par arrêt, du mardi 29 mai 1770, rendu en la grande chambre au rapport de M. Bèze de Lys, la cour a confirmé le testament olographe de la dame Ménage de Pressigny, qui était aveugle, etc." This decision of one of the courts did not change the mind of Denizart, since he commences by laying down the principle, that a blind man can make a will only in the nuncupative form. This single decision cannot hold against the authority of the great names who contend against the rule there laid down.

Lacombe is of the same opinion as Dénizart.

Pothier, Traité des Donations Testamentaires, chap. 1er, after speaking of the different formes of wills in France, of the olographic, mystic and nuncupative, says, in speaking of nuncupative testaments : Art. 4. " Lorsque le testateur est aveugle, il faut appeler un huitième témoin qui signe avec les autres·" Antoine Despeisses, sec. 1, des Personnes qui peuvent faire testament, p. 11 et 12, vol. 1, says : " L'aveugle peut faire un testament; mais parce qu'il y a plus de dangers qu'on ne commette fraude en les testaments des aveugles que de ceux qui ont la vue, on a requis à ce testament un plus grand nombre de témoins." Sallé, in his Esprit des Ordonnances de Louis XV. says : "Comme les personnes privées de l'usage de la vue sont plus exposées à être trompées que d'autres, on a toujours ajouté en leur faveur quelques formalités de surcroit."

I proceed to quote the opinions of the modern french commentators on the Code Napoléon. We must bear in mind that art. 1581 of our Code is copied from art. 970 of the french Code.

Delvincourt, vol. 2, p. 85, note 12, says: "Et comme celui qui ne sait ou ne peut lire ne peut davantage écrire, il ne pourra faire de testament olographe, et ne pourra donc tester que par acte public."

Grenier, Traité des Donations, vol. 1, p. 427, sec. 3, no. 258, says : " De là il suit qu'un aveugle qui aurait su lire, qui pourrait même écrire ou signer, ne peut point tester sous la forme du testament mystique. Cette observation a été judicieusement faite par Lacombe dans son commentaire de l'article 9, de l'ordonnance de 1735 ; la même décision résulte de ce que dit Ricard, partie 1, no. 1474. En sorte que l'aveugle peut seulement tester sous la forme du testament fait par acte public, à moins qu'avant sa cécité, il n'eut fait un testament olographe, qu'il ne fut pas dans son intention de changer. The same writer, (same vol. no. 281) adds : " J'ai eu occasion de dire dans cette seconde partie, au commencement de la section 3, que l'aveugle ne peut point tester sous la forme mystique, il ne le peut donc que par acte public." "Le caractère du testament olographe, est d'être fait par le testateur seul : or un aveugle, quelqu'habitude qu'il ait pu conserver de l'écriture, pourrait-il bien se flatter d'écrire son testament, de le dater et signer, de manière à ce qu'il n'y eut aucun des inconvéniens que cet état fait naturellement craindre, qu'on prévoit assez sans les détailler, et qui pourraient rendre le testament illisible et nul. Si on suppose qu'il se fasse aider et guider par un tiers, alors la possibilité des insinuations et des surprises ne se présente-t-elle pas à l'esprit ? et ne s'élève-t-il pas un doute légitime sur

la validité d'un testament fait dans une semblable circonstance? Où est cette garantie, si fortement exigée par la loi, de la certitude des volontés du testateur? Asssi Dénizart, avait-il d'abord posé en principe, qu'un aveugle ne pouvait tester que par testament public fait devant notaire. Il paraît que c'est un annotateur, qui a ajouté de suite la citation de l'arrêt de 1770. Les héritiers soutenaient avec force qu'une personne en état de cécité, n'avait pu faire un testament ologrape; et un arrêt isolé qui semble avoir jugé le contraire, peut-être par des circonstances inconnues (la cécité pouvait n'être pas complète) peut-il fixer les opinions sur un fait sur lequel le sentiment et la raison instruisent suffisamment? La prudence exige donc qu'une personne aveugle, prenne la seule mesure que la loi permette relativement à son état, afin d'assurer l'exécution de ses dernières volontés."

Duranton, vol. 9, no. 134, says : " Et comme ceux qui ne savent ou ne peuvent lire, ne peuvent, pareillement écrire, ils ne peuvent non plus faire un testament olographe." Again. at no. 136 : " Celui qui est privé de l'usage de la vue ne pouvant pas lire, il ne peut par conséquent tester en cette forme, ni dans la forme olographe ; mais l'affaiblissement de la vue n'est point la cécité, et si le testateur peut lire au moyen d'une loupe, cela suffit, quoiqu'il ne pût lire que lentement, et même avec difficulté. C'est au surplus un point de fait que les tribunaux jugeraient comme tel, d'après les éléments de la cause."

Merlin, Répert. verbo Testament, sect. 2. § 3, art. 3, quotes with approbation, Serres, Institutions du Droit Français, who says : " Les personnes incapables de lire, quand bien même elles auraient appris à former leur seing, doivent être mises au même rang que les aveugles, pouvant être exposées à la mauvaise foi de l'ecrivain et aux mêmes surprises qu'eux ; il ne doit leur être permis par conséquent de faire non plus qu'aux aveugles, qu'un testament public et noncupatif." " Cattalon (liv. 2. chap. 12,) rapporte deux arrêts du parlement de Toulouse, parfaitement conformes à cette doctrine."

Boileux and Poncelet, the latter now a distinguished professor of the law faculty in Paris, in their late work on the French Civil Code, hold the same doctrine. In commenting on art. 979, they say : " En terminant cette section, il n'est pas inutile d'exposer les causes d'incapacités physiques, qui ne permettent de tester que sous certaines formalités ou qui empêchent de tester sous quelque forme que ce soit. L'aveugle ne peut tester que par acte public, il est incapable de faire un testament olographe, puisqu'il ne peut écrire, ni un testament mystique, puisqu'au moment de l'acte de souscription, il ne peut s'assurer que l'acte présenté, est son testament."

Rogron. in his valuable notes on the French Civil Code, says on art. 977 : " Ou ne peuvent lire. Ils ne pourraient s'assurer si c'est bien leur volonté qui a été consignée par écrit; ces personnes ne peuvent faire de testaments que par acte public."

Bergier, who wrote before the Nap. Code, is the only writer of his time mentioned, who thinks that a blind man can make an olographic will. Does his name overbalance the names of Ricard, Lacombe, Denizart, Serres and others? And under the new Code, Vazeille, and perhaps one or two others, think that as blind persons are not expressly excluded, they can make their wills in the olographic form; "mais il faut avouer," says that writer, " que la faculté du testament olographe, par l'aveugle, présente de graves inconvéniens; c'est sûrement par oubli que le législateur ne l'a point interdite." Will this opinion of Vazeille, flanked by one or two writers, outweigh the opinions of such men as Merlin, Duranton, Grenier, Delvincourt, Boileux, Poncelet, Rogron and others?

But it has been said in argument, and this is the only reason given by Vazeille, that inasmuch as the law does not expressly forbid a blind man to make an olographic will, he has a right to do so. I admit the general rule, that incapacities are not to be presumed. But I contend that to all general rules there are exceptions. The spirit of the law must be looked into ; the legislator very often deals in generalities. The courts, in their wisdom and discretion, should interpret the law in such a manner as not to make it appear absurd. Hear what judge Martin himself says on that subject. (Bullard's discourse on his life and character.) " I remember that perhaps on more than one occasion, when reminded by counsel of that instruction of the Louisiana Code, which forbids the judge to disregard the words of a law under the pretext of pursuing its spirit, he (judge Martin) replied : certainly never under the pretext of pursuing its spirit, but if, in the sincere desire to ascertain the will of the lawgiver,

you discover that it would be violated by giving a literal interpretation to the words he has employed to express it, you are bound to give those words a reasonable interpretation, rather than that which corrodes the text and frustrates in truth the will of the legislator."

I will now show that Vazeille himself is of a different opinion in a case analogous as to the principle. Art. 980 of the french Civil Code, says : "Les témoins appelés pour être présents aux testaments, doivent être mâles, majeurs, régnicoles, et jouissant des droits civils." These qualities, are according to the french Code, the only ones required. A blind man therefore, who is mâle, majeur, regnicole, et jouissant de ses droits civils, can be a good witness to a will, according to the rule laid down by Vazeille, "que la loi n'interdisant pas le testament olographe aux aveugles, ils peuvent le faire."

But neither does the french law incapacitate, or interdict a blind man from being a witness to a will. And yet Vazeille, and almost all other writers have agreed on this point, "that a blind man cannot be a good witness to a will."

Hear what Coin Delisle, commenting (art. 980) on the french Code, says, No. 21 : "Voilà donc tout ce que contient le Code Civil sur les incapacités absolues? il ne s'est occupé que sous le rapport civil; il n'a rien dit des incapacités naturelles que le droit romain rangeait au nombre des incapacités proprement dites, en rejetant du nombre des témoins testamentaires, les aveugles, les sourds, les muets et les insensés; les auteurs admettent, presque tous, ces incapacités. Cependant les lois romaines sont abrogées, et il est de principe que les incapacités ne s'étendent pas. Aussi avons-nous dit ailleurs que ce n'étaient pas là de vraies incapacités, mais des impossibilités physiques, et que les questions sur ce genre de difficultés devaient être jugées suivant les circonstances. L'ancien doyen de la faculté de Paris, a dit avec un sens profond : 'Si le défaut physique est tel qu'il ait pu mettre le témoin dans l'impossibilité d'affirmer l'identité de la personne du testateur, ou de s'assurer de la vérité de ses dispositions et de leur conformité aux intentions des disposans, le témoignage doit être rejeté et le testament déclaré nul, si ce témoin était nécessaire pour compléter le nombre exigé par la loi.' Delvincourt, tome 2, note 3 sur la p. 86."

"Une règle (says Duranton) commune aux témoins, soit des testamens, soit par acte public, soit en la forme mystique, c'est qu'ils doivent être mâles, majeurs, sujets du roi, et jouissant des droits civils. Et comme il est nécessaire qu'ils voient la personne qui teste, afin de prévenir les fraudes, qu'ils l'entendent aussi dicter ses dispositions, et afin qu'ils puissent rendre témoignage des faits s'il y a lieu, il s'ensuit que l'aveugle, le sourd et le muet, qui ne savent pas écrire, ne peuvent être témoins aux testamens.'" Duranton, vol. 9, no. 204.

Toullier, vol. 5, no. 390, says : "La faculté d'être employé comme témoin dans les actes, est un droit civil dont ne peut être privé aucun français, qu'en vertu d'une disposition de la loi, ou d'un jugement rendu contre lui, lorsque d'ailleurs la nature ne lui a pas refusé les qualités nécessaires pour rendre un témoignage raisonnable et certain de ce qu'il a vu et entendu. Les incapacités des témoins viennent donc de la nature ou de la loi civile. Le Code ne s'est point occupé des incapacités naturelles, et s'en est rapporté sur ce point à la prudence du magistrat, qui n'a point à craindre de s'égarer, en prenant pour guides les jurisconsultes qui ont développé sur cette matière des principes dictés par la raison."

Grenier, vol. 1, no. 254, says : "Il peut se présenter encore des cas sur lesquels la loi ne s'est point expliquée, et dans lesquels le sort d'un testament pourrait être compromis, à raison de la qualité des témoins qui seraient appelés, quoiqu'ils eussent d'ailleurs les qualités requises par l'article 980, c'est à-dire qu'ils fussent mâles, majeurs, sujets de l'empereur, jouissant des droits civils. Il y a des personnes qui, par leur état physique, doivent être réputées dans l'impossibilité de rien comprendre et de rien attester, telles qu'un interdit, ce qui ne peut avoir lieu actuellement que pour cause d'imbécilité, de démence ou de fureur, un muet, un sourd-muet. On doit en dire autant d'un aveugle, qui, quoiqu'il ait pu entendre pourrait être surpris n'ayant pu voir ce qui se passait." Merlin, Repertoire, mot Témoin Instrum. : § 2, no. 3, 4. Duranton, no. 104. Dalloz, ch. 6, sect. 4, art. 5, § 4, no. 6. Poujol, no. 2, sur l'art. 974, contends for the same doctrine. We have said, in our original petition, that François Xavier Martin was physically incapacitated on account of blindness, from making a valid olographic will.

There are many other cases in which it has been decided in France, that a

man may possess all the qualities required in art. 980, that is to say, he may be mâle, majeur, regnicole et jouissant des droits civils, and yet not be a good witness to a testament. Thus, almost all the french commentators agree in saying, that a man who is not acquainted with the language in which an act is written, cannot be a good witness, and yet there is nothing in the french law that disqualifies him on that account. Toullier, vol. 5, no. 393. "Ceux qui n'entendent pas la langue du testateur, sont comparables aux sourds, et ne peuvent être témoins parce qu'ils ne peuvent comprendre ce qu'il dicte." (And in a note of that writer:) "Il est vrai que le Code ne dit point qu'il soit nécessaire que les témoins entendent la langue du testateur, mais la raison le dit, car s'ils ne l'entendent pas, s'ils ne comprennent pas le sens des dernières volontés du testateur, à mesure qu'il les dicte, ils ne peuvent ni attester que le testament a été écrit tel qu'il a été dicté, ni savoir qu'il l'a réellement été. Grenier, vol. 1, no. 225. Merlin, Repertoire, verbo Témoin Instrumentaire. Delvincourt, vol. 2, p. 213. Vazeille on art. 980, no. 26, Coin Delisle, art. 980, no. 26.

The same question was raised in Louisiana, and was decided in the same manner as in France, in the case of *Hebert's Heirs* v. *Hebert's Legatees*, 11 L. 361. There it was alleged that a will was null, because one of the witnesses did not understand the language in which it was written. It was contended on behalf of the defendants, that all persons are good witnesses to a will, except those who are expressly excluded by law. The court said : "But it is contended by defendants' counsel that, inasmuch as all persons who are by law incapable of being witnesses to testaments are specially enumerated in art. 1584 of the Louisiana Code, it follows necessarily, that all other persons whatever are competent witnesses for that purpose. In this opinion, we do not agree with the counsel.

"The legislature have manifested great solicitude on the subject of last wills and testaments, and endeavored, by every possible safeguard, to ensure their faithful execution. They have required that nuncupative wills, by public act, should be attested by three witnesses, and read in their presence to the testator. This wise precaution, and strongest barrier which the law interposes for the protection of the testators, would be vain and nugatory, if the witnesses were incompetent to the trust they were called to fulfil. Language is the vehicle of thought, and if the witnesses could not understand that in which the will was written, it is plain they would be in no better situation than the deaf, who are expressly declared incompetent by the law cited by the counsel. Eadem est ratio, eadem est lex. Louisiana Code, art. 1571." I have mentioned these cases as tending to establish the fact that there are incapacities, which, though not mentioned in the law, are not the less incapacities founded on reason and nature, and it is left in such cases to the prudence and wisdom of the magistrate to decide according to the circumstances.

It has been strongly contended for defendant, that under our Code a blind person could even make a mystic will. Art. 1579, C. C. The french text says : "ceux qui ne savent ou ne peuvent lire ;" the english text : "those who know not how, or are not able, to write." The word write, is an unintentional mistake of the person who translated the french into english. This art. 1579 is a literal copy of art. 978 of the Nap. Code. If we wish to go to a higher source we find the same thing in the french ordinance, and in the spanish and roman law. How could a blind man, who, according to them, is able to make a mystic will, be sure that the requirements of art. 1579 have been complied with? How does he know that the paper which he presents to the notary and witnesses, is really his will ? "Pour pouvoir faire un testament mystique (says Grenier vol. 1, no. 258,) il ne suffit pas d'avoir su lire ; il faut encore pouvoir lire. On sent aisément le motif de cette disposition. Celui qui lit peut, en dictant ses dispositions à un scribe, veiller à ce qu'elles soient fidèlement écrites, au lieu que celui qui ne peut lire n'a pas cette faculté, et dès lors la loi n'a aucune garantie que le papier qu'il présente comme contenant ses dernières volontés, les contient en effet." Merlin, Testament Mystique. Pothier, Donations testamentaires—du Testament Mystique. Delvincourt, v. 1. p. 252.

IV. We will now examine whether the testator *F. X. Martin* intended, in giving the whole of his fortune to his brother, to disinherit his other heirs, or whether it was not a device to avoid the payment of the tax of ten per cent to the State. It will be contended by the appellant that substitutions, or *fidei-commissa* prohibited by our laws, can never be implied ; they must

STATE
v.
MARTIN.

be expressed in the act itself, or at least must result from it as a necessary consequence. Therefore when the charge to receive for and return to another is not expressed in the act, or does not necessarily result from it, the disposition, even though it should contain a simulated donation, does not render the testament void, provided the real donee be capable of receiving from the donor.

Should we admit the truth of this proposition, it could not apply to the present case, as we contend that a *fidei-commissum* was made to evade a law allowing ten per cent to the treasury, and that the donees, who are foreigners, could not receive their portion without committing a fraud against the fisc. But far from assenting to such a doctrine, we say that according to art. 1507 of our Code, all kinds of substitutions, or *fidei-commissa*, are strictly prohibited—it does not matter whether the real donee could receive, or not, directly from the donor. The provisions of our Code are, on that subject, much more rigorous than those of the french Code. Our Supreme Court have in several decisions lately rendered so held, and it is now a matter no longer to be questioned.

In the case of *Tournoir* v. *Tournoir*, 12 La. p. 23, the court said : "The law prohibits all *fidei-commissa* even in favor of persons capable of receiving. The Civil Code provides, that when, to prevent fraud, or from any other motive of public good, the law declares certain acts void, its provisions are not to be dispensed with on the ground that the particular act in question has been proved not to be fraudulent, or not to be contrary to the public good." The same principles were re-affirmed in *Rachal* v. *Rachal*, 1 Rob. 116. *Liautaud* v. *Baptiste*, 3 Ib. 454. *Compton* v. *Prescott*, 12, Ib. 74.

To show the existence of a *fidei-commissum*, all kinds of proof are admitted, litteral, testimonial and presumptive, especially in a case like this, where it is alleged that a prohibitory law has been violated, and a fraud committed on the fisc. " Presumptions" (says the Code, art. 2267,) " not established by law, are left to the judgment and discretion of the judge, who ought to admit none, but weighty, precise, and consistent presumptions, and only in cases where the law admits testimonial proof, unless the act be attacked *on* the ground of fraud and deceit." In such cases, all presumptions, even of the lightest kind, are admitted. When a man intends to commit a fraudulent act, or to violate a prohibitory law, he uses precautions of all kinds not to be discovered ; he covers, as with a thick veil, the object he has in view, and all his actions are calculated to induce a contrary belief to what his real intentions are. And it is in order to discover the true intent and meaning of parties, that the lawgiver has permitted all kinds of proof. Without this permission, how easy it would be to commit frauds ! And how difficult to prove them, if we were to be held to strict rules of evidence, as in ordinary cases. *Cécile* v. *St. Denis*, 4. La. p. 184. " Where fraud is charged, direct and positive evidence is seldom to be obtained. Circumstantial evidence is commonly all that can be had, and every circumstance becomes material, to ferret out the fraud." The whole doctrine on this subject, is fully explained, in these few words. See also, *Reels* v. *Knight*, 8 Mart. N. S., p. 268.

It is not even necessary for us, to show that there was an agreement made between the testator and the universal legatee. The intention of the testator, when it appears either by litteral, testimonial or presumptive proof, is sufficient to cause the nullity of the act to be pronounced. This is the opinion of the most eminent law writers.

Chardon, chap. 2, art. 1, in treating of the interposition des personnes dans les libéralités, nos. 16, 17, 18, 19 and 20, says: " Or, nos auteurs enseignent unanimement, qu'il n'est pas nécessaire de prouver le pacte : qu'il suffit que de fortes présomptions persuadent que telle a été la volonté du donateur en nommant son donataire, et de celui-ci en acceptant le don. Ceux qui prêtent leur nom à ces fidéicommis tacites, dit Domat, p. 524, soit qu'ils s'engagent par écrit ou verbalement, ou en quelque manière que ce soit, s'ils reçoivent à dessein de rendre aux personnes à qui le testateur ne pouvait donner, sont considérees par la loi, comme s'ils derobaient, etc. Les autres auteurs vont plus loin : ils n'exigent que la preuve de l'intention du donateur. Ricard, part. 1, chap. 3, sect. 16, no. 749, ajoute à la théorie les exemples qui la fortifient: " Nous avons des exemples........ auxquels les conjectures du tacite fidéicommis se sont trouvées si violentes, que la cour s'en est contentée, pour déclarer la donation nulle, sans qu'il y eut preuve formelle de la promesse de rendre la chose donnée par le donataire à la personne prohibée. C'est ce qui

a été jugé par un arrêt du 5 décembre, 1644, par lequel le testament fait par une jeune demoiselle, pendant l'année de son noviciat en religion, au profit du frère de son tuteur, qu'elle n'avait jamais connu, et qui, n'ayant pas d'enfans, avait, pour lui succéder, son frère tuteur, fut déclare nul." Il cite également l'arret du 29 avril 1653, dont nous donnerons les details ci-après, p. 162. Il rappelle même, comme conséquent avec les premiers, un troisième arrêt, du 18 mars 1652, qui a rejeté la demande des héritiers; en faisant observer que ce rejet n'a été prononce, que parce que les conjectures du tacite fidéicommis alléguées par les héritiers de la testatrice, ne se trouvèrent pas suffisantes.

" Deux autres exemples sont donnés par Furgole, no. 224. " Il y a dans le nouveau journal des Audiences, tom. 5, liv. 8, un arrêt du 17 août 1708, qui décide qu'il suffit qu'il y ait preuve que le mari, en léguant une somme à un tiers, ait eu intention que le legs fût restitué à sa femme incapable de recevoir des libéralités de son mari, suivant l'article 282 de la Coutume de Paris, pour déclarer le legs nul, comme un avantage indirect entre conjoints, quoiqu'il n'y ait point de preuve de la convention du testateur avec le légataire; et par un arrêt du 2 juillet 1708, rapporté au même endroit, chap. 26, il a été jugé que, pour prouver un fidéicommis, ou avantage indirect entre mari et femme, il n'est pas nécessaire qu'il y ait preuve par écrit du fidéicommis, ni même de présomption qu'il y avait convention entre le testateur et le légataire; il suffit qu'il y ait des présomptions violentes de l'intention du testateur."

" Bourjon, dans son Droit commun de la France, tom. 2, p. 73, art. 10, professe la même doctrine; et cite aussi l'arrêt de 1708, dont les détails répandront quelque lumière sur ce que cette matière peut avoir d'abstrait. Le sieur de Thiersault, conseiller au grand conseil, s'était marié à soixante-onze ans, avec une très jeune demoiselle. Il voulut ajouter aux avantages qu'il lui avait faits par leur contrat de mariage, une rente de 701 fr. sur l'état qui lui avait été reconstituée en 1700, pour la réduction au denier vingt, d'une rente de 708 fr. qui lui appartenait en propre. Pour cela, il fit un testament, par lequel il se borna à léguer au sieur de Serre, son ami, une pension viagère de 200 fr., et un diamant de 50 pistoles; puis par un codicile, il lui légua sa rente de 701 fr. au capital de 14,020 fr.; mais seulement au cas où elle serait contestée à sa femme, déclarant qu'il croyait qu'elle lui appartenait par leur contrat de mariage, tant à cause de la donation de meubles et acquêts qu'il contenait, qu'à cause d'un arrêt du conseil qui déclarait acquêts les rentes provenant de commutation; 'n'entendant, ajoutait-il, ne diminuer en rien les droits de mon épouse, et ne léguant la dite rente audit sieur de Serre qu'au dit cas.' Lors de son inventaire on trouva, dans la liasse de papiers concernant cette rente, un mémoire fort long et écrit en entier de sa main, dans lequel il exposait que Titius avait légué à un de ses amis une rente viagère de 200 fr. et 1,000 fr.; qu'il lui avait dit en conversation qu'il lui laisserait encore une rente de 700 fr.; qu'il aurait désiré la léguer à Sempronia, sa femme, si la coutume ne s'y opposait; qu'il l'en laisse le maître et ne l'oblige en rien; qu'il peut affirmer n'être engagé ni de parole, ni par écrit, d'aucun fidéicommis, son intention étant cependant qu'il la restitue volontairement à Sempronia.

" Ce mémoire contenait ensuite une explication de l'article 282 de la Coutume de Paris, des détails sur la famille et les biens de Titius, et sur le désir qu'il avait eu de laisser à sa femme les moyens de soutenir sa qualité. Le sieur de Serre, avait, en 1705, formé demande contre la veuve, en paiement des deux legs contenus au premier testament, sans faire mention ni du second, ni de la rente de 701 fr.; mais une instance s'étant engagée entre la veuve et les héritiers, réclamant cette rente, il intervint et la revendiqua. Le 15 juillet 1706, une sentence des requêtes du Palais condamna les héritiers à lui payer tous ses legs, même celui de la rente de 701 fr., en affirmant qu'il n'avait aucun dessein de la rendre à la dame de Thiersault, et qu'il n'y avait pas, entre elle et lui, de convention de partager ce legs entr'eux. Le sieur de Serre, malgré que les héritiers se fussent retirés, fut admis au serment et le prêta. Les héritiers ayant appelé au parlement, cette affirmation admise par les juges de première instance, contre des parties qui, loin d'y avoir consenti, s'étaient retirées, fut comptée pour rien, et au fond le legs de la rente fut annulé; parceque, dit l'arrêtiste, le mari, en la léguant, avait eu l'intention qu'elle fût restituée à sa femme, quoiqu'il n'y eût pas de preuve de la convention du testateur avec le légataire.

Rien ne peut être plus conforme aux premières notions du droit, que cette décision. Un légataire ne peut être propriétaire légitime de la chose léguée,

STATE
v.
MARTIN.

que quand la volonté du testateur a été qu'il le devînt ; du moment donc qu'il apparaît une volonté contraire, la chose léguée ne peut rester légitimement, ni à celui que le testateur a nommé, parcequ'il n'a pas voulu la lui donner, ni à celui qu'il avait en vue, parceque la loi s'y oppose. Loin que le Code puisse autoriser un changement de jurisprudence, on peut conclure de la règle écrite dans l'art. 911, qu'il l'a très positivement confirmée. ' Toute disposition au profit de l'incapable sera nulle, soit qu'on la déguise sous la forme d'un contrat onéreux, soit qu'on la fasse sous le nom de personne interposée.' Ce texte, comme on le voit, n'exige la preuve ni de pacte ni de promesse ; mais seulement que le don soit destiné à l'incapable, quoique adressé à un autre. Tel est dans cette action le point principal qu'il faut éclaircir.

"Il en est un second qui ne doit pas être négligé, et que les auteurs ont sagement prévu. Il peut arriver que pour autoriser le prête-nom à déclarer à la justice qu'il entend garder l'objet donné, il ait été convenu directement, ou par ces voies obliques dont le sieur Thiersault a donné l'idée, entre le donateur et son confident, que celui-ci resterait réellement propriétaire de cet objet, mais en donnerait la valeur à la personne incapable. Il est evident que la fraude serait absolument la même, et que dans ce cas, comme l'enseigne Pothier, dans son Traité des Donations entre Mari et Femme, no. 98, la chose destinée à l'incapable devrait être remise aux héritiers du donateur.

"Il peut se faire encore que le donataire nommé le soit sérieusement pour une partie, et que le surplus seulement doive être remis par lui à l'incapable ; ce qui n'en serait pas moins pour cette portion une infraction à la loi. C'est donc à l'éclaircissement de ces faits divers que doit tendre la preuve du *fidéi-commis*.

Tous les genres de preuves, conséquemment celle vocale, sont admissibles ; nous avons déjà si souvent dit et établi que, quand il s'agit de faire connaître à la justice la violation frauduleuse d'une prohibition d'ordre public, cette preuve ne peut pas être refusée, que nous nous serions abstenu d'une démonstration particulière pour l'interposition de personne, si en 1819 on n'avait pas soutenu le contraire, avec beaucoup d'éclat, devant la cour royale de Paris.".

See also, Merlin, Rép. de Jur. *Verbo Fidei-commis tacite,* who holds the same doctrine, and cites the same, and other cases. The provisions of our Code on *fidei-commissa,* are still more rigorous than those of the french Code. What Chardon therefore says, applies with still greater force to a case arising under own Code, where all kinds of *fidei-commissa* are prohibited, even in favor of persons capable of receiving.

It remains then to show, what was the intention of *F. X. Martin,* in making his brother *P. B. Martin* his sole heir. But we will go farther, and establish satisfactorily, that the object the testator had in view was well known both to the universel legatee and to the apparently disinherited heirs, and we will also show what were and are the intentions of the said legatee. Interrogatories were propounded to *P. B. Martin,* the universal legatee. Being asked ; whether he does not consider himself morally and in duty bound to his late brother, to transmit a portion of said fortune, to his other heirs or some other persons to him mentioned ? He answers : " Je ne me considére aucun autre devoir, que de faire ce que mon cœur me dira. Je prendrai dans mon cœur ce que je ferai un jour, ou ce que je ne ferai pas." And again being asked : Whether it was not his intention to transmit, give or remit, now, or at a future time, or at his death, the property left to him by his brother, or part of the same to his other heirs, or some of his heirs ? He says : " Je n'ai là-dessus d'autre intention que celle de disposer de ma fortune selon ma volonté. Là-dessus je dis que je ne me crois pas obligé de faire, dans ce moment-ci, un testament public. Je ferai mon testament comme je l'entendrai."

To the question, whether it is not his intention to transmit, give or remit now, or at a future time to the other heirs ? His only reply is, that he will dispose of his fortune as he pleases, and that he is not obliged to make his will. We must therefore take, as confessed, the facts which we sought to discover, and concerning which he refused to answer. Art. 349, C. P. provides that: "The party interrogated on facts and articles, is bound to answer under oath, and categorically, each of the questions put to him, unless he cannot do so without confessing himself guilty of some crime. Except In the above case, if the party interrogated refuse or neglect to answer on oath to all the questions put to him, the facts concerning which he shall have so refused, or neglected to answer, shall be taken for confessed." This fact is now judicicially admitted and

taken for confessed, that *P. B.* M*artin* intends to transmit, give and remit, now, or at a future time, the property left to him by his brother, or part of the same, to the other heirs. We have there the clearest proof of the intention of the universal legatee.

Two cases having a good deal of analogy with this, and cited by Chardon, in his Traité de la Fraude, chap, 2, nos. 28, 29 and 30, establish the true principles by which we should be guided, in arriving at a correct decision of the matter.

I give them at length, with the judicious observations of Chardon.

" Deux arrêts solennels du parlement de Paris, des 24 janvier et 11 février 1716, qui ont ordonné cette dernière affirmation, et les sentiments uniformes des jurisconsultes qui ont écrit depuis sur cette matière et applaudi à ces décisions, semblaient avoir fixé ce point important de jurisprudence. Mais M. Grenier, dans son Traité des Donations, ayant émis une opinion tout-a-fait contraire, la question mérite de notre part un examen d'autant plus sérieux, que nous sommes très éloigné de partager son sentiment. Suivant lui, vouloir que le donataire affirme que même au moment où il affirme, il n'a pas l'intention de remettre le don à un incapable, c'est se permettre une inquisition odieuse: il ajoute que le donataire qui n'a pas promis de rendre à l'incapable et le déclare, n'est engagé ni par une obligation civile, ni par une obligation naturelle, et que s'il remet la chose donnée à l'incapable, celui-là la tient de lui et non du disposant.

" D'abord, il est difficile d'apercevoir une odieuse inquisition dans les efforts que feraient les magistrats pour connaître la vérité dans une telle conjoncture: D'une part, leur but est louable, puisqu'il ne s'agit que de savoir si une prohibition qui tient à l'ordre public a été enfreinte ; de l'autre, le procédé n'a rien d'inquisitorial, puisque la délation du serment rend celui à qui il est déféré maître de sa cause. En second lieu, ou il affirme qu'il entend conserver, et dans ce cas, la demande qui lui a été faite n'a rien eu d'offensant pour lui; ou il refuse, et ce refus ne permet plus de douter que son intention est de faire la remise du don à l'incapable. Or, nous avons établi, no. 24 et suivans, d'après Domat, Ricard, Furgole, Pothier, et les nombreux arrêts par eux rapportés, qu'en quelque temps que se fasse la remise, ce fait seul prouve suffisamment l'interposition, et il faut en conclure que la disposition dans laquelle est le donataire de la faire, décèle également cette interposition. Effectivement, pour que cette remise déjà faite, ou qui va l'être, ne fût pas reputée la consommation de la fraude, il faudrait qu'on pût la considérer comme une libéralité pure, à laquelle le donataire se serait porté de son mouvement propre, sans aucune autre impulsion, comme on la definit en droit, nullo jure cogente facta : or, cette libéralité pure ne se présume jamais, et doit être prouvée, surtout dans un cas où la fraude est redoutée. La conséquence naturelle de la remise est donc que le donataire a été chargé de la faire, ou au moins qu'il présume que telle a été l'intention du disposant ; et il suffit qu'il se détermine à la faire par cette présomption, pour qu'on soit persuadé qu'en la faisant, il ne pense pas à faire un don, mais à acquitter une dette. Il peut se méprendre, dit M. Grenier; les hommes sont assez clairvoyans sur leurs intéréts, pour qu'on ne puisse pas imputer à méprise la crainte de conserver un accroissement de fortune, et le désir de la faire passer dans d'autres mains. C'est, d'ailleurs, une hypothèse qui ne peut pas se vérifier : lorsque celui à qui un don est adressé n'ose plus le conserver, et croit, pour l'acquit de sa conscience, devoir le remettre à un autre ; qui pourrait faire connaître sa méprise ? le défunt, et il a emporté son secret. Les motifs de M. Grenier, pour faire abandonner cette jurisprudence, sont donc fort légers ; et nous croyons en apercevoir de très graves pour la maintenir. Les tribunaux sont les gardiens des prohibitions : et c'est du parti qu'ils prendront sur le serment qui les concerne, que dépendra le respect ou la dérision de ces prohibitions. Nous le répétons, dans ce genre de fraude, le remède est dans le mal même. Celui à qui le don est confié a été choisi comme homme loyal; s'il a les qualités qui l'ont fait choisir, et qu'il soit pressé de questions autant que les circonstances l'exigeront, la vérité l'emportera, surtout quand pour être fidèle à un dangereux ami, il faudra s'exposer à être infidéle à la société, à la religion, et à l'honneur. Pour remporter cette victoire, il faut donc que la formule du serment embrasse tous les cas possibles, tels que nous les avons prévus, no. 17; il faut que le donataire soupçonné affirme qu'il n'est pas chargé de remettre la chose donnée à un incapable : qu'il n'a pas l'intention de la lui remettre, ni en nature, ni en équivalent, ni en tout, ni en partie, ni actuellement, ni à l'avenir.

" *C'est pour enchainer ainsi le fidéi-commis sous toutes les formes que la malice*

ingénieuse des hommes pourrait lui donner, qu'a été imaginée la formule adop-tée, en 1716, par le parlement de Paris ; les détails des espèces dans lesquel-les sont intervenus ses arrêts, achèveront de justifier sa jurisprudence.  La Princesse d'Isenghien avait laissé son immense fortune à l'abbé de Thou, insti-tué par elle son légataire universel ; aucun motif raisonnable n'expliquait cette largesse démesurée envers un abbé ; et beaucoup de probabilités désignaient le prince, son mari, comme le véritable objet de sa disposition.  Les héritiers de la princesse en demandèrent la nullité.  L'avocat général de Lamoignon, pour pénétrer dans tous les plis de la conscience de l'abbé de Thou, proposa de lui faire la délivrance du legs, mais à la charge par lui d'affirmer, 'qu'au moment même de son serment, il n'avait pas intention de remettre le legs à personne prohibée, directement ni indirectement, ni en tout, ni en partie.'  Ses conclu-sions furent adoptées complètement par l'arrêt du 24 janvier 1716.

" Le mois suivant, une cause absolument semblable en droit, quoique beau-coup moins importante, se présenta.  Charles Seuret, menuisier à Nesle, ayant des enfants de sa fille d'un premier lit, et marié en secondes noces avec Mar-guerite Desmarets, fit, en 1711, son testament ; légua 50 fr. seulement à cha-cun de ses petits enfants, et le surplus de ses biens au sieur Soucanier, chanoine de Nesle.  Sur la demande en délivrance de ce dernier, la mère des mineurs soutint que le sieur Soucanier était interposé pour faire parvenir les biens de Seuret à sa seconde femme.  Le bailli de Nesle, par une première sentence, ordonna que le sieur Soucanier affirmerait que le legs était sérieux et à son pro-fit, qu'il n'avait fait aucun pacte à ce sujet, ni avec le testateur, ni avec sa veuve ; et qu'en acceptant le legs, il n'avait pas eu l'intention de le remettre à la veuve.  Le sieur Soucanier affirma qu'il n'avait fait aucun pacte avec le testateur ; que la veuve lui avait dit n'avoir pas connaissance du legs ; mais il refusa son serment sur tout le surplus de la formule, en déclarant qu'il était maitre de son bien et pouvait en disposer à son gré.  (The precise declaration made by *P. B. Mar-tin.*)  Une seconde sentence ordonna qu'il se conformerait à la première, et que, faute de ce faire à l'audience suivante, il serait débouté de sa demande.  Disposé à consommer sa fraude à la loi, si son affirmation équivoque pouvait être admise, mais non pas à se parjurer, s'il fallait donner à cette affirmation toute l'étendue exigée, il appela au parlement.  Le même avocat général soutint le bien jugé des sentences du bailli de Nesle.  S'appercevant même que la for-mule de ce premier juge était moins complète que celle prescrite à l'abbé de Thou, il conclut à ce que le sieur Soucanier fût assujetti au même serment, quoique les parties n'y eussent pas conclu, mais attendu qu'elles étaient mineu-res.  L'arrêt fut également conforme à son réquisitoire ; et l'on voulut, disent les auteurs qui rapportent ces arrêts, rendre la jurisprudence uniforme.  Ce second arrêt est du 11 février 1716.

" Veut-on une nouvelle preuve des effets salutaires de cette jurisprudence, on la trouvera dans un trait fort honorable pour l'ordre des avocats, que rap-porte Bannelier, jurisconsulte très estimé du parlement de Bourgogne, dans ses notes sur les Traités de Droit Français, à l'usage de ce Parlement, note 573.  Une dame Meignien, de Dijon, ayant deux enfans, un fils et une fille, avait marié sa fille au sieur Guy de Labergemont, conseiller, avec promesse d'égalité entre le frère et la sœur.  Par son testament, elle les institua effective-ment ses héritiers par égale portion ; mais en léguant à M. Melenet, avocat au parlement de la même ville, une somme de 80,000 fr., à prélever sur sa succes-sion.  M. Melenet avait été le conseil de cette dame, pendant longues années, sans en avoir rien reçu, et si le legs eût été modique, dit Bannelier, son con-frère et son ami, il eût pu le croire à lui ; mais l'importance de la somme lui donna la persuasion qu'il était destiné au fils de la testatrice, pour rendre vaine la promesse d'égalité.  Ne sachant pas, ce sont les expressions de Bannelier, se porter à aucune contravention soit aux lois soit aux contrats, il répudia le legs en entier. Ce trait de délicatesse et de respect pour la loi, console un peu de tous ceux en sens contraire que nous sommes obligé de retracer à chaque pas dans ce traité ; et il est, il faut le reconnaitre, la plus ferme critique qu'on puisse faire du système de tolérance de M. Grenier.  M. Melenet n'avait fait ni pacte, ni pro-messe ; il ignorait absolument les intentions de la dame Meignien ; mais il ne se fit pas d'illusion ; il ne voulut pas prendre le legs pour lui, persuadé que l'inten-tion de la testatrice n' était pas de l'en gratifier ; il ne voulut pas accepter pour le remettre au fils, parce qu'il sentait qu'en faisant cette remise, il n'aurait pas l'esprit de bienveillance et de générosité qui constitue la libéralité, et ne ferait

que se rendre complice de la fraude conçue par la dame Meignien ; il ne craignait pas de se meprendre sur son mouvement de délicatesse, comme M. Grenier le redoute ; il ne l'éprouva que pour céder à l'impulsion qu'il en reçut, en homme d'honneur, ami des lois. Sans chercher à diminuer le mérite de cette action, ne peut-on pas présumer que la sévérité avec laquelle M. Melenet se jugea lui-même, ne fût que la conséquence de celle dont le parlement de Paris venait de donner l'exemple quelques années auparavant ? Ce qui nous suggère cette réflexion, c'est que Bannelier ne rapporte cette anecdote qu'à l'occasion des deux arrêts de 1716.

" Enfin l'opinion fondée par ces arrêts est devenue, pendant un siècle et plus, la doctrine universelle. M. Grenier ne cite que Furgole et Pothier,pour l'avoir enseignée, ce qui pourrait déjà paraître déterminant ; mais il faut y ajouter les deux célèbres avocats généraux, de Lamoignon et Joly de Fleury, sur les conclusions desquels ces arrêts ont éte rendus ; Bannelier dans sa note 573 ; Roussaud-Lacombe dans sa Jurisprudence Civile, au mot Avantage Indirect, s. 1, no. 2; Dénisart au mot *Fidéi-commis;* et MM. Camus et Bayard au même mot, dans le nouveau Dénisart. Tous ces auteurs en font une règle élémentaire ; et nous ne connaissons ni un auteur, ni un arrêt qu'on puisse leur opposer. Nous ne craindrons pas de le répéter : si le sentiment de M. Grenier obtenait la préférence, le procédé de la princesse d'Isenghien, du menuisier de Nesle, et de la dame Meignien deviendrait familier, et les lois prohibitives seraient audacieusement méprisées."

The deceased intended to appoint his brother his universal legatee, to deprive the State of the ten per cent allowed to it by the law of 1842, without however intending to disinherit his other heirs. In 1828, the legislature of Louisiana passed a law similar in all respects to the law of 1842, creating a tax of ten per cent on all sums of money or property, belonging to a succession opened in this State, and going to foreigners not domiciled in Louisiana. Soon after this law was passed, Judge *Martin* sent for his brother *P. B. Martin,* for the express purpose of evading that law, as he often declared to his late colleagues on the bench, Judges *Morphy* and *Simon.* His brother, *P. B. Martin,* left France in accordance with his instructions, and came to this country, previously to the year 1830. We discover this fact in the testimony of *Grailhe,* who says, that he became acquainted with *P. B. Martin* at the commencement of the year 1830. The statute of 1828 was repealed in 1830 ; and soon afterwards, we find that *P. B. Martin,* being no longer wanted to accomplish the object Judge *Martin* had in view, returned to his native country. But in 1836, the same law was again revived (see Acts of 1836, p. 146), and we again find *P. B. Martin,* the defendant, returning to this country at the request of his brother, in 1836 or 1837 (*Grima's* testimony). This law of 1836 was declared, in May, 1838, by the Supreme Court, not obligatory, it not having received the approbation of the governor. *Clayton's Heirs v. Attorney General,*12 La. 350. Judge *Morphy* says that Judge *Martin* told him, some time after the arrival of his brother in this country, that he had induced his brother to come and reside here, and intended to appoint him his universal legatee, stating that, in this way, his estate would not be subject to the tax; and that he has often heard judge *Martin* complain of the ten per cent tax ; he often told him, that as he could not give any property to his relatives, who were not here, without subjecting his estate to this tax, he would leave it all to his brother. Judge *Simon* also tells us, that he and Judge *Martin* had many conversations about his succession ; when Judge *Martin* said, that he would leave his estate to his brother, as then it would not be subject to the tax, and that was his main object in calling his brother to this country. If it be true that Judge *Martin* really intended to leave the whole of his fortune to his brother, *P. B. Martin,* why the great uneasiness he manifested about the passage of the law of 1842 ? *Greiner* says, that when the tax of 1842 was before the legislature, Judge *Martin* asked him frequently about it, and as to the prospect of its passing, and was apprehensive it would pass. He said that it was an unjust law, only known in Louisiana, and appeared to be uneasy about it. He also said that it was a very foolish law. Again, we hear him on several occasions, stating that the law of 1842 might be easily evaded, by testamentary dispositions. (See testimony of *Bullard, Morphy,* and *Simon.*) And in what way has he sought to evade that law ? By testamentary disposition ! Judge *Martin* was very fond of all his relatives; he always spoke highly and favorably of them. *Greiner* says that Judge *Martin* had a strong regard for

87

STATE
v.
MARTIN.

his relatives, and never heard him say any thing against them. *Curry* says that Judge *Martin* always spoke kindly of his family. Judge *Bullard* believes that he was on good terms, with his relatives in France. Can we then reasonably suppose that a man, who always appeared so very fond of his relatives, at the very moment too of going to meet them in his native country, should have really had the intention of disinheriting them? Can it be believed, that he then intended to disinherit his nephews and nieces, for whom he had a great regard and affection. This will was made on the eve of his departure for France. When Judge *Martin* returned, he often spoke in high terms of his relatives; they had travelled with him. And yet he did not change his will! Can any one believe, that it was because his relatives did not come to this country. that he disinherited them? This has been contended for by the counsel for the defendant. But, if this be true, how is it that he made no distinction between them, and his niece, *A. B. Martin,* who left country, friends and every thing dear to her, to come here and take care of her uncle in his old age.

*Grima,* for the appellant.

*Mazureau,* on the same side. "Celui qui amasse une grande fortune, sème des procès qui ger eront après sa mort." Cette sentence d'un philosophe indien, si je ne me trompe, n'a jamais empêché certains hommes dans aucun pays du monde civilisé, ancien ou nouveau, d'accumuler, pour ains dire, tous les jours de leur vie, des richesses dont ils ne savaient jouir qu'à leur manière—en les contemplant. Mais l'expérience a souvent prouvé qu'elle était vraiment juste; et le procès actuel en est un exemple.

*François Xavier Martin,* artisan de sa propre fortune, arrivé dans sa jeunesse aux Etats-Unis, était un de ces hommes comme on n'en voit peut-être pas beaucoup aujourd'hui, pour qui l'étude, un travail opiniâtre, et l'exercice constant de la faculté pensante, étaient autant de besoins de première nécessité. Deux passions semblaient le dominer : celle de la célébrité comme savant et profond juriste, et celle des richesses. Sa vie extérieure était, en quelque sorte, celle d'un philosophe revenu du toutes les vanités mondaines. Et, dans son intérieur, le plus souvent seul avec lui-même, il développait avec une sagesse toute particulière, les ressources que lui créait son propre génie, soit pour étendre sa réputation comme légiste et magistrat, soit pour augmenter le trésor qu'il avait amassé par son travail et son économie. Il fut trente ans juge de la Cour Suprême de notre Etat, et il en était le président lorsque l'organisation judiciaire voulue par notre constitution nouvelle le fit descendre de son siège. Trente ans, son oreille fut caressé des témoignages les plus flatteurs d'une très haute considération, et comme savant et comme juge intègre et incorruptible. Il est descendu dans la tombe, escorté par un nombreux convoi, composé de ce que notre cité renferme de plus respectable. Mais, en rendant sa dépouille mortelle à la terre, notre mère commune, il a laissé un testament par lequel il a disposé, en faveur de son frère, d'une fortune de près de quatre cents mille piastres! Et ce juge, ce président de notre Cour Suprême, célèbre par ses capacités intellectuelles, par une judiciaire distinguée ; par des lumieres d'un ordre supérieur ; qui a pu, pendant trente ans, durant les neuf ou dix dernières desquelles il avait perdu l'usage de la vue, rédiger, rendre et prononcer des décisions, des sentences que beaucoup de gens considéraient comme autant d'oracles, n'a pas pu échapper à la sévérité de la sentence du philosophe indien! Sa mort a donné naissance à un procès, et dans ce procès, fait au nom de l'Etat, il est représenté comme ayant été physiquement incapable de faire un testament olographe ; et on en demande l'annulation! Une pétition supplémentaire est présentée, dans laquelle on reconnait manifestement que cette prétendue incapacité n'était que l'effet d'une imagination échauffée par l'envie d'obtenir au moins quelque lambeau de son opulente succession ; et dans laquelle, voulant arriver plus sûrement à ce but, on l'accuse de n'avoir fait par son testament qu'un *fidéi-commis* prohibé par notre Code.

I. Le premier pas dans ce procès a donc été la présentation de la pétition, introduisant l'action en nullité du testament olographe. Deux allégations sont faites dans cette pétition. L'une, qui est la seule base de l'action, porte que le testament dont il s'agit est nul et ne peut produire aucun effet, attendu que, lorsqu'il a été fait, *François Xavier Martin* était physiquement incapable de le faire, étant aveugle. La seconde que sa succession passe à des héritiers domiciliés hors de cet Etat et de tout Etat et Territoire des Etats-Unis.

Hé bien! sa succession ne pouvait passer à ceux que l'on dit ses héritiers domi-

ciliés hors des Etats-Unis, qu'autant que le testament, instituant un légataire universel, serait annulé. Alors et alors seulement ces héritiers succédaient ab intestat au défunt; jusque là ils n'avaient rien à prétendre, ils n'étaient rien. Je ne prétends cependant pas dire que ces étrangers, étaient sans qualité pour agir. Mais eux seuls avaient une action—c'est du moins ce que je crois pouvoir démontrer. J'y procéderai dans un moment. En attendant je reprends la pétition que l'Etat a présentée, ou qu'on a présentée en son nom; et je me demande comment les organes de l'Etat ont pu demander l'annulation du testament, sur le seul fondement de l'incapacité physique à sa date. N'était-ce pas agir directement et principalement dans l'intérêt des prétendus héritiers étrangers, et leur ouvrir la voie afin de les rendre habiles à mettre la main sur la riche succession du testateur, et de la transporter chez eux, hors de notre juridiction, après l'avoir convertie en piastres? L'Etat de la Louisiane avait-il intérêt à ce que cela se fît? Et remarquons-le bien; c'était l'Etat que ses organes employaient pour faire tous les frais de cette singulière entreprise, au profit de citoyens ou sujets d'une nation, amie il est vrai, mais étrangère. Ce n'est pas tout: conçoit-on que l'avocat général et ses collègues aient poursuivi, contre *Paul B. Martin*, et l'annulation du testament, se fondant sur l'incapacité physique alléguée par eux, et le payement des $39,608? Employerai je la forme dubitative pour poser et résoudre une question qui est, peut-être, plus sérieuse qu'elle ne me semble l'être, et que voici: Le testament étant annulé, comme on le demandait, n'en résultait-il pas que *Paul B. Martin*, qui n'était quelque chose que par lui, n'était plus rien, aussitôt la nullité prononcée? Que l'avocat général veuille prendre la peine de décider cette petite question, je lui en serai vraiment obligé. En attendant je dirai que, sauf meilleur avis, il me paraît on ne peut plus raisonnable de résoudre cette question par l'affirmative. Si cette conséquence est juste et irréfutable, nous dira-t-on comment *Paul B. Martin* pouvait être condamné au payement des $39,608 demandées? Avec quoi aurait-il dû les payer? Avec les biens ou fonds de la succession? Mais le testament étant nul, il n'avait aucun droit de disposer, ni de ces biens, ni d'aucune partie de ces biens, pour payer cette réclamation ou aucune autre.

L'Etat n'avait aucune action, aucun droit de demander l'annulation du testament, sur le fondement de la cécité alléguée. Tant que le testament n'était pas annulé, l'Etat n'avait rien à réclamer contre qui que ce fût; car ce ne pouvait être qu'après la nullité prononcée, que la succession s'ouvrait en faveur d'héritiers étrangers, et ce ab intestat; même après la nullité prononcée, l'appelant cessant d'avoir qualité, puisqu'il n'est rien qu'autant que ce testament soit maintenu, l'Etat n'aurait pas pu lui demander le payement de la taxe, à moins qu'il n'eût été nommé curateur ou administrateur de la succession ab intestat; et à plus forte raison, avant cette nullité déclarée, par jugement en dernier ressort, l'appelant ne pouvait ni être poursuivi, ni se défendre, sur le chef de cette demande de payement. Nous référons la cour à Merlin, Répertoire, *Verbo* Nullité, sec. 2 et 3. Toullier, vol. 7, no. 553, jusqu'à 564. 6 Mart. N. S. 362 à 365. 3 Ib. N. S, 458 à 461.

En général et à très peu d'exceptions près, il n'y a de vraies nullités, absolues ou relatives, que celles qui résultent de la disposition de la loi, soit qu'elle prohibe un acte, soit qu'elle prescrive impérativement une formalité sans laquelle l'acte est imparfait. Cela me conduit à faire remarquer: 1°. qu'il n'existe chez nous aucune loi qui défende à un aveugle de faire, de dater, de signer, de sa propre main un testament; 2°. que, dans sa pétition, l'Etat n'allègue point que le Juge *Martin*, aveugle, était frappé d'une incapacité légale de faire son testament dans cette forme, c'est à dire olographe; 3°. que, quand même une loi lui aurait interdit la faculté de disposer dans cette forme, il aurait fallu que l'Etat eût un intérêt né, un intérêt actuel, échu, pour en demander la nullité: et certes rien de tel n'existait, tant que les prétendus héritiers ne jugeaient pas convenable de demander à justifier de leurs qualités et de leurs droits, et surtout, tant qu'ils ne réclamaient pas, en ces qualités et en vertu de leurs droits reconnus, la nullité du testament. En vain aurait-on voulu, si la prohibition ou l'interdiction de tester dans la forme olographe, eût existé, avancer ou prétendre que le testament fait contre la prohibition ou interdiction était comme s'il n'eut jamais été fait. On aurait bien pu, d'après le sentiment de Toullier, considérer ce testament comme infecté d'une nullité absolue; mais ce n'aurait été qu'une de ces nullités absolues établies pour le seul intérêt des particliers; et, conséquemment, rien ne pouvait autoriser l'Etat à faire prononcer cette nullité. La

raison la voici : c'est que nul n'est héritier s'il ne veut l'être, et que, par son action, s'il eût triomphé, l'Etat aurait fait déclarer héritiers, des personnes qui, par les motifs les plus respectables, auraient pu ne pas vouloir prendre cette qualité, au détriment de celle favorisée par le testament. Au surplus, aucune incapacité légale, rien autre chose qu'une incapacité physique, n'était allégué par la pétition : et ce que j'ai dit plus haut à ce sujet suffit, je pense, pour me dispenser de répéter, que l'Etat agissait sans droit aucun, d'action ou autrement. Mais je ne puis laisser passer une réflexion dont je suis frappé, sans la communiquer à la cour. Le testament, je le répéte, avait été ouvert et prouvé ; le légataire universel avait fait inventaire, et était en possession. Que signifiait donc l'allégation contenue dans la pétition présentée après, de l'incapacité physique dont était frappé le testateur de faire un testament olographe ? Que signifiait-elle, si ne n'est une accusation de faux quant au testament lui même, et de prejure, quant aux témoins qui, sous leur serment, avaient attesté que ce testament était entièrement écrit, daté et signé de la main du Juge *Martin?* Elle ne signifiait que cela et rien de plus ; car s'il était à, la date de ce testament, physiquement incapable de l'écrire, le dater, et le signer, il n'y avait pas à balancer ; il fallait conclure de suite que le testament présenté était l'œuvre d'un faussaire, d'un contrefacteur, et le serment des témoins qui ont juré que ce testament était de la main du défunt, un parjure. L'avocat général, s'il était convaincu de l'incapacité physique par lui alléguée, avait, j'en conviens, un devoir à remplir envers l'Etat. Ce devoir était, non pas de demander à l'appelant $39,608 41 c., mais bien de chercher quel était le faussaire, le contrefacteur, et de le mettre, ainsi que les témoins parjures, en accusation.

II. Voyons maintenant la pétition supplémentaire que l'on a présentée au nom de l'Etat. Elle, ou la pétition originale, devait être rejetée.

Ainsi que la cour peut le voir, en lisant cette assez curieuse production, le défunt *François Xavier Martin* n'est plus représenté comme frappé d'une incapacité physique de faire un testament olographe ; on lui reproche, littéralement et avec une clarté d'expression peu commune, non plus d'avoir été aveugle; mais d'avoir, par son testament olographe, légué tout son bien à son frère, *Paul Barthélémi Martin,* résidant à la Nouvelle-Orléans, après s'être bien entendu avec celui-ci, afin que tout son bien, ou partie de son bien, passât à ses autres héritiers, tous étrangers et résidant en France, pour être partagé comme s'il n'eût été fait aucune disposition *mortis causâ.* Et l'on ajoute que cela s'est ainsi fait contre la loi et l'ordre public, et avec l'intention de violer la loi de 1842.

Les conseils ou organes de l'Etat voudraient-ils bien prendre la peine de nous expliquer, comment l'homme qui était physiquement incapable de faire un testament olographe, a cependant légué, par son testament olographe, tout son bien à son frère? En attendant, je prendrai la liberté de dire que, sur l'exception qui fut proposée en tems convenable, la cour de district aurait dû rejeter de suite la pétition supplémentaire. Mais la cour de district a jugé à propos de rejeter cette exception comme elle a aussi rejeté la première.

III. L'aveugle *François Xavier Martin,* a-t-il fait lui-même, a-t'il écrit, daté, et signé, de sa propre main, le testament olographe déposé à la cour de district après son décès? Examinons d'abord cette question de fait.

Un des légistes qui figurent dans ce procès, du côté du demandeur, a prétendu que le testament olographe était, de sa nature, un testament secret ; je sais qu'un ou deux des nombreux commentateurs du Code Napoléon en ont dit autant. Rien n'est plus hazardé, pour ne pas dire rien n'est plus faux, que cette proposition. Nous ne connaissons, sous l'heureux empire de notre nouveau et de notre premier Code Civil, et nous ne connaissions, à la Louisiane, avant que la manie de codifier ne nous saisît, qu'une seule espèce de testament qui, de sa nature, soit ou fut secret ; n'en déplaise aux docteurs qui disent le contraire, c'est, comme c'était, le testament mystique. Sous la loi espagnole ce testament, qu'on appelait testament *in scriptis,* avait lieu, ou se faisait, quand le testateur voulait tester en secret de manière qu'on ne sût pas son contenu, "en poridad, que non sepan ninguno de los testigos lo que es escrito en él." Loi 2, titre 1er, Partida 6. Sous nos Codes, et notamment sous le nouveau, il est intitulé : "Testament mystique *ou secret,* autrement appelé fermé." Code, art. 1577. Et ce dernier nom, qu'on me permette de le dire, est évidémment pris de l'espagnol ; car les juristes les plus renommés ne l'appelaient pas autrement. Febrero l'appelle "testamento cerrado (ce qui, en français signifie fermé) que en latin se llama, *in scriptis.* Escrituras, parte 1a. tomo 1o, capit. 1, § 19, no.

212·" page 176, édition de 1797.　Aucun autre que le testament dont je parle ne fut jamais et n'est point à présent, ni de sa nature ni autrement, un testament secrèt.

Me dira-t-on que le testament olographe était inconnu des Espagnols, et cherchera-t-on à argumenter de là qu'on ne peut pas dire que do sa nature aussi il n'était pas secrèt?　Le testament olographe, était et est très connu de la loi espagnole.　Par une cédulè royale du 24 Octobre 1778, tous ceux qui ne sont justiciables que des tribunaux militaires (fuero de guerra), et ce ne sont pas les militaires seuls qui sont dans ce cas, mais bien d'autres personnes selon leurs emplois ou missions, (destinos) pouvaient faire eux-mêmes, de leur propre main, leurs testamens.　Ces testamens faits dans un moment de danger imminent, comme dans un combat, n'avaient pas besoin de la présence d'aucun témoin, et ils étaient valides pourvu qu'on prouvât qu'ils étaient écrits par le testateur.　Depuis 1778, et en vertu de la cédule dont je viens de parler, les testamens de cette espèce ont été dispensés de toute autre forme, ils ont pû être écrits sur papier non timbré, et, pourvu qu'ils fussent écrits et signés de la main du testateur, cela suffisait pour leur validité.　Voyez Febrero, Escrituras, parte 1a. capit. 1. § 1. no. 15, page 26 de l'édition susdite.　Or, on conviendra je présume quedispenser d'une formalité, génante quelque fois, n'est pas restreindre une faculté existante.　Si je dis que je n'exige plus tout ce que j'exigeais autrefois, on ne peut point me reprocher d'avoir commandé de faire comme si je n'avais pas changé de disposition.　Or quand le législateur a dit:　Je vous dispense de la formalité des témoins, il ne serait pas logique de conclure que, sous peine de nullité, il faut user de la dispensation, et ne pas écrire son testament devant témoins.　"_Non solent que abundant vitiare scripturas._"

Si l'on ne savait que les plus grands esprits s'égarent, se trompent quelque fois, sans qu'on ait le droit d'en manifester tout haut son étonnement, on pourrait assurément témoigner une grande surprise, en entendant un légiste prétendre qu'un testament olographe est de sa nature un testament secret, lorsqu'on a lu l'article 1581 de notre Code, qui dit:　"Le testament olographe est celui qui est écrit par le testateur luimême. Il faut pour qu'l soit valide, qu'il soit écrit entier, daté, et signé, de la main du testateur lui-même. Il n'est assujetti à aucune autre forme."　Car cela signifie clairement, bonnement, et sans plus de finesse que, si un autre que le testateur en écrit une partie, et le signe, ou le date, ce n'est plus un testament olographe.　Mais cela ne peut jamais vouloir dire que lorsqu'il est réelement écrit en entier, daté, et signé, par le testateur, s'il y est ajouté quelqu'autre forme, cette autre forme le viciera, le fera annuler.　Si l'on en doutait il suffirait, pour s'en bien assurer, de lire l'article 1583, que l'on me dispensera j'èspere d'écrire ici.　De ce que je viens de dire, il suit tout naturellement, que je puis, aveugle ou non, faire mon testament olographe si bon me semble, devant un nombre quelconque de témoins, le leur lire ou faire lire, prendre même leurs conseils, les suivre et les faire tous signer après moi, au nombre de sept même. Cela n'empêchera pas mon testament d'être tout écrit, daté, et signé, de ma propre main ; cela ne l'empêchera pas d'être olographe.

Après avoir parlé d'un arrêt d'un parlement qui en 1779 déclara valide le testament olographe d'une personne aveugle, et nous avoir dit que cet arrêt "can throw no light on our case," le juge de la cour inférieure nous dit:　"The commentators are divided on the subject and leave us to recur to our law, the text of which does not declare null an olographic will made by a blind man."　Delà il était assez sensé de présumer que l'État allait être débouté sur la première de ses allégations au moins.　Pas dutout: Le jugement continue : "But that very text of our laws says : "In order to be valid it (the olographic will) must be entirely written, dated and signed by the hand of the testator."　Et portant delà·il nous dit : "The testimony shows that neither according to the letter or to the spirit of the law, the testator in this case could, at the date of that document, have entirely written, dated and signed his olographic will with his own hand."

Je m'arrête ici un moment et je dis: Oh! Honorable Seconde Cour de District, la question soumise à votre sagesse, était moins de savoir si d'après les dires de témoins entendus, il pouvait écrire en entier son testament, le dater, et le signer; que de savoir si en effet il l'a écrit en entier, daté, et signé de sa propre main?　Croyez vous, que c'est remplir suffisamment votre mandat que de prononcer avec n'importe quels témoignages de gens _plus ou moins instruits_, plus ou moins réfléchis, ou plus ou moins légers, ou

plus ou moins judicieux, qui vous diraient qu'un aveugle ne peut pas écrire, ou qu'il.ne le pouvait pas.quand il a fait son testament, à moins que, par exemple, on ne l'assît à une table, qu'on n'y mît devant lui du papier,qu'on ne lui mît à la main une plume chargée d'encre, qu'on ne lui posât la main sur le papier à l'endroit où il faut commencer, qu'on ne rechargeât sa plume d'encre quand il est nécessaire de le faire, qu'on ne lui remît ensuite cette plume à la main. qu'on ne dirigeât cette main à l'endroit.où il fallait reprendre pour continuer d'écrire, qu'on ne l'avertît de revenir à gauche quand sa plume s'écartait de la page, et que là encore on n'y dirigeât sa main ; croyez vous, dis-je, qu'il soit logique de conclure de la que ce n'est pas lui qui a pu écrire en entier, dater et signer son testament de sa propre main? N'est-il donc pas excessivement clair qu'avec ces secours il peut fort bien, l'aveugle qui sait écrire, écrire en entier, dater et signer son testament? Est-ce que l'aveugle qui ne se.conduit dans les rues qu'à l'aide de son domestique, sur l'épaule duquel il appuie sa main, ne marche pas? ne parcourt pas lui-même en entier la distance qu'il y,a de son point de départ à son point d'arrivée? Selon vos idées, ô Honorable Cour Inférieure, l'homme dont la main tremblerait trop pour signer, sans qu'on la lui tint, ne signerait donc pas lui-même, si on la lui tenait quand il signe? Sans me donner la peine de fouiller dans les commentateurs du Code Napoléon, je trouve dans les auteurs qui ont écrit sur nos anciennes lois, et auxquels malheureusement, je crois, on n'a pas assez emprunté ; dans Febrero, par exemple, des contrats "Ecritur-as," chapitre 1er., sec. 19, no. 214, page 178, édition de 1797: "Esta legal forma, y solemnidad como derecho mas nuevo que el de las Partidas és la que se observa: de suerte que si el testador no sabe, ó no puede escribir à lo menos llevandole, ó gobernandole alaguno la mano tremula (pues en este ultimo caso puedo hacerlo à presencia del escribano y testigos sin que por esto se vicie ni anule,y asi se practica) debe firmar por él uno de los testigos, &c." Remarquons bien que là Febrero traite du testament mystique, tel.que l'a établi une loi de Toro qui est ¡la 2c, tit. 4, liv. 5, de la Recopilacion : et que cette loi de Toro, exige que le testateur signe, quand il peut signer, l'acte de suscription avec les temoins, auxquels il doit, ainsi qu'au notaire, présenter son testament signé par lui, s'il sait et peut écrire, ou, sinon, écrit par toute autre personne de sa confiance ; en leur disant: "Este es mi testamento, ruego os que escribais en èl vuestros nombres." Avec les notions que paraît avoir la cour de district sur ces matiéres, il est très probable qu'elle déclarerait nul un testament mystique, fait sous notre propre Code, s'il lui était prouvé que la signature que doit y apposer sur l'acte de suscription le testateur, n'y a été apposée qu'à l'aide d'une autre personne qui lui tenait la main ei la guidait. Ne dirait-elle pas cette cour : c'est le testateur luimeme qui doit signer ; la signature que le Code exige de lui doit etre toute entière de lui-meme, de lui seul ; or il n'a pas signé lui-même, il n'a pas signé lui seul ; sa main tremblante ne le lui permettait pas ; il était physiquement frappé de l'incapacité d'écrire à moins qu'on ne l'aidât ; donc ce qu'on appelle son testament n'est pas écrit, daté et signé selon la lettre et l'esprit du Code ; donc son testament est nul?

Il convient d'autant plus d'adopter et suivre ce qu'enseigne Febrero, que ce qui est prescrit dans notre Code pour le testament mystique, n'est que ce qui était prescrit pour ce testament dans notre ancienne loi espagnole sur laquelle il écrit. Et j'ajoute qu'il n'est aucune de nos lois qui, en exigeant ce qu'elles exigent, soit pour le testament mystique, soit pour le testament olographe, indique ou prescrive que, pour écrire ou signer, on sera tenu de prendre soi-même la plume, de.la plonger dans l'encrier pour avoir de l'encre, d'employer tel ou tel instrument, de faire usage de tel ou tel fluide ou matière pour le faire, sous peine de nullité.

La cour inférieure nous a parlé de l'esprit de la loi relativement au testament olographe ; je relis cette loi : voici ses termes : "Il faut, pour qu'il soit valable, qu'il soit écrit en entier, deté et signé de la main du testateur lui-meme."

Rien n'est plus explicite à mon gré que ce texte. Or, je suppose qu'un particulier, sachant et possédant l'art mécanique d'écrire, de former les lettres, et de les joindre et les lier, dans une perfection admirable, se mette dans la tête d'écrire son testament olographe ; mais, qu'ignorant l'orthographe il demande, à quelqu'un qui se trouve auprès de lui, comment s'écrivent les mots dont il veut se servir ; la personne présente le lui dit ; et il écrit correctement, et il date et signe, sans faire aucune faute. Il meurt ; son testament est présenté à l'homologation; des amis aussi peu savans que lui, mais qui l'ont vu écrire et signer cent fois,

qui connaissent son écriture aussi bien que la leur propre, viennent à la cour, et sous leur serment, déclarent, ce qui est bien vrai, que ce testament, corps, date et signature, est tout entier de son écriture. Le testament est homologué. Ce testament est ensuite attaqué ; son annulation est demandée, sur une allégation qu'à l'époque où le défunt parait avoir fait ce testament, il était incapable de le faire, c'est à dire de l'écrire tel qu'il est écrit. Des témoins sont cités ; ils comparaissent ; le testament leur est montré ; ils reconnaissent très bien les caractères ; ils pensent et disent bien que c'est de la main du testateur ; mais ils ajoutent, ce qui est encore vrai, que la veille même de la date du testament, il ne savait, ni un mot de grammaire, ni un seul mot d'orthographe ; et ils déclarent, en leur âme et conscience, qu'il n'a pu le faire tout seul, qu'il n'a pas pu lui-même l'écrire tel qu'il est écrit, daté et signé—qu'il a fallu pour cela que quelqu'un, plus habile que lui, l'écrivit d'abord, et qu'ensuite il le copiât ; enfin que, sans une telle aide, un tel guide, il était incapable d'en venir à bout.

Voilà une hypothèse dans laquelle il faut convenir qu'un homme qui a une vue parfaite, resemble passablement à un aveugle ; n'est-ce pas être intellectuellement aveugle que de ne pas savoir l'orthographe usuelle des mots ? celui-là est-il bien sûr, peut-il l'être, qu'il n'exprime pas une idée pour une autre ? Eh bien ! vient, d'abord, un praticien, appelé avocat, légiste, qui nous dit : " Le testament olographe est de sa nature secret ; or celui-ci n'est pas secret, puisqu'avant sa naissance même il était connu de la personne qui l'a écrit pour que le testateur le copiât ; donc il est nul." Ensuite on entend la cour qui, doctement, déclare que, d'après les témoignages, il est impossible que le testateur ait écrit le testament qu'on dit être de lui, puisque ce testament est correctement orthographié, et que la preuve constate qu'à la date de cet acte important, le testateur était tout à fait incapable d'orthographier deux mots ; et elle casse le testament, comme n'étant pas conforme à ce qu'il lui plait d'appeler la lettre et l'esprit du Code—comme n'étant pas écrit, mais seulement copié, par le testateur.

Autre hypothèse ; on sait que le testament olographe, pour être valide, doit être écrit en entier, daté et signé *de la main du testateur lui-même.* On a vu à la Nouvelle-Orléans, il y a quelques années, un jeune homme de la race Anglo-Saxonne, qui n'avait ni bras ni mains. Il découpait d'une manière parfaite avec ses pieds toutes sortes de fleurs et de desseins ; il ouvrait une montre et la montait ; il chargeait une arme à feu et la tirait ; il écrivait une lettre, la ployait, et la cachetait. Supposons qu'il eût eu la fantaisie de faire, d'écrire, de signer, de dater son testament ; et qu'il fut mort après. La cour de district aurait-elle cassé son testament ? Je n'ose le croire ; cependant son attachement à la lettre de la loi, lui en aurait fait un devoir ; car le testament, pour être valide, devait être écrit en entier, daté et signé *de la main* du testateur lui-même, et malheureusement, par l'effet irrémédiable d'une bien cruelle *incapacité physique,* le testateur n'a pu l'écrire que *du pied*.

" Pitoyables jouets de notre vanité
" Faisons au moins l'aveu de notre infirmité !"

Arrêtons-nous ; et, surtout, gardons nous, en nous appuyant sur des principes que nous entendons mal, que nous appliquerions de travers, de tenir d'une manière toujours inflexible à la règle qui veut que " quand les termes de la loi sont clairs et exempts d'ambiguité, on ne s'écarte pas de la lettre sous le pretexte d'en pénétrer l'esprit ;" car la lettre, dans l'hypothese présentée ici, comme dans les précédentes, ferait commettre une grande absurdité, une énorme injustice, une iniquité révoltante ; elle tuerait. Jamais un homme bien organisé, sous le rapport intellectuel, ne doit admettre que l'intention du législateur ait été, ou soit susceptible de faire donner à sa loi des effets aussi affreux. Inclinons-nous, respectueusement, devant cette sage loi Romaine qui, vraiment, consacre un principe d'une vérité éternelle : " Scire leges non est hoc verba earum tenere, sed vim ac potestatem." Que veut le législateur en disant que "le testament olographe, pour être valide, doit être écrit en entier, daté, et signé de la main du testateur lui-même ?" Il veut bien clairement et bien explicitement que l'on respecte, que l'on exécute, un testament olographe ; mais, comme, pour être olographe, un testament doit être écrit par le testateur et non par une autre personne, il exige que ce soit bien le testateur qui écrive, date et signe lui-même, et non pas un étranger ou un autre individu. Il ne dit point au testateur: fais y attention ; tu ne dois écrire que tes propres idées, soit qu'elles te viennent tout d'un coup, soit que tu les aies muries. Il ne lui dit point: ne prends conseil de

qui ce soit; ne communique tes volontés à personne ; ne charge personne de te les rédiger convenablement pour les copier ensuite. Non; il ne dit rien de semblable; et pourvu que l'acte produit à l'homologation soit un testament écrit, daté, et signé par le testateur lui-même, quel que soit le membre dont il se sera servi pour l'écrire, c'est tout ce qu'il lui faut ; il n'en demande pas davantage ; il est satisfait ; sa volonté régulatrice est obéie.

IV. Je demande la permission de faire quelques observations sur la prétention élevée à la cour inférieure, et qu'on renouvellera peut être ici, de faire casser le testament qui nous occupe, sur le fondement, excessivement fragile, je crois, que, légalement parlant, un aveugle ne peut pas faire un testament olographe.

Je rappellerai, en commençant, que, ni dans la pétition originale, ni dans celle supplémentaire, on ne trouve aucune allégation d'incapacité légale; et cependant il a plu la cour de district d'examiner cette question, comme si elle avait été soulevée par les actes de la procédure !

J'examinerai donc, et je discuterai la question d'incapacité légale, selon les lois françaises qu'invoquent les commentateurs que l'on a cités à la cour inférieure. En expliquant l'article 978 du Code français qui porte : "ceux qui ne savent, ou ne peuvent, lire ne pourront faire de dispositions dans la forme mystique," M. Duranton nous dit, (tome 9, page 159, no. 134) : " Et comme ceux qui ne savent ou ne peuvent lire, ne peuvent pareillement écrire, ils ne peuvent pas non plus faire un testament olographe." Il ajoute (page 60, no. 136) " celui qui est privé de l'usage de la vue ne pouvant pas lire, ne peut par conséquent tester en la forme mystique, ni en la forme olographe."

Partant de cette opinion ou décision, bien tranchante comme on le voit, et qui, en vérité, pourrait bien finir par n'être pas d'un très grand poids dans notre affaire, on nous saisit au corps; on nous enferme hardiment dans les limites étroites d'un petit sorite, d'où l'on se flatte que nous ne pourrons pas sortir. On nous dit : "Pour faire un testament mystique, il faute être en état de lire ; pour lire, il faut regarder; pour regarder, il faut voir; or l'aveugle ne voit pas : donc il ne peut pas regarder ; il ne peut pas regarder, donc il ne peut pas lire : il ne peut pas lire, donc il ne peut pas faire un testament mystique : il ne peut pas faire un testament mystique, donc il ne peut pas faire un testament olographe. Duranton l'a dit, donc le testament de *François Xavier Martin* est nul. Jadis, en France, quand on invoquait le grand nom de Dumoulin, présidens, conseillers, avocats, dans les parlemens, se découvraient et s'inclinaient en témoignage de vénération. Le temps où l'on en fera de même chez nous, quand on citera Duranton, viendra peut-être : en attendant, et sans vouloir me soustraire au tribut d'admiration si légitimement dû à ses œuvres immortelles, on me permettra, j'espère, de m'inscrire en faux contre cette proposition de son cru, que "ceux qui ne peuvent lire, ne peuvent écrire." Cette proposition peut être vraie, et je n'en doute point, à l'égard de personnes qui n'ont jamais su lire ; mais elle est certainement fausse, quant à celles qui ayant su lire et écrire parfaitement, ont eu le malheur, dans un âge avancé, de perdre la vue, de devenir aveugles. Avant de le prouver, ce qui ne sera pas difficile, je pense, oserai-je demander à Monsieur Duranton, pourquoi "ceux qui sont privés de la vue ne peuvent pas, en France, tester dans la forme mystique ? Il me répondra de-suite, et sans hésiter, j'imagine : c'est parce que l'article 978 du Code Napoléon le dit bien clairement, quoique en d'autres termes.

Maintenant, comment se peut-on permettre, n'ayant sous les yeux que cet article 978, d'en conclure que celui qui ne sait, ou ne peut lire, ne peut pas faire un testament olographe ? Comment ? La raison en est de suite donnée par Mr. Duranton: " *comme ceux qui ne savent ou ne peuvent lire, ne peuvent pareillement écrire,* ils ne peuvent pas non plus faire un testament olographe. Celui qui est privé de la vue ne pouvant pas *lire* ne peut, par conséquent, tester en la forme mystique, ni dans la forme olographe." Où a-t'il trouvé cela le docteur Duranton ? est-ce dans son Code Napoléon ? Oui, quant à la forme mystique. Non, quant à la forme olographe. Car l'article 970 de ce Code ne porte que ceci : " Le testament olographe ne sera point valable, s'il n'est écrit en entier, daté, et signé de la main du testateur : il n'est assujetti à aucune autre forme." Nous voyons donc ici: 1°. Que la formalité de *lire* le testament olographe, n'est pas prescrite. 2°. Que c'est, dans son propre fonds, ou en se rendant l'écho de, Dieu sait qui, que M. Duranton a trouvé, et a bien voulu enseigner que, "celui qui ne peut pas lire ne peut pas faire un testament olographe." 3°. Que, s'il nous l'enseigne, c'est parce que lui, professeur de droit et membre de

la légion d'honneur, croit que quiconque ne peut pas lire, ne peut pas écrire!

Comment un professeur de droit français peut-il bien faire cette erreur? Il me serait difficile de le concevoir. Si M. Duranton était ici je pourrais lui dire: "Daignez voir le testament olographe qu'a certainement bien écrit, daté, et signé de sa main, le défunt *François Xavier Martin*, aveugle, qui, depuis plusieurs années, ne pouvait plus lire dutout; et j'ai trop bonne opinion de vous pour m'imaginer que vous n'écouterez pas la voix de votre raison, qui, éclairée par le témoignage de vos sens, vous dira qu'un aveugle peut écrire, quoiqu'il ne peut rien lire dutout." Et si ce grand homme refusait de se rendre; s'il exigeait, avant de céder, qu'on lui montrât un aveugle écrivant; je lui dirais: O sceptique! approchez! posez-moi sur les yeux, tel bandeau que vous jugerez assez épais pour empêcher tout rayon de lumière d'y avoir accès · Je m'engage à écrire en votre présence, un testament tel que la loi de votre pays—tel que celle du mien, veut qu'il soit pour être valable.

L'aveugle, en France, ne peut pas faire un testament mystique; rien n'est plus positif, d'après les termes de l'article 978. Mais lorsque, je vois, ce que M. Duranton ne peut pas voir mieux, mais peut voir aussi bien. que moi, que l'article 970 du même Code, dit: "le testament olographe ne sera point valable, s'il n'est écrit en entier, daté, et signé de la main du testateur": et qu'il ajoute de suite: "il n'est assujetti à aucune autre forme"—je ne puis m'empêcher de laisser parler ma raison, qui me dit tout haut, "l'aveugle qui peut écrire peut faire, en France même, un testament olographe."

Grenier, dans son "Traité des Donations, des Testamens," &c., volume 1er. partie 2e., chap. 1er., sec. 5, no. 281, page 285, 4e. édition, nous dit; "J'ai eu occasion de dire dans cette seconde partie, au commencement de la section 3, que l'aveugle ne peut point tester sous la forme mystique; il ne le peut donc que par acte public."

Si, comme on l'a vu, l'aveugle ne peut pas tester, en France, sous la forme mystique, ce n'est que parce que l'article 978 du Code Napoléon ne veut pas que ceux qui ne peuvent pas lire fassent leurs testamens dans cette forme. Mais, en résulte-t-il qu'ils ne peuvent tester que par acte public? c'est ce dont il est permis de douter; car il n'est assurément pas logique d'en conclure que les aveugles ne peuvent pas tester sous la forme olographe. M. Grenier semble lui-même n'être pas très sûr de la justesse de sa conclusion; car il continue, et, au troisième alinéa plus loin, il veut bien nous dire: "M. Bergier, dans une note sur Ricard, des Donations, pages 32 et 33, a pensé que rien n'empêchait qu'on ne déclarât valable le testament olographe qu'un aveugle aurait pu faire même dans son état de cécité. Il invoque un arrêt du 29 Mai 1770, rapporté par Denisart, au mot testament, no. 160, qui a ordonné l'exécution du testament olographe de la dame Ménage de Pressigny, qui était aveugle, au moment où elle l'avait écrit, daté, et signé."

M. Grenier ne se permet pas de condamner ce que dit Bergier. Il se borne à dire: "Cette opinion n'est pas sans difficulté." "Le caractère du testament olographe (continue-t-il) est d'être fait par le testateur seul." Sans doute, si, par ces paroles, vous entendez que c'est lui et non pas son voisin qui doit *l'écrire, le dater, et le signer*; mais si vous voulez dire que, pour faire un testament olographe, le testateur doit s'isoler, se séquestrer, se tenir hors de la vue de toute autre personne que lui-même, je m'inscris en faux; car dès que mon testament est écrit en entier, daté et signé de ma propre main, la loi est satisfaite; et il lui importe fort peu que je l'aie écrit, soit retiré dans mon cabinet; soit dans un salon, au milieu de nombreux visiteurs qui se disposaient à recevoir mes derniers adieux; soit assis sur le seuil de ma porte, à la vue de tous les passans. "Or. un aveugle, quelqu'habitude qu'il ait pu conserver de l'écriture (ajoute-t-il) pourrait-il bien se flatter d'écrire son testament, de le dater et signer, de manière à ce qu'il n'y eût aucun des inconvéniens que cet état fait naturellement craindre, qu'on prévoit assez sans les détailler, et qui pourraient rendre le testament illisible et nul." Le problème à résoudre n'est pas de savoir s'il y à quelqu'inconvénient à ce qu'un aveugle écrive lui-même son propre testament, mais seulement de savoir si la loi veut ou ne veut pas, lui permet ou lui défend de le faire.

"Si on suppose (ajoute M. Grenier) qu'il se fasse aider et guider par un tiers, alors la possibilité des insinuations et des surprises ne se présente-t-elle pas à l'esprit? et ne s'élève-t-il pas un doute légitime sur la validité d'un testament fait dans une semblable circonstance?" Ne supposez pas, mais, prouvez

qu'il a été aidé et guidé,non seulement pour tremper de nouveau sa plume dans l'encrier, quand il, le fallait ; non seulement pour recommencer au point ou il s'était arrêté pour cela ; car il n'y a rien là que de purement méchanique; mais qu'il a été aidé et guidé par la volonté d'autrui, quant à la manière de disposer de son bien ; et alors vous pourrez raisonnablement et légalement douter que son testament contienne bien ses propres volontés ; mais à moins de cela, ne nous parlez pas de la possibilité des insinuations et des surprises. Car si, étant alléguées, elles n'étaient pas prouvées avoir ces caractères, aucun doute légitime, aucun doute raisonnable même, ne pourrait, dans l'esprit d'un juge sage, s'élever sur la validité du testament. L'auteur termine ce paragraphe par ces mots : "Où est cette garantie, si fortement exigée par la loi, de la certitude des volontés du testateur ?" La garantie exigée par la loi de la certitude de la volonté du testateur, qui a préféré à une autre la forme olographe, se trouve tout entière dans le testament lui-même, quand il est écrit en entier, daté, et signé de la main du testateur. La loi chez vous n'en exige pas d'avantage. Cette certitude ne cesse, et ne peut cesser, que lorsqu'il est allégué et prouvé que le testament n'est que l'effet de l'erreur, de la crainte, ou de la violence, ou du dol ou de la fraude.

A l'alinéa qui suit immédiatement M. Grenier, que l'on serait tenté de croire persuadé qu'il a, sinon détruit, du moins singulièrement affaibli, l'effet que pouvait produire l'arrêt du 29 mai 1770, nous dit : "Aussi Dénizart avait-il d'abord posé en principe qu'un aveugle ne pouvait tester que par testament public fait devant notaire." Cela manque un peu d'exactitude. Dénisart n'avait point et, n'a point, posé d'abord en principe qu'un aveugle ne pouvait tester que par acte public devant notaire. Voici, mot à mot ce qu'il a dit : " Celui qui est aveugle ne peut tester, en pays de droit écrit, que par la voie du testament nuncupatif ; sur quoi voyez l'article 7 de l'ordonnance de 1735, et testament nuncupatif. Si c'est en pays coutumier, un pareil testament ne peut être fait que pardevant notaires,ou curés en se conformant à l'article 25 de l'ordonnance de 1735."—Voilà ce qu'il a dit : et il y a, je crois du moins, entre cela et ce que dit M. Grenier, une différence assez sensible. Poser en principe, n'est point invoquer une règle tracée par la volonté législative. La volonté législative reconnait un principe et le consacre, mais ne le crée point. Elle crée, elle établit, elle prescrit des règles, elle les fait observer, et voilà tout. Dans les pays de droit écrit, la loi romaine prévalait, et depuis Justinien, qui avait réduit le testament olographe à n'être employé valablement que dans les testamens de pères de famille, disposant de leurs biens entre leurs enfans, il n'y avait plus que le testament public notarié. Dans les pays coutumiers, l'ordonnance de 1735, article 7, le dit expressément : le testament de l'aveugle doit être fait dans la forme nuncupative. Je répète donc que c'est d'après des règles tracés par les lois, qu'a parlé Dénisart, et qu'il n'a point lui posé en principe, ce qu'il a dit du testament de l'aveugle. J'observerai en outre, que l'arrêt du 29 mai 1770, que l'on trouve cité dans Dénisart, contrairement aux règles suivies en pays de droit écrit, et dans les pays coutumiers soumis à l'ordonnance de 1735, a posé en principe que l'aveugle qui peut écrire peut valablement tester dans la forme olographe. Et certes rien n'est plus conforme aux lumières du sens commun, dont s'écarte bien évidemment toute disposition ou règle arbitraire ou positive, qui priverait un aveugle de la faculté de faire ce que l'homme qui a l'usage de la vue ne pourrait pas mieux faire que lui : savoir, disposer par testament olographe.

Mais écoutons M. Grenier jusqu'au bout. Il continue : " Il parait que c'est un annotateur qui a ajouté de suite la citation de l'arrêt de 1770."—Où cela parait-il ? il serait difficile de le dire. Mais que ce soit un annotateur qui ait ajouté cette citation, ou Dénizart lui-même qui l'ait faite, l'arrêt n'en est pas moins là, et il n'est pas aisé d'écarter l'obstacle qu'il oppose à toute prétention de déshériter légalement l'aveugle qui sait écrire, qui peut écrire, et qui écrit, du droit qui lui est garanti par l'article 902 du Code Napoléon, qui porte : " Toutes personnes peuvent disposer et recevoir, soit par donation entre-vifs, soit par testament, excepté celles que la loi en déclare incapables." M. Grenier semble, pourtant vouloir atténuer le coup que lui porte cet arrêt, en nous disant : " Les héritiers soutenaient avec force qu'une personne en état de cécité n'avait pu faire un testament olographe; et un arrêt isolé qui semble avoir jugé le contraire, peut-être par des circonstances inconnues (la cécité pouvait n'être pas complète) peut-il fixer les opinions sur un fait sur le quel le sentiment et la raison instruisent suffisamment?"—Il y aurait eu, peut-être, un peu plus de bonne foi, à rapporter en son entier la citation prétendue ajoutée par un anno-

tateur, qu'à prendre la peine assez inutile, selon moi, de parler de la sorte. La voici dans son intégrité cette citation, vraiment malencontreuse pour tous ceux qui s'efforcent de faire dire à la loi plus qu'elle ne dit:

"Cependant, par arrêt du mardi 29 mai 1770, rendu en la Grand-Chambre, au rapport de M. Beze de Lys, la cour a confirmé le testament olographe de la *Dame Ménage de Pressigny* qui était aveugle (qui *était aveugle,* c'est positif,) au tems auquel elle l'avait écrit, signé et daté. Ses héritiers attaquèrent de nullité son testament qui ne contenait que des legs pieux et des rentes viagères faites à ses domestiques. On pense bien que le moyen des héritiers était qu'un aveugle ne pouvant écrire, cela emportait la nullité d'un testament olographe. Mais *M. Gouvé* qui défendait le *Sieur Garnier,* exécuteur testamentaire, répondait que la testatrice avait pu écrire, puisqu'elle avait écrit, quoiqu'elle fût aveugle.; ab actu ad posse valet consequentia; et il était prouvé que le testament et les codiciles étaient bien effectivement l'ouvrage de sa main et les traits de son écriture. Enfin *M. Gouvé* établit dans le mémoire imprimé dans cette instance, qu'on ne pouvait conclure, de ce que la loi Romaine, 8.cod. Qui testam. facere possunt, et l'ordonnance de 1735 n'avaient parlé que des testamens nuncupatifs et mystiques, elles eussent limitativement assujetti les aveugles à se servir de l'une ou l'autre de ces deux formes."

Que deviennent, en face de cette citation, la supposition des circonstances inconnues, et la probabilité que la cécité ne fut pas complète?

Venons à nos propres lois.

V. Est-il vrai que, dans l'État de la Louisiane, à la date du testament de feu *François Xavier Martin,* la loi interdisait à l'aveugle qui sait et peut écrire, et qui écrit, la faculté de faire un testament olographe?

Dans l'examen de cette question je remonterai aux lois qui nous régissaient avant la naissance de notre Code actuel. Je ne remonterai point, cependant, jusqu'aux lois romaines, qui furent abrogées en Espagne dès le 7me. siècle de notre ère, par une loi du roi Chindasvindo, qui est la 9mo. tit. 1er. lib. 2, De las leges de los Visogodos.—Abrogées de nouveau par la loi 8, tit. 1er. lib. 2, del Fuero Juxgo: puis, successivement, par la loi 15, tit. 1er. Part. 1a. et par la loi 6, tit. 4, Part 3, qui défendirent expressément, que les lois romaines fussent observées; et, depuis lors, elles n'ont jamais été remises en force. On sera peut-être étonné de ce que je viens de dire à ce sujet, quand on se rappelera avoir lu dans pluiseurs traités justement appréciés sur les contrats et même sur les testamens et donations, de nombreuses citations faites par les juristes Espangnols, des principes du droit romain; mais l'étonnement cessera dès qu'on saura que l'abrogation n'a jamais pu porter et n'a porté en effet que sur ce qui était de droit positif ou arbitraire, établi ou prescrit par la puissance législative; et que, dans toutes les possessions soumises à la couronne d'Espagne, tout ce qui, dans le droit romain, était *principe, ou précepte* tiré du droit de la nature et des gens, était respecté et considéré comme inviolable: car, si, comme je l'ai dit plus haut, les lois créent et prescrivent des règles, et ne créent pas des principes, (les principes existant par eux-mêmes,) les lois ne peuvent pas abroger les principes: Ils sont éternels comme la justice.—Vide en tête de la Instituta civil y real de Joseph Berni, la Carta de Dn. Gregorio Mayam y Siscar, page 25 et précédentes.

La loi 14, tit. 1er. Partida 6, porte en termes exprès, que l'aveugle ne peut faire de testamens que dans la forme nuncupative en présence d'un notaire et de sept témoins. Cette loi était en force lorsqu'en 1808 la législature du Territoire d'Orléans nous donna le Code appelé "Digeste de la loi Civile, &c." Ce Code ne statua rien à l'égard du testament de l'aveugle spécialement, et l'on pourrait inférer de ses dispositions que l'aveugle pouvait tester même dans la forme mystique, car tout ce qui, là, est exigé de lui, pour ce testament, est qu'il l'écrive, ou le fasse écrire; qu'il le signe, s'il sait signer; qu'il le close et le cachette, ou le fasse clore et cacheter; qu'ensuite il déclare au notaire et aux témoins que le contenu en ce papier clos est son testament, écrit par lui-même, ou par un autre, et signé ou non signé de lui; enfin qu'il signe l'acte de suscription, s'il sait signer. Voyez art. 99, page 229, Code de 1808. Quoiqu'il en soit, en 1825, la sagesse codificatrice, mit au monde notre Code actuel, dont voici les dispositions textuelles qui ont déjà été citées en partie:

"Article 1456. Toutes personnes peuvent disposer ou recevoir par donation entre-vifs, ou par cause de mort, excepté celles que la loi en déclare expressément incapables."

Je pourrais m'arrêter ici et sommer l'Etat demandeur, l'Etat qui lui-même a fait cette loi, de me trouver dans tout le Code, qui est son ouvrage, un endroit qui déclare que l'aveugle est expressément déclaré incapable de disposer par testament. Mais, m'objectera-t-on : on ne vous dit pas qu'il est incapable de tester ; on soutient seulement qu'il ne peut le faire dans la forme olographe. Je vous entends ; mais je vous réponds qu'il me suffit de voir qu'il peut tester, pour avoir le droit d'exiger de vous de me montrer, dans votre Code, que cette faculté est restreinte, quant à lui, à telle ou telle forme ; et je crois pouvoir m'engager, comme je le fais dès ce moment, à prouver qu'il a le droit de tester dans la forme de testament public notarié, dans la forme de testament mystique, et dans la forme olographe.

Commençons par nous rappeler qu'en supposant que la loi des Partidas relative à l'aveugle pût coexister avec notre Code actuel, elle était abrogée depuis seize années quand le Juge *Martin* a fait son testament ; d'où il faut conclure que cette ancienne loi est nécessairement sans influence sur ce testament. Cela posé, je passe à l'accomplissement de mon engagement.

1er. L'aveugle peut tester par testament nuncupatif notarié. Cela va sans contestation.

2. Il peut tester par testament mystique.

C'est ce que l'on conteste : Voyons donc ce que porte notre Code à ce sujet. Article 1577. "Le testament mystique ou secret, autrement appelé testament fermé, se fait dans la forme suivante : Le testateur doit signer ses dispositions, soit qu'il les ait écrites lui-même, soit qu'il les ait fait écrire par un autre." "Le papier qui contiendra ses dispositions, ou le papier qui leur servira d'enveloppe, devra être clos et scellé ; le testateur le présentera ainsi clos et scellé, au notaire et à sept témoins, ou il le fera clore et sceller en leur présence ; ensuite il déclarera au notaire en présence des témoins, que le contenu en ce papier est bien son testament, écrit par lui, ou par un autre par ses ordres, et signé de lui testateur ; le notaire dressera aussitôt l'acte de suscription, qui sera écrit sur ce papier ou sur la feuille qui lui sert d'enveloppe, et cet acte sera signé tant par le testateur que par le notaire."

Quiconque sait lire le français voit et comprend fort aisément, qu'il n'est rien dans cet important article, qui indique au testateur, ou à qui que ce soit, qu'il a quelque chose à lire, soit au notaire, soit aux témoins ; rien qui lui en fasse un devoir. On voit de même, que le notaire, qui doit dresser l'acte de suscription, n'est pas non plus obligé de lire quoique ce soit, pas même cet acte, soit aux témoins, soit au testateur. Ainsi, pourvu que le testateur, tout aveugle qu'il est, signe ses dispositions testamentaires, écrites par lui ou par une autre personne ; que le papier contenant ses dispositions soit clos et scellé ; qu'il le présente, ainsi clos et scellé au notaire et à sept témoins, ou qu'il le fasse clore et sceller en leur présence ; qu'ensuite il leur déclare que le contenu en ce papier est son testament écrit par lui, ou par un autre par ses ordres, et signé de lui, testateur ; pourvu enfin qu'il signe l'acte de suscription quand le notaire l'a écrit, la loi est satisfaite : elle n'exige rien de plus que cela de lui.

Dira-t-on qu'un aveugle ne peut pas faire tout cela ! c'est une question de capacité physique que l'on soulève alors, et ici nous traitons de la capacité légale. Au surplus je dis qu'un aveugle peut fort bien écrire ; je dis qu'il peut ployer, fermer, clore, cacheter un papier écrit par lui, ou par une autre personne. Mais revenons à la question d'incapacité légale ; sans perdre de vue cependant, que l'aveugle qui sentira qu'il ne peut pas faire ce que notre article 1577 exige, attachera assez d'importance à faire un testament d'une exécution facile, pour ne pas commettre l'imprudence d'entreprendre rien au dessus de ses forces. On m'arrêtera peut-être, en me citant d'un air de triomphe l'article 1579 qui porte :

"Ceux qui ne savent ou ne peuvent lire, et ceux qui ne savent ou ne peuvent signer, ne peuvent faire de dispositions dans la forme du testament mystique."

Je confesse que cet article (sur lequel je pourrais faire les mêmes remarques que j'ai faites sur l'article 978 du Code français, auquel il a emprunté une partie de ce qu'il dit,) présente tout d'abord quelque ressource au système embrassé par les commentateurs Duranton et autres, et à nos adversaires qui se sont faits leurs échos ; mais je ne crois pas trop présumer de mes forces en pensant que cette ressource est de bien peu de valeur ou d'importance. Si, dans la rédaction d'un certain nombre d'articles, nos codificateurs se sont montrés copistes, on ne saurait certainement point comment contester que, dans celui-ci, ils se sont

montrés, au moins, un peu *originaux;* et, sans le respect dont je suis pénétré pour leur mémoire, je ne sais pas trop si je ne dirais pas que cet article est tout à fait absurde.

Un aveugle se présente, ayant à la la main son testament, qu'il a bien soigneusement pris, tenu et gardé, depuis le moment où il l'a écrit, ou fait écrire par son ami, homme digne de tout sa confiance ; et il dit au notaire et aux sept témoins, en le leur remettant, clos et scellé : "Le contenu en ce papier est mon testament, signé de moi. Notaire, écrivez l'acte de suscription." Vous plaisantez mon ami ; vous ne pouvez pas lire car vous êtes aveugle ; ainsi vous ne pouvez pas faire un testament mystique. C'est vous qui voulez rire, j'imagine ; si je ne peux pas lire, je peux signer du moins : si vous en doutez, je vais signer devant vous ; or, la dernière partie de votre article 1579, que l'on m'a lue, veut bien que je sois privé de la faculté de faire un testament mystique, si je ne peux pas signer ; mais, si je peux signer, il est clair qu'il me donne cette faculté ; car, si celui qui ne peut écrire ne peut pas tester dans cette forme, celui qui le peut, ne peut pas manquer d'être admis à le faire valablement. Réfléchissez donc, je vous prie, que votre article 1577 ne me charge point de lire, soit ce que j'ai fait, soit ce qu'a fait mon ami par mon ordre.

Faisons bien attention ici à ce qui est statué par les arts. 1570, 71, 72, 73, et 74 pour le testament nuncupatif sous signature privée ; Là une lecture est expressément exigée de la part du testateur, comme formalité essentielle ; mais, à l'egard du testament mystique, il n'y a rien de semblable : non, rien n'a besoin d'être lu. soit par le testateur, soit par le notaire lui-même. Dites que je ne puis pas fair cun testament nuncupatif sous signature privée, je n'aurai rien à répliquer : mais ne dites pas que je ne puis pas en faire un mystique.

On me reprondra : c'est la loi ; il faut s'y soumettre. Je ne l'avouerai pas comme je l'ai avoué quant à l'article 978 du Code français. Eh ! pourquoi me demandera-t-on ? C'est parce que le véritable texte de votre Code est le texte anglais ; ainsi le voulait la constitution sous l'empire de laquelle le Juge *Martin* a testé ; et ce texte ne contient pas l'absurdité que renferme ce que vous appelez le texte français.—Mais toutes nos lois sont bitextes ;—devaient-elles l'être ?—Je le nie. Quand cette constitution vous a dit que vos lois seraient dans la langue de la constitution des Etats-Unis, elle n'a point dit qu'elles pourraient l'être aussi dans la langue du Code français ;—mais elle ne l'a pas défendu !—*Inclusio unius est exclusio alterius;* voilà ma réponse. Je prends donc notre texte anglais, de l'article 579, et je lis : "Those who know not how, or are not able to write, and those who know not how or are not able to sign their names, cannot make dispositions in the form of a mystic will," Maintenant, soit que je combine cet article 1579 avec l'article 1577, écrit en anglais, soit que je le combine avec ce même article écrit en français, je vois que l'article 1579 est une conséquence qui découle tout naturellement de l'article 1577. En effet, par cet article 1577, je puis faire mon testament moi-même, mais pour cela il faut que je puisse écrire : je puis le faire par une autre personne, et pour cela il n'est pas nécessaire que j'écrive, il suffit que je puisse le signer de ma maine (sign my name.) Le texte anglais se lie avec ce qui le précède ; le texte français ne se lie pas ; l'un est dicté par le bon sens, l'autre est une absurdité. J'en conclus donc que, rigorousement et constitutionellement parlant, l'aveugle qui peut écrire, celui qui ne peut que signer son nom, peuvent faire un testament mystique.

3. L'aveugle qui peut écrire peut faire un testament olographe.

Inutile, je pense, de répéter ici ce que j'ai dit, sur le testament olographe, dans mes observations critiques sur les passages cités de Messieurs Duranton et Grenier à la cour inférieure. Je me bornerai à rappeler la disposition de notre Code, telle qu'elle est contenue dans l'article 1581. La voici encore.

"*Le testament olographe est celui qui est écrit par le testateur lui-même. Il faut pour qu'il soit valable, qu'il soit ecrit entier, daté et signé de la main du testateur lui-même. Il n'est assujetti à aucune autre forme, et peut être fait en tous tems, même hors de l'Etat.*"

Ce texte qui est aussi intelligible que concis, est parfaitement d'accord avec le texte anglais qui se trouve en regard avec lui dans le Code. Il n'est susceptible d'aucun commentaire. Il n'est nécessaire d'aucune interprétation pour le comprendre. La prétendue incapacité légale, n'est qu'un ridicule songe-creux, à moins qu'on ne trouve dans les lois qui existaient à la date du testament olographe du Juge *Martin*, une disposition qui exclue *expressément* l'aveugle qui peut écrire, dater et signer de sa propre main,

STATE
v.
MARTIN.

de la faculté de faire un testament do cette espèce. Où est elle cotte disposition! nulle part. Mais a-t-on dit à la cour inferieure, et, peut être dira-t-on ici, les aveugles sont, par l'article 1584, *absolument incapables* d'être témoins dans les testamens. Rien n'est plus vrai. Mais qu'inférer de la? Un esprit non prévenu dirait de suite: déclarer un aveugle incapable d'être témoin dans les testamens, n'est pas déclarer cet aveugle incapable de faire un testament. Il continuerait et ne pourrait s'empêcher de se demander: ne sait-on pas, ou ne peut-on pas faire, la différence entre un témoin et un testateur? Le testateur peut bien assurément tester quoiqu'il n'y voie pas, quoiqu'il soit aveugle, car, s'il ne peut pas écrire son testament, il peut le faire écrire, le dicter: et pour cela il n'a pas besoin d'y voir: mais le témoin—comment pourra-t-il dire, 1o. qu'il a vu le notaire écrire et signer; 2°. que les témoins dont les signatures sont apposées au testament sont indentiquement les mêmes personnes qui sont dites y avoir été présentes; 3°. que tout le testament a été confectionné, achevé, etc., sans divertir à aucun autre acte; 4°. que toutes les signatures qui se trouvent au testament sont bien les mêmes qui y ont été écrites en sa présence; 5°. que, pendant que le notaire écrivait, pas un seul témoins n'est sorti et n'est rentré plus tard; 6°. que tous ont, ainsi que lui, signé ensemble? &c. &c. Quoi! ces réflexions n'ont pas frappé les organes des prétentions de l'Etat! Mais ces Messieurs ne voient donc pas que, pour que leur logique ne fît pas un peu rire aux dépens de leur sagacité, ils devraient non pas se contenter d'avancer, avec cette disposition à la main, que l'aveugle ne peut pas faire un testament olographe, mais bien qu'il ne peut faire de dispositions testamentaires sous aucune forme? Je veux bien, pour ma part, leur passer d'assimiler un testateur à un témoin instrumentaire, mais j'y mets une condition qui, je crois, est fort juste: assimilez tant que vous voudrez, mais que votre assimilation soit entière. Et dites, si vous en sentez la force: un aveugle ne peut être témoin à aucun testament; donc un aveugle ne peut faire aucun testament. Puis l'on prononcera sans rire, si l'on peut.

En m'excusant autant qu'il et en moi de le faire, d'avoir honoré cette question de mes remarques—question vraiment oiseuse, puisqu'il n'y avait dans la procédure aucune allégation d'incapacité légale, je passe à l'examen de la question de simulation; et voici comment je la pose:

VI. Est-il vrai que l'institution de légataire universel, faite par le testament olographe de F. X. Martin, en faveur de son frère Paul Bmi. Martin, n'est qu'une simulation; qu'en réalité, et en vertu de convention arrêtée, du vivant du testateur, entre lui et son frère, il doit, par rapport à ses héritiers du sang, être considéré comme s'il fût mort sans avoir tosté; et sa succession être partagée entre eux tous selon leurs degrés respectifs de parenté avec lui? Enfin que le testateur n'a eu recours à cette simulation que dans la vue illicite de frustrer l'Etat de la Louisiane de la taxe de dix pour cent, imposée par la loi sur toute succession échéant dans le dit Etat, à des aubains non résidens soit de cet Etat, soit de tout autre Etat ou territoire de l'Union? La cour sait aussi bien que moi que l'article 349 de notre Code de Procédure, fait à la partie interrogée sur faits et articles un devoir d'y répondre, sous serment et cathégoriquement, sous peine de voir tenus pour confessés les faits sur les quels elle aura refusé ou négligé de répondre. Elle sait aussi que, dans un esprit d'équité, de justice naturelle, l'article 354 du même Code, veut que les réponses des l'interrogé *fassent preuve*, sans pourtant exclure la *preuve contraire;* mais quelle ne puisse être *contredite* que par le serment de deux témoins, ou d'un seul témoin corroboré de circonstances graves; ou par une preuve littérale. Ces deux dispositions sous les yeux, l'on doit, ce me semble, conclure que l'allégation de simulation, faite dans la pétition supplémentaire, était réduite au néant par les réponses du défendeur; et l'on doit, conséquemment, résoudre la question que faisait naître cette allégation, et que j'ai posée plus haut, par une négative tranchante; à moins que deux témoins, ou au moins un témoin seul, soutenu de circonstances graves, ou une preuve littérale, n'aient donné aux réponses assermentées du défendeur un démenti clair, non équivoque, formel.

Il s'agit donc maintenant de chercher, dans les pièces au procès, dans le dossier, si cette exigence de la loi a été satisfaite—si le démenti a été donné, comme il est prescrit qu'il soit donné, pour nous empêcher de proclamer tout haut que l'allégation était fausse, ou du moins tout à fait contraire à la vérité.—Je n'hésite point à dire, dès ce moment, que, quelle que pointilleuse attention que l'on veuille porter, à recueillir, épelucher, disséquer chaque phrase, chaque pa-

role sortie de la bouche des témoins que les organes de l'Etat ont jugé à propos de produire, dans l'espoir de justifier la grave accusation renfermée dans leur allégation, on n'y trouvera rien sur quoi l'on puisse asseoir un jugement qui leur soit favorable. Serait-ce dans le témoignage de M. *Grima* que l'on se flatterait de trouver une base à cette étrange accusation ? Eh ! pourrais-je dire à nos adversaires: songez donc que ce témoin vous a appris, que le Juge *Martin* voulait que la fortune, qu'il avait amassée ici, par son travail et son économie, y restât; que c'est dans cette vue qu'il avait institué son frère son légataire universel; mais qu'il craignait qu'après son décès, ses biens ne fussent vendus par ce frère. Cette partie du témoignage de M. *Grima* ne repousse-t-elle pas du pied et de la main l'idée d'un dessein illicite de faire passer les biens du testateur à ses héritiers étrangers, dans la vue de frustrer l'Etat de sa taxe ?—Mais il aimait, et affectionnait tendrement ces mêmes individus !—Sans contredit; et certes il voulait leur faire beaucoup de bien : vous en avez la preuve encore dans le témoignage de M. *Grima*; mais il voulait que ses neveux vinssent se fixer, s'établir ici, y demeurer, y travailler; et, à cette condition, il leur aurait acheté une habitation de la valeur de $150,000. Prenez-y bien garde; c'est le testateur lui-même qui vous le dit par l'organe de M. *Grima*; c'est lui que vous avez ainsi rendu témoin dans cette cause; témoin contra producentem, il est vrai, mais témoin que vous avez choisi, élu, que dis-je ? exhumé, pour venir ici déposer de la turpitude dont vous n'avez pas hésité à le dire coupable. Si vous eussiez pu réussir à faire passer par la bouche de M. *Grima*, un aveu, une conversation, une confidence du défunt qui fût susceptible de vous aider à soutenir votre système d'attaque, vous ne manqueriez pas de nous dire; et ce d'une voix triomphante : "nous avons la confession du coupable ! Avouez donc que ce prétendu coupable s'élève contre vous du fond de la tombe, où vous l'auriez dû respecter peut-être; et, par la voix de M. *Grima*, confond, pulvérise, anéantit votre accusation.

Mais me dira-t-on peut-être, M. Grima nous apprend aussi, que *Paul B. Martin* a offert de vendre, veut vendre les biens à lui laissés par le défunt, et partir pour France ! Et quelle conséquence en pourrait-on en tirer qui déposât en faveur du demandeur ? Le Sieur *Paul B. Martin* est français : n'est-il pas naturel qu'il désire aller jouir de sa belle fortune sous le doux climat de la Provence, son pays natal ? Que prouve la disposition de vendre où il est ? rien, si ce n'est que le Juge *Martin* avait raison de craindre, comme il le disait à M. *Grima*, qu'après son décès, son frère ne vendît tous les biens qu'il lui laissait ici ? Mais cela prouve-t-il, que dis-je ? cela donne-t-il lieu à une présomption de notre part, que le testateur et son légataire se fussent entendus comme on l'a allégué, afin de frustrer l'Etat de sa taxe ? L'esprit le plus injustement prévenu n'oserait le dire. La réponse de ce légataire, que, très-délibérément, les organes des prétentions de l'Etat demandeur, ont eux mêmes rendu témoin dans cette cause, est là; oui, elle est là cette réponse qui leur dit bien clairement, sans équivoque, sans ambiguïté, que jamais rien de semblable n'a été entendu entre lui et son frère; que son frère lui a dit : " Je t'ai fait mon héritier ; dispose de ma fortune; c'est à toi." Or, ce ne sont pas des présomptions tirées par nos préventions aveugles eu intéressées qui peuvent être opposées à une réponse aussi catégorique, aussi foudroyante pour le système accusateur que je combats ; ce sont *deux témoins* qui *dementent* cette réponse ; c'est au moins un seul *témoin*, témoin *non suspect*, (cela va s'en dire,) *soutenu de circonstances graves, ou une preuve littérale*, qui contredise cette réponse, que la loi exige. Où sont les deux témoins ? où est le témoin unique, accompagné de ces circonstances ? où est la preuve littérale, qui disent ici le contraire de ce qui est déclaré sous la religion du serment, par *Paul B. Martin*, dans ses réponses aux interrogatoires qui lui ont été proposés ? Nulle part.

Il ne reste même pas à l'Etat ou à ses organes, la chétive ressource de dire que les réponses du défendeur ont été étudiées ; car je le dis, et ils ne peuvent pas le nier, c'est ex abrupto, à l'audience, sans qu'il en eût aucun avis préalable, que ces interrogatoires on été présentés ; et c'est là, sur le champ, qu'il a répondu à chacun, au fur et à mesure qu'on les les lui a lus.

Voyons le témoignage donné par le Juge *Simon*. Aux questions qui lui sont faites de la part de l'Etat. il dit, le 25 Février : " J'ai souvent entendu le juge (*Martin*) parler de la disposition en faveur de son frère : il disait que son principe était qu'un homme devait laisser son bien à ses plus proches parens, et de ne rien laisser à des étrangers. Qu'entre ces parens il choisirait

ceux qui demeureraient le plus près de lui, et que, s'il n'en avait aucun ici, il leur laisserait encore son bien à quelque distance qu'ils fussent, de préféence à tout étranger."

Une pause d'un moment ici. Ces sentimens du Juge *Martin* sont, peut-être, difficiles à concevoir pour les personnes qui, en brisant les liens politiques qui les attachaient à la terre natale, brisent également tous leurs liens de famille. Mais, si le gouvernement de ma patrie m'oblige, par ses actes tyranniques, par ses lois arbitraires ennemies de toute liberté rationnelle, de tout principe d'équité, ou de de justice, à le fuir, à me faire ailleurs et loin de lui, une patrie qui me fasse jouir, à l'ombre de ses lois sages et protectrices, de tous les avantages qui font le bonheur de l'homme digne d'être libre, la nature n'en conservera pas moins sur moi toute sa douce et puissante influence en faveur de mes parens; car ils ne sont pas complices du despotisme qui m'a induit à m'expatrier; ils en sont eux-mêmes les victimes; et je dois les plaindre de n'avoir pas eu, soit le courage, soit les moyens de suivre mon exemple; parce que je les aime, et qu'il ne dépend pas plus de moi de les aimer, qu'il ne dépend d'eux de tressaillir de joie quand je leur prouve par ma correspondance que je ne les ai pas oubliés; qu'éloigné des lieux qu'ils habitent, ils me sont toujours présens par la pensée.—Or, se fondera-t-on sur ces sentimens du Juge *Martin* que je n'ai fait qu'essayer de développer, pour assaillir sa mémoire? pour l'accuser d'avoir voulu, par amour pour ses parens aubains, se rendre coupable d'une détestable fraude? Si on le faisait, rien ne serait plus vain, plus puérile même, que de se flatter d'être écouté favorablement.

Ne divisez pas sa pensée: vous n'en avez pas le droit: elle est toute entière dans ce que vient de dire le Juge *Simon*, qui n'est en cela que l'écho du Juge *Martin*. Prenez la donc entière comme elle est, et dites nous, messieurs les organes des prétentions de l'Etat, dites nous, si son testament n'est pas parfaitement d'accord avec cette pensée. Il l'est bien certainement; et il n'y a ni subtilité, ni tour d'adresse, ni sophisme habile ou ingénieux, qui puisse faire pencher un homme aussi honnête que sensé à en douter un seul instant. Voilà donc, jusqu'ici, encore un témoin qui, au lieu de contredire les réponses du défendeur, vient et leur donne une nouvelle force!

Poursuivons! "J'ai (dit ce témoin) souvent entendu le Juge *Martin* se plaindre de la taxe de dix pour cent; et il m'a souvent dit que, comme il ne pouvait rien donner à ses parens absens, sans faire subir cette taxe à sa succession, il laisserait tout à son frère." Encore une pause, et lisons la loi qui établit cette taxe: la voici.

Section 4. Tout individu non domicilié dans cet Etat, et qui n'est pas citoyen d'un autre Etat ou Territoire de l'Union, auquel écherra à titre d'héritage, de legs ou de donation, la totalité ou une partie de la succession d'une personne décédée dans cet Etat *ou ailleurs*, paiera une taxe de dix pour cent sur le montant de toutes sommes d'argent ou sur la valeur, &c.

J'ignore s'il s'est trouvé un bien grand nombre d'individus qui ayant des amis ou des parens hors des Etats-Unis, et non-citoyens d'aucun des Etats ou Territoires de la République, en faveur des quels ils auraient eu quelque penchant à faire quelques dispositions testamentaires, aient appris avec joie l'existence de cette loi bursale; mais je ne serais point surpris d'apprendre qu'un nombre bien plus grand s'en soit plaint ou en ait murmuré: car rien ne me semble plus naturel. Nous sommes, en général, les meilleurs gens du monde, et notre patriotisme est à toute épreuve, à nos intérêts près cependant. Mais, pour dire toute ma pensée, je ne saurais flétrir d'aucun reproche l'homme qui ayant payé constamment et avec toute la ponctualité désirable, sur ses biens, à mesure qu'il les acquérait du fruit de son labeur, taxe d'Etat, taxe de paroisse, tax de ville, &c., fronce un peu le sourcil et laisse échapper quelques paroles expressives de son mécontentement, en songeant qu'outre ces tributs passablement onnéreux, il faudra s'il veut laisser vingt mille piastres à son frère qui est né en France, et qui n'est jamais sorti de Bordeaux, par exemple, que ces vingt mille piastres qui lui appartiennent bien, se rédeisent à dix-huit mille. Sera-t-il raisonnable de le blâmer, s'il se récrie, en disant: mais ce que mon frère me donnerait, par réciprocité d'affections, s'il décédait avant moi, ne supporterait point une réduction semblable, au profit du trésor de France. Eh! je le crois sans peine, et bien d'autres personnes le croiront avec moi de très bonne foi, *François Xavier Martin*, qui, il faut qu'on le sache bien, tenait à la matière en raison compensée des peines qu'il s'était données pendant soixante ans pour acquérir sa fortune, a du

mur murer, se plaindre tout haut de cette loi, par la quelle l'Etat se fesait l'héritier forcé de la dixième partie de ce qu'il avait tant travaillé pour gagner, s'il osait céder à ces sentimens de la nature qui devaient le porter à laisser en mourant, sa succession à ses parens aubains domiciliés en France. Mais, en se plaignant a-t-il dit : En dépit de cette loi arbitraire je ferai passer mes biens, ma succession, en France, et l'Etat n'aura pas les dix pour cent qu'il veut s'approprier sur les fruits de mes travaux, de mes économies, de mes privations de soixante longues années ! Il n'a rien dit de tel. Il a dit, je laisserai le tout à mon frère—à mon frère qui n'habite pas la France, qui est ici, qui demeure avec moi, qui depuis plusieurs années gère mes affaires en vertu de ma procuration. Voyez pour ces faits le témoignage de M. Guyol et celui de Greiner.

Observons bien que ce n'est point une seule fois que le défunt a dit à son collègue *Simon* qu'il laisserait tout son bien au défendeur. Ce témoin dépose qu'il le lui a dit en différentes circonstances. Il déclare aussi qu'après le testament fait, le Juge *Martin* l'avait envoyé chercher pour s'informer si lui, témoin, voudrait agir comme son exécuteur testamentaire, lui disant qu'il avait fait son frère son légataire universel, et que, pour le cas d'absence ou de mort de celui-ci, il avait nommé le témoin son exécuteur testamentaire. Observez bien encore que ce témoin a déclaré au testateur, qu'il consentait à être son exécuteur testamentaire dans les cas prévus ; mais qu'il n'a jamais reçu de lui aucune direction quant à sa manière d'agir en cette qualité ; et que le testateur, ne lui a jamais parlé d'aucune autre personne que son frère à qui dût aller sa succession. Réunissez toutes ces circonstances et, assurément, il sera impossible de rien y trouver qui *contredise* les réponses du défendeur aux interrogatoires sur faits et articles. Elles les corroborent en effet dans toutes leurs parties.

Et qu'on me dise s'il tombe sous le sens que le testateur, ayant prévu le cas de la mort de son frère et ayant pourvu, pour ce cas, à le remplacer par M. *Simon*, comme exécuteur testamentaire, ne lui aurait pas dit : en cas de prédécés de mon frère, vous voudrez bien agir de telle ou telle manière ? Il ne lui dit rien à ce sujet. Or quel aurait été le résultat si, le légataire mourant avant le testateur, et ne pouvant recueillir sa succession, ni la transmettre conséquemment, M. *Simon* eût été appelé à agir ? N'est-il pas d'une évidence irrésistible que la succession du juge passait sans obstacle à ses collatéraux de France ? Ou donc était le dessein de frauder l'Etat de sa taxe ? Et si le Juge *Martin*, prévoyant le cas du prédécés de son frère, eût voulu, par une institution simulée, frustrer l'Etat de sa taxe, croit-on qu'il lui aurait été impossible de trouver un bienveillant qui se fût prêté à figurer comme son légataire universel, moyennant une commission de deux ou trois pour cent, afin de bien assurer, dans ce cas, l'exécution des prétendues intentions illicites qu'on a la charité toute chrétienne de lui prêter ? Au lieu de tout cela, le testateur agit d'une manière conforme à ses principes. Il laisse sa fortune à son plus proche parent ; il la lui laisse parce qu'il est ici auprès de lui, avec lui : et, après ce parent, advienne que pourra. Voilà l'unique conclusion raisonnable à la quelle on puisse arriver. Voilà la vérité. Ainsi point de fraude présumable même. Il laisse son bien à son frère, parce qu'il a l'espoir qu'il ne le vendra pas, qu'il ne le sacrifiera pas : il le lui laisse, parce qu'il a confiance dans l'avenir de son pays adoptif; parce qu'il sait que la prospérité toujours croissante de ce pays ne peut que donner un accroissement de valeur aux immeubles qu'il laisse à sa mort; il le lui laisse, parce qu'il sait bien que son frère n'est pas un évaporé, un dilapidateur, et que, célibataire comme lui, mais mortel comme lui, sa succession ira tout naturellement à leurs neveux et nièces de France, un peu plus tard il est vrai mais, un peu plus considérable qu'à présent. Il a cet espoir, ce désir, et c'est pourquoi il craint que ce frère, usant de son droit, ne s'empresse de vendre, de réaliser, de sacrifier ses propriétés pour aller jouir plus vite.—Revenons au témoignage de M. *Simon*. Il déclare que ; " Lui et le Juge *Martin* ont eu plusieurs conversations, au sujet de sa succession, qui se résument en ceci : qu'il laisserait son bien à son frère, parce qu'alors il ne serait pas sujet à la taxe; que tel avait été son principal objet en le faisant venir dans ce pays-ci. Mais que le juge ne lui a jamais rien dit qui puisse l'autoriser à dire, que son bien irait a aucune autre personne." A une question de l'avocat-général, il repond : " Qu'il ne sait aucun autre fait que ceux qu'il a déjà déclarés; mais qu'il avait été pénétré de l'idée que le Juge *Martin* n'avait pas absolument l'intention de déshériter ses parens ; et les raisons qu'il avait pour cela étaient que, comme il voulait disposer en faveur de son frère, pour éviter la taxe, cela n'était pas suffisant pour détruire

l'ordre ordinaire des choses." Il ajoute : "*Mais je répète encore que je ne connais aucun fait qui puisse m'autoriser à le dire;* ce sont seulement mes impressions à moi. Je n'ai même jamais communiqué mes impressions au testateur; car ce n'était pas de mes affaires."—M. *Simon* termine sa déposition, en nous apprenant "que feu *François Xavier Martin*, était très content de voir arriver sa nièce ici, et qu'il paraissait avoir pour elle l'affection que doit avoir un oncle pour sa nièce," &c.—Or, je dois ne pas omettre qu'à la fin de son témoignage, M. *Simon* avait déclaré que :  " Un jour, dans une conversation entre lui et le défunt juge, il lui avait demandé pourquoi il ne laissait rien à cette nièce, et que le juge avait répondu : elle a soixante mille francs,. et c'est assez pour une femme."

Comme on ne peut guère écrire aussi vite qu'on lit, il faut que je confesse qu'il me tardait d'avoir transcrit tout ce qui, dans ce témoignage, peut avoir trait directement, ou indirectement, à la question qui nous occupe; et c'est à ce point que j'allais passer sous silence un fait qui n'est pas sans importance,.et qu'a relaté M. *Simon* ; le voici : " Lorsqu'en 1846, je partais pour les· Attakapas. le juge *Martin* me chargea de m'enquérir s'il y avait là,· à vendre, une habitation ; ayant, disait-il, l'intention de donner cent mille piastres à deux neveux qu'il avait en France et qu'il attendait ici. Je lui promis de le faire. A mon arrivée, il. vint me demander si j'avais fait quelque recherche ; je lui repondis qu'il n'y en avait point à vendre alors ; il me répliqua : j'en suis charmé ; mes neveux ne· veulent pas venir; ils n'auront pas mon argent·" J'ose à peine me permettre de demander ici, s'il est possible qu'aucune personne se flatte de tirer quoique ce soit de ce long témoignage qui contredise aucune des réponses du défendeur aux interrogatoires sur faits et articles qui lui ont été posés ; car je ne puis vraiment point me le persuader. Rien dans ce témoignage ne soutient l allégation accusatrice du demandeur. Jusqu'ici nous devons dire, au contraire, que le testateur ne voulait point qu'aucune partie de sa succession allât, après sa mort à des parens aubains domiciliés hors des Etats ou Territoires de l'Union. Ainsi. que j'en ai fait la remarque, il voulait que le bien qu'il avait amassé restât·ici dans sa patrie adoptive, autant qu'il·était en lui·de l'y faire rester ; il aimait, sans doute, ses neveux; mais il voulait qu'ils vinssent jouir de ses bienfaits à la Louisiane ; il voulait qu'ils s'y fixassent, qu'ils s'y établissent, [qu'ils y travaillassent avec ce qu'il leur donnerait ; mais dès qu'il est informé qu'ils ne veulent pas venir : *j'en suis charmé*, dit-il, *ils n'auront pas mon· argent*.—Il avait pour sa nièce l'affection naturelle d'un oncle ; il ne veut rien faire pour elle, et pourquoi?. c'est parce qu'elle a soixante mille francs, et que c'est assez pour une femme.

En voilà assez, j'ose le dire avec confiance, pour laver le testateur de l'imputation odieuse qu'on avait eu le courage de faire à sa mémoire. Les morts, disait Cromwell, ne se vengent pas ; mais je dis que les morts peuvent parler et confondre leurs injustes accusateurs, quand ceux-ci osent troubler leurs cendres, les évoquer des régions éternelles, et les interroger. Ce procès qui, je l'espère, ne sera pas une leçon. perdue pour tout de monde, en· est la preuve.

Je passe à un autre témoin, produit, comme les précédens,· par le demandeur; au Juge *Alonzo Morphy*. Et ici, je prie la cour de m'éviter la peine de l'examiner, de le commenter, de le critiquer, de l expliquer. Ce témoin ne sait rien, ne dit rien qui puisse être d'aucune influence sur la décision de notre question ; et si l'on veut le lire avec quelqu'attention et se rappeler ce que j'ai dit sur plusieurs endroits des témoignages de Messieurs *Grima* et *Simon*, on sera convaincu que je ne ferais ici qu'une fastidieuse répétition de ce que l'on a déjà lu.

Reste un témoin entendu aussi de côté de l'Etat, M. *Greiner*.

" Le juge (dit M. *Greiner*) paraissait *uneasy*, inquiet, pendant que la loi de 1842, était en discussion." On le croira sans peine ; car il pouvait lort bien, en 1842, avoir la pensée de laisser une grande partie de son bien à ses parens absens, et cette loi le contrariait d'autant plus, si elle passait, qu'elle faisait l'Etat héritier d'un dixième de ce qu'il leur destinait ; ce qui, en réalité, augmentait le *nombre de ses héritiers, et diminuait* d'un dixième ce que, sans elle, ils auraient eu ; mais, s'en suit-il, qu'il ait violé cette loi, qu'il ait fait un testament simulé, frauduleux, pour affranchir ses parens absens de la taxe ? Répondez qu'on pourrait se l'imaginer ; mais songez que l'on peut aussi, en respectant et les lois de la morale et celles de la logique, vous dire que ce ne serait ni charitable ni conch ant, et que très logiquement il serait permis de présumer le contraire.

"Le Juge *Martin* a dit que la loi pourrait être aisément éludée" ; oui, et il a dit

en cela une vérité palpable ; s'en suit-il qu'il ait testé frauduleusement pour l'éluder ; non, car il n'avait qu'à faire venir ici un de ses parens, qu'à l'y faire résider auprès de lui ; et, en lui laissant tout son bien, il le soustraiait à la taxe, mais il ne violait point la loi qui l'établissait ; car cette loi n'imposait la taxe que sur les successions, ou parts de successions, échéant à des aubains résidant en pays étrangers. Il est deux manières d'éluder cette loi ; l'une très licite et autorisée par elle, l'autre fort repréhensible, et qu'elle condamne. Celle licite consiste, comme je viens de le dire, à faire venir auprès de soi, ses parens etrangers, à les y retenir, jusqu'au moment où l'on pourra disposer en leur faveur, et à leur donner son bien, par testament, quand le tems de le faire sera venu. L'autre, celle illicite, ou au moins très illégale, consiste à faire d'un mannequin son héritier apparent, après avoir obtenu de lui la promesse de transmettre au véritable héritier ce qu'on lui confie. Il n'y a rien dans la première qui répugne à la loi ; au contraire, la loi l'autorise. Dans la seconde, on court le risque de s'en rapporter à un fripon qui garde tout ; et il suffit d'y réfléchir pour n'y pas avoir recours, si l'on ne veut pas frauder en pure perte.—Quand on voit deux manières, l'une honnête et licite, l'autre frauduleuse, de se soustraire à une taxe, à un impôt, à un tribut, à une charge ; c'est s'écarter de tout principe moral, que de prononcer sans preuve et sur de vagues soupçons, que c'est la manière illicite et frauduleuse que l'on a choisie. "On ne doit jamais juger sans preuve, ni présumer qu'un homme sage ait fait une action indigne de sa conduite ordinaire, ni qu'une personne ait manqué à son devoir. Domat, Lois Civiles, liv. 3, tit. 6, sec. 4, no. 7.

Tout ce que ce témoin a déclaré sous son serment peut-être admis sans aucune défiance, sans aucune observation ; tout cela peut-être vrai sans que qui ce soit au monde, à moins qu'il ne soit frappé d'aliénation mentale, puisse prétendre, tout haut, ni tout bas, que les réponses du défendeur aux interrogatoires sur faits et articles qu'on a jugé convenable de lui proposer, en reçoivent la plus légère atteinte. Ces réponses restent intactes : elles étaient invulnérables, car elles étaient vraies. Ainsi il m'est permis, je pense, de dire tout haut ici, sans craindre d'être démenti par le jugement de la cour, que l'imputation de simulation, l'allégation de fraude, sur laquelle on a fondé une demande en nullité du testament olographe du Juge *Martin*, est tout à fait erronée ; et que, conséquemment, ce testament doit sortir son plein et entier effet. Et comment en pourrais-je douter ? On a démandé que ce testament fut déclaré nul sur le fondement d'une incapacité physique ; et ce fondement a disparu devant la vérité. Au sceptique insensé qui niait le mouvement, il dut être suffisant qu'on répondît par l'action de marcher; comme il aurait suffi qu'on lui dît : Malheureux ! que fais-tu quand tu parles? ne remues tu pas ta langue? De même ici, l'allégation d'incapacité était et a été confondue par la preuve d'un fait encore plus simple, savoir, que le testament était bien réellment écrit, daté, signé de la main du testateur lui-même.—Et, ce qu'il y a de remarquable, c'est que c'est le demandeur, auteur de cette allégation, qui a bien voulu le prouver par ses propres témoins. Pressé que l'on était par la conviction acquise, avant toute preuve, que l'incapacité physique n'était qu'une risible chimère, on a tenté d'y suppléer par une allégation plus grave, qui, outre l'effet de faire mettre le testament au néant, devait produire celui de flétrir a jamais la mémoire du testateur comme coupable d'une fraude insigne; on a avancé qu'il *avait fait* son testament dans l'intention réfléchie, froidement délibérée, de voler à l'Etat près de $40,000, pour en enrichir, en violation d'une loi précise, des collatéraux, non citoyens des Etats ou Territoires de l'Union, habitant le sol d'une nation étrangère ! Et, tel était l'esprit de vertige qui animait les moteurs de ce procès que, ne pouvant s'apercevoir que cette allégation détruisait la première, ils ont persisté à demander l'annulation qui formait l'objet de tous leur vœux, en maintenant (sans abandonner, disaient-ils) l'incapacité physique.

Or cette seconde allégation qu'est-elle devenue ? elle a eu le sort de l'autre ; et ce sont encore les zélés organes des prétentions de l'Etat, qui ont pris le soin de la tuer, et par les témoignages qu'eux-mêmes ils ont fait entendre, et par la bouche du testateur qu'ils diffamaient ; et par les déclarations assermentées faites par le défendeur—par le défendeur qu'ils ont fait juge dans sa propre cause, en lui proposant des interrogatoires sur faits et articles.

*Le Gardeur*, on the same side. I. The judge below pronounced the will null and void, because substitutions and *fidei-commissa* are prohibited by our laws. The judge labors under a very erroneous impression of what *fidei-com-*

STATE
v.
MARTIN.

*missa* and substitutions are. What is the substitution or *fidei-commissum* prohibited by our laws? It is a disposition either *inter-vivos* or *mortis causâ*, by which the donee or instituted heir is bound to preserve, and return to another, the thing donated. That disposition can never be implied; it must be expressed in the act, or at least it must result from it as a necessary consequence. Why does the law discountenance and prohibit substitutions and *fidei-commissa*? Because they either change the legal order of succession, or tie up for a length of time in the hands of individuals property which is thus placed out of the reach of commerce. Therefore, when the charge to preserve for and return to another is not expressed in the act, or does not necessarily result from it, the disposition, even though it should contain a simulated donation, does not render the testament void, provided the real donee be capable of receiving from the donor. The law says that no man shall do indirectly what he is not permitted to do directly, and I hold the converse of this proposition to be equally true, to wit, that a man has an unquestionable right to do indirectly what the law permits him to do directly. See Toullier vol. 5, nos. 21, 24, 25, 27, 28, 30. Villargues, *verbo* Substitution, nos. 2, 3, 4, 9, 10, 14. Merlin, Répertoire de Jurisprudence, vo. Substitution, sec. VIII, no. 2; sec. X, § 1, no. 1. "Questions de Droit," vo., Substitution Fidéi-Commissaire, § IV, p. 29: § VI, p. 46; § XLII p. 84. It may, then, safely be stated that the jurisprudence of France is positive that, such substitutions and *fidei-commissa* only as impose the charge of preserving and returning a thing to a third person, are to be considered as prohibited by law; and that those dispositions alone can have the effect of avoiding a testament or donation.

Let us now see what the rule is under the jurisprudence of this State.

In the case of *Mathurin* v. *Livaudais*, 5 Mart. N. S. p. 302, the Supreme Court spoke as follows: "Our Code, it is true, declares that substitutions and *fidei-commissa* are abolished. But the object of this change in our jurisprudence was, as it is well known, to prevent property from being tied up for a length of time in the hands of individuals, and placed out of the reach of commerce. The framers of our Code, certainly never contemplated to abolish naked trusts uncoupled with an interest, which were to be executed immediately. If they had, they would not have specially provided in a subsequent part of the work for testamentary executors, described their duties, and recognised the validity of their acts. The obligation imposed on the legatee by the will of the testator in this case, cannot be distinguished from that of an executor, except in the name; and it is the duty of the court to look to things, rather than to the words." See also the case of *Milne's Heirs* v. *Milne's Executors*, 17 La. p. 57. In another case, that of *Duplessis* v. *Kennedy*, 6 La. p. 246, we find the following language: "This court has already decided in more than one case, that whenever it necessarily results from the language of the instrument, that a substitution was intended, its entire nullity must be pronounced. That it is of the essence of a substitution, that the original donee should be bound by the terms of the donation, to preserve the property given for, and to transmit it to, another person or class of persons, which persons are appointed to take after the original donee, *ordine successivo*, and in derogation of the legal order of succession."

But it will perhaps be contended that the mere charge to return, uncoupled with that of preserving the thing donated, annuls the disposition, and reference will be had to the case of *Tournoir* v. *Tournoir*, 12 La. 22, and that of *Rachal* v. *Rachal*, 1 Rob. 115, in which it was held by the late Supreme Court that "the law prohibits all *fidei-commissa*, even those in favor of persons capable of receiving, and although the donee is not bound to preserve but simply to return." These cases are in contradiction with the decisions above quoted, in which it was distinctly held "that in abolishing substitutions and *fidei-commissa*, the law did not mean to prohibit naked trusts, uncoupled with an interest, which are to be executed immediately." They are incompatible with, and repugnant to, the very letter of our law. Article 1507 of the Louisiana Code reads thus :

"Les substitutions et les *fidei-commis* sont prohibés. Toute disposition, par la quelle le donataire, l'héritier ou le légataire est chargé de conserver et de rendre à un tiers, est nulle, même à l'égard du donataire, de l'héritier institué, ou du légataire."

It is an elementary principle, in the interpretation of statutes, that a law

should be considered as a whole; that effect should be given to every part of it, and that the words of restriction found in a law should be extended to each and every portion of it. Under this principle, it is plain that the second paragraph of the article above quoted applies to *fidei-commissa* as well as to substitutions, and that consequently such dispositions only, be their names what they may, as impose the charge to preserve for, and return to, a third person, are prohibited by our laws. True it is, the expressions in the english text are that " every disposition by which the donee is charged to preserve for or to return a thing, to a third person, is null;" but article 1507 was reprinted in the new Code from art. 40, p. 217, of the old Code, and it is well settled that under such circumstances, effect must be given to both texts. *Durnford* v. *Clark's Estate*, 3 La. 202. Merlin, in his " Répertoire de Jurisprudence, *verbo* Fidéi-commis" and Villargues, "*eodem verbo*," make a distinction between a " fidéi-commis and a " fidéi-commis tacite." The former is synonimous with, and means " substitution fidéi-commissaire." This distinction strengthens the construction we have just put on article 1507, which speaks of " fidéi-commis," but not of " fidéi-commis tacite." Besides; Merlin, whose correctness cannot be questioned, in speaking of *fidei-commissa*, says: " Une autre condition essentielle pour établir un fidéi-commis est que les termes dont on se sert pour l'exprimer emportent l'ordre successif ou le trait de tems, c'est à dire qu'ils n'appellent le substitué qu'en second ordre et après que l'institué ou donataire immédiat aura recueilli." Répertoire, *verbo*, Substitution fidéi-commissaire, section 8, n. 3. This author again says: " Il y a, en effet, fidéi-commis toutes les fois qu'il existe une disposition par la quelle les deux gratifiés sont appelés à recueillir successivement et non concurremment. Questions de Droit, *verbo* Substitution fidéi-commissaire § 6, p. 46." Thus clearly showing that he made no difference between a *fidei-commissum* and a substitution; and thereby accounting for the distinction which he establishes between a " fidéi-commis" and a " fidéi-commis tacite," the former being a " substitution fidéi-commissaire," and the latter a naked trust, without term, condition or delay. But should it be contended, in the very teeth of the distinction thus made by Merlin and Villargues, that the word fidéi-commis as used in art. 1507, means " fidéi-commis tacite," let us see whether, in that broad signification, the word would also cover disguised donations made to persons capable of receiving.

Merlin, in his " Répertoire," *verbo*, Fidéi-commis tacite, no. 2, says: " Ces sortes de fidéi-commis ne se font ordinairement que pour avantager indirectement quelque personne prohibée, comme le mari ou la femme dans les cas ou ils ne peuvent s'avantager, ou pour donner à des batards (adultérins ou incestueux) au delà de leurs alimens." Villargues, *verbo* Fidéi-commis tacite, remarks: " Toute disposition au profit d'un incapable sera nulle, soit qu'on la déguise sous la forme d'un contrat onéreux, soit qu'on la fasse sous le nom de personnes interposées." C. N. 911. Louisiana Code, art. 1478. " C'est ici qu'est le siège de la matière. Nous retrouvons dans la disposition que la loi annule le fidéi-commis tacite, ou secret, qui était réprouvé par les lois romaines; même but de la part de celui qui dispose, comme identité de vues de la part du législateur, pour annuler la disposition. * * * * Voilà ce que les lois appelèrent fidéi-commis tacite ou secret. Et cette sorte de disposition était annulée comme fait en fraude de la loi."

Thus, had the words " fidéi-commis tacite" been inserted in article 1507 of the Louisiana Code, they would not have applied to dispositions made to persons capable of receiving.

II. Was the deceased physically incapacitated on account of blindness, from making an olographic will?

It is contended that secrecy is of the essence of an olographic testament; whence the inference is drawn that any assistance given to the testator is fatal, and that, consequently, the olographic will is void, because the testimony shows that the testator would have been unable to make it, had not some assistance been extended to him. The proposition from which this inference is drawn, is palpably erroneous; for there is nothing, either in the spirit or in the letter of our laws, which can authorize the assertion that an olographic testament is essentially a secret one. Indeed, secrecy is of the essence of no kind of testament known to our laws. A testator may, if he think proper, keep his last dispositions secret; but he is not bound to do so, nay, not even when he selects the form of a mystic or secret testament, as even then he can require the as-'

sistance of a stranger and have the testament written by the latter. Civ. Code art. 1577. But, is it true that every assistance in the making out of an olographic will, annuls that will? I think not. A testament must be the sole and exclusive work of the testator's will. Hence, if it was shown that, through fraud, violence or error, a testament did not contain the testator's will, it should be declared null. The opposite party have shown that there can have been no fraud, violence, or suggestion practised upon the testator, and that no error could have existed on his part. All their witnesses concur in saying that, before making his testament, the deceased declared that his intention was to leave the whole of his estate to the defendant, and, since it was made, that he had carried his intentions into effect! So that, by the plaintiff's own showing, not a doubt can be reasonably entertained as to the fact, that the olographic testament under consideration contains the testator's last will and dispositions. How, then, can that instrument be declared null, simply because some physical or external assistance may have, or has actually, been extended to the testator, when it is shown that it was entirely written, dated and signed by him, and that it is a faithful repository of his last will and intentions? Toullier, in his 5th vol. no. 347, holds as follows: "Le testament ne doit émaner que de la volonté du testateur; il faut qu'il soit l'acte propre, l'acte personnel du testateur. Celui-ci peut néanmoins s'aider des lumières d'un conseil, la loi ne le lui défend pas; mais sa volonté ne peut jamais être supplée par le ministère d'autrui, ni subordonnée à celle d'une autre personne. Si le jurisconsulte peut donner ses avis au testateur, ce n'est que sur la forme et non sur le fonds du testament; ce n'est que pour prêter aux pensées du testateur le secours nécessaire des expressions propres ou légitimes. Ainsi le testament ne serait pas nul, quand on en trouverait le modèle écrit de la main d'un conseil ou même d'un légataire; il suffit que le testateur l'ait adopté, et se le soit rendu propre, soit en l'écrivant, s'il s'agit d'un testament olographe, soit en le dictant, s'il s'agit d'un testament public, soit en le présentant aux témoins, s'il s'agit d'un testament mystique." This shows incontestibly, that assistance may be afforded to a testator, provided that assistance does not operate upon the substance of the testament, which must and should always be the work of his own free will.

The testament itself shows that the deceased was not physically incapacitated from making it. Let us see how far the opposite party has succeeded in showing that, under our laws, a blind man has no right to make an olographic testament, when he can do it. The counsel rely first on art. 1579 of the Civil Code, which provides that "those who know not how, or are not able, to write, and those who know not how, or are not able to sign their names, cannot make dispositions in the form of the mystic will." This is not contested. Indeed the very definition of the olographic testament, shows conclusively that no man has a right to make such a testament unless he can write and sign, as the olographic will is that "which is entirely written, dated and signed by the hand of the testator." Now, the fact that the deceased could write and sign, is not denied; at all events, it is clearly established by the testament itself, which is proven to be entirely written, dated and signed by him. What effect, then, this article can have on the question before the court, I am at a loss to conceive, unless the learned counsel should contend that the positive enactment of the legislature in the english text of art. 1579 must yield and give way to the french text, which inhibits from making a mystic testament those who cannot read, whereas the english text, disqualifies those alone who cannot write. But granting that due effect should be given to the french text, although the article itself was not reprinted from the old Code, (see pages 226, 228, 230, 232,) what would the consequence be? Unquestionably this: that a blind man could make no dispositions in the form of a mystic will, because he is unable to read. But that does not show that a blind man cannot make an olographic testament. Incapacities are *stricti juris*, and cannot be extended *de casu in casum*, nor *de personâ in personam*. This is well settled. Therefore the law which disqualifies a man from making a mystic testament because he cannot read, does not thereby incapacitate him from making an olographic will. Art. 1579 contemplates mystic testaments only, and has no application to this case.

The counsel next array against us a host of commentators: Duranton, vol. 9, no. 139. Delvincourt, vol. 2, note 12, p. 309. Boileux, on art. 979 of the Napoléon Code. Rogron, on the same article, and on arts. 977 and 978. Domat, des Testamens, titre 1, sec. 3, § 20. Merlin, *verbo* Testament. Coin Delisle,

on art. 980, and Greiner on Donations, vol. 2, no. 258 and 281. There is not a syllable in Merlin tending to establish what is contended for by the opposite party; and the only reasonable inference that could be drawn from the silence, of this learned and distinguished author, would be that, in his opinion, a blind man has an unquestionable right to make an olographic will. Incapacities are *stricti juris;* and as there is no express provision of law prohibiting a blind man from making an olographic testament, and this is attempted by inference only, it is rational to suppose that, had Merlin thought that that incapacity could be established by inference, he would have so stated in his profound and interesting commentary on last wills and testaments. The passage quoted from Coin-Delisle can have no bearing upon this case. He says that a blind man cannot be a witness to a testament, although not disqualified by the Napoléon Code. This may be true. But our Code says in positive terms, that persons insane, deaf, dumb, or blind, are absolutely incapable of being witnesses to testaments. Art. 1584. But admitting that a blind man should be declared incapable of being a witness, even though no express provision to that effect had been inserted in our Code, could it be inferred that a blind man is incapable of making an olographic will, because he is not capable of being a witness to a testament? This would be a *non sequitur.* A blind man who is not so by birth, can write. And as any man who can write, can also make an olographic testament unless incapacitated therefrom by an express provision of law, the consequence is that, under the general rule of law, a blind man can make an olographic rule, unless deprived of that right by an exception to that rule. But the object of the lawgiver in requiring that public testaments should be made in presence of witnesses was, unquestionably, to guard against the fraudulent practices which might otherwise be resorted to. How could the witness know that there was no substitution of persons, unless he could see the testator, and thus acquire the proof that he was not imposed upon. The object of the law might then be defeated were persons who are blind permitted to act as witnesses to testaments, because they are physically incapable of ascertaining the truth of the external acts of others. All the remaining commentators quoted by the opposite party unite, save one, in saying that a blind man cannot make an olographic testament, because he cannot write; and this shows that they had in contemplation those persons only who are blind by birth. Far, then, from supporting the position taken by our adversaries, these commentators are clearly in our favor, because their opinion is grounded upon the sole fact that a blind man is physically incapacitated of writing, and is therefore pregnant with the affirmative that a blind man who can write can make an olographic will. *Cessante causâ, cessat effectus.*

After alluding to a decision reported in Dénisart, by which the olographic testament of a blind person was held to be valid, Grenier, vol. 2, p. 281, says: "Cette opinion n'est pas sans difficulté. Le caractère du testament olographe est d'être fait par le testateur seul: or, un aveugle, quelqu'habitude qu'il ait pu conserver de l'écriture, pourrait-il bien se flatter d'écrire son testament, de le dater et signer, de manière à ce qu'il n'y eût aucun des inconvéniens que cet état fait naturellement craindre, qu'on prévoit assez sans les détailler et qui pourraient rendre le testament illisible et nul. Si on suppose qu'il se fasse aider et guider par un tiers, alors la possibilité des insinuations et des surprises ne se présente-t-elle pas à l'esprit? Et ne s'élève-t-il pas un doute légitime sur la validité d'un testament fait dans une semblable circonstance? Où est cette garantie, si fortement exigée par la loi, de la certtiude des volontés du testateur?" Thus Grenier no where says that the law prohibits a blind man, who can write, from making an olographic testament. He simply states that the question is not free from difficulty, and that it would be more prudent for a blind man to make a nuncupative testament by public act. The advice may be good. As to the arguments against the dangers of permitting a blind man to dispose *mortis causâ* by an olographic will, they might be entitled to some weight were they pressed upon the lawgiver, but they certainly can be of no influence upon the mind of a judge who is called upon to apply the law, not as it should be, but as it is. What are the extraordinary dangers pointed out by the author? He says that the testament might be illegible; that, if aided and assisted by a third person, the testator might fall a victim to insinuations and deceits; that the will of the testator might be uncertain. If there is no possibility of reading the testament—if frauds and deceits have been practised upon the testator—if his

STATE
v.
MARTIN.

will cannot be ascertained—surely, for these reasons, or for any of them, the testament must be declared null; but the nullity would not be pronounced on account of the testator's blindness.

Our Code provides that "all persons may dispose or receive by donation *inter vivos or mortis causá*. except such as the law expressly declares incapable." Art. 1456. It then divides testaments into three classes, nuncupative, mystic, and olographic (art. 1567); and provides that in order to be valid, an olographic testament must be entirely written, dated, and signed by the hand of the testator, but is subject to no other form. Art. 1581. That Judge *Martin* had a right to dispose of his property by a donation *mortis causá*, is not to be disputed ; that a blind man is by no express provision of the Code declared incapable of making an olographic testament, cannot be denied ; that the testament under consideration is entirely written, dated and signed by the hand of the testator, must be admitted, as it is abundantly proven by the testimony; that there is no proof, and not even a suggestion, of fraud, or mistake, on this branch of the case, clearly results from the original petition and the proofs adduced by the plaintiffs themselves. But it will perhaps be contended that, although a blind man is not expressly, yet he may be impliedly, incapacitated from making an olographic testament. This may be true. Indeed, any man is incapable of making an olographic testament, who is unable to fulfil the formalities without which no such testament can exist. Thus a man who cannot write, is incapable of making an olographic testament, because that testament must be written by the testator. If therefore a man, who cannot write, has the misfortune of being blind, he is incapable of making an olographic testament, not because he is blind, but because he cannot write. Coin-Delisle, in commenting upon article 978 of the Napoléon Code, says (at page 408, no. 4) : " La loi ne déclare pas spéeialement l'aveugle incapable du testament mystique ; et la nullité n'est prononcée en ce cas que par une conséquence directe de l'art. 978, qui interdit cette forme à ceux qui ne peuvent lire. Nous pencherions donc pour la validité d'un testament mystique dont un aveugle doué d'une instruction suffisante, aurait imprimé ou fait imprimer les dispositions en caractère saillans, et qu'il aurait su et pu lire par le toucher." In this opinion Coin-Delisle has the concurrence of Marcadé, who says (vol. 4, p. 48) : " M. Coin-Delisle dans un autre passage va bien plus loin que nous, et présente une doctrine qui doit paraître plus douteuse, quand il admet la validité du testament qu'un aveugle aurait fait imprimer en caractères saillans, et qu'il aurait pu lire par le toucher. Nous partageons cependant son opinion." Our laws do not declare a blind man incapable of making an olographic testament. If unable to write, his incapacity to make such a testament would result from the express provisions of art. 1581, which provide that that testament is not valid, if not written by the testator. Therefore a blind man who can write, is neither expressly nor impliedly incapable, under our laws, of making an olographic testament.

Toullier in his "Droit Civil Français," 5th vol. no. 477, *in fine*, says: " Sous l'empire du Code, toute personne qui sait écrire peut faire un testament olographe, excepte celles que la loi en déclare incapables. Or, il n'y a sur ce point aucune incapacité contre les muets ; ils peuvent donc, comme toute autre personne, faire un testament olographe."

Marcadé, vol. 4, p. 7, no. 2, ¶ 3, says: " Du moment que le testament est écrit en entier de la main du testateur, la prescription de la loi est accompli et l'acte est valable, de quelque manière et sur quelque substance qu'il soit écrit. Du moment que cet acte contient des dispositions de dernière volonté, c'est donc un testament; et du moment que ce testament est ecrit en entier, daté et signé de la main du testateur, c'est donc un testament olographe valable." And farther, at page 13, no. 5 : " Une fois que le testament est écrit, daté, et signé de la main du testateur, il est parfaitement valable ; car il n'est assujetti à aucune autre forme."

Coin-Delisle, in commenting upon the Napoléon Code, p. 332, no. 7, says : " Il n'était point inutile d'établir plusieurs espèces de testamens ; la forme olographe est, par la nature des choses, interdite à ceux qui ne savent pas ecrire ; la forme mystique à ceux qui ne peuvent pas lire ; le testament public aux personnes qui ne peuvent pas parler. La diversité des formes répond donc à la diversité des besoins. Ainsi le sourd-muet fera valablement un testament olographe, à moins qu'il n'ait pas l'intelligence de ce qu'il écrit; l'aveugle, qui est rarement assez habile pour faire un testament olographe, et à qui il est défen-

du de prendre la forme mystique (and this shows that he is not prohibited from making an olographic will, but, on the contrary, has an unquestionable right to select that form when *assez habile*,) a pour ressource le testament public. Celui qui ne peut pas parler et qui ne pourrait écrire un long testament, fera connaître ses dernières volontés par un testament mystique. La loi ne touche en rien à la capacité sur ce point; elle exige seulement l'accomplissement de certaines formes, aux quelles une maladie, une infirmité, ou le défaut d'instruction, font obstacle."

Villargues, Dictionnaire du Notariat, *vo.* Aveugle, no. 5, says: "Remarquez qu'on devrait en général décider autrement (the court of Pau had pronounced the nullity of a *sous-seing privé*, signed, but not written, by a blind man,) si l'aveugle avait lui-même écrit l'acte, quoiqu'alors la surprise soit encore possible; mais du moins cette circonstance devrait être prouvée." No. 6. "Un aveugle peut-il tester ? Il ne le peut pas dans la forme mystique; mais il le peut par acte devant notaire, et rigoureusement aussi dans la forme olographe."

Vazeille, Donations and Testaments, art. 978, p. 498, says: "M. Grenier, suivant Ricard et Lacombe, a décidé que l'aveugle était incapable non seulement du testament mystique, mais même du simple testament olographe. M. Bergier, annotateur de Ricard, a pensé que le testament olographe qu'un aveugle aurait pu écrire, dater et signer, pourrait être valable: et il cite un arrêt de 1700 qui, en effet, a rejeté la demande en nullité du testament olographe fait par la *dame de Pressigny* en état de cécité. Cette note fait dire à M. Grenier que la chose n'est pas sans difficulté. Il ne peut y avoir de difficulté que pour la vérification de l'écriture, si elle est contestée; car la loi n'interdit pas le testament olographe aux aveugles. Ceux qui peuvent écrire, malgré leur infirmité, ont certainement le droit de tracer eux-mêmes leurs dernières volontés, quoiqu'ils ne puissent pas les lire. Ils ne sont exclus que du testament mystique par l'art. 978."

See also the extract from Dénisart, vol. 4, p. 715, cited by M. *Mazureau, ante* pp. 698–699.

A question, not identical with the one now under consideration, but which hasconsiderable analogy with it, has been recently decided by this court. In the case of the *Union Bank* v. *Morgan, ante* p. 418, it was contended that certain endorsements given by one of the defendants were null and void, because he was blind, and that a letter of attorney which had been signed by him before a notary public, but not in presence of three witnesses, as required by the Code, was not good as an authentic act, and still less as one *sous seing privé*. But it was decided differently. Neither fraud nor error had been alleged or proven, and this court placed the case upon the broad ground that all persons have the capacity of contracting, except those whose incapacity is specially declared by law. In that case the court went further than Villargues, who simply holds that the *sous seing privé* of a blind man is valid when signed and written by him. It disregarded the decision of the court of Pau, which had pronounced the nullity of a *sous seing privé* signed, but not written, by a blind man, upon the ground that it was impossible for him to ascertain the truth of what he had been called upon to sign. The decision in *Morgan's* case is correct, because fraud and error are never presumed; and that court must be ignorant of the first principles of law, which would supply an incapacity not created by the legislator, on the apprehension of a mere possibility of fraud being practised upon, or error being committed by, the person thus illegally deprived of his rights. Therefore, in matters of contract, the case of the *Union Bank* v. *Briggs* decides that, when no fraud or error is proven, the contract *sous seing privé* of a blind man is good and valid, because the law does not declare him incapable of contracting. The court is now called upon to decide what the rule must be in matters of donations *mortis causâ*. If this court has ruled that a *sous seing privé* signed, although not written by a blind man, is valid in law, it must rule that an olographic testament entirely written, dated, and signed by a blind man, is equally valid in law. Indeed, the case of *Morgan* is a stronger one than the present; for it is impossible that a blind man can know by himself the contents of a paper written by another, which he is called upon to sign. But in the case of an olographic testament, no such impossibility can exist, as a testament of that description is nothing but a *sous seing privé* not only signed but entirely written by the party himself. Besides, in this case, no fraud or error is alleged.

STATE
v.
MARTIN.

III. The agreement to defraud the State being disproved, has it a right to pray for the nullity of the will upon the technical ground that it is irregular in point of form ?

This question brings us at once to the merits of the exception to the original petition. Admitting, for argument sake, that the testament is irregular in point of form, the State has no right to avail itself of the nullity which may result from that irregularity.

Nullities are either absolute or relative. By absolute nullities are meant those which can be set up by all persons interested ; by relative nullities, those which can only be set up by the persons in whose favor they are established. Merlin, Répertoire de Jurisprudence, vo. Nullité, §. 2, no. 1. Zachariæ, Droit Civil Français, vol. 1, p. 69. Under what head of nullity does the objection to Judge Martin's testament fall ? Villargues, vo. Testament, no. 547, says : " La nullité qui résulte, par rapport à un testament, d'un vice de forme, n'est pas absolue; elle n'est que rélative, ou, en d'autres termes, elle n'est que relative à l'héritier légitime." Biret, in his treatise on Nullities, vol. 1. p. 42, remarks : " Dans l'ancienne jurisprudence on reconnaissait aussi cette règle que la volonté tacite ou expresse d'une partie intéressée faisait disparaître les effets de la nullité relative. Un testament nul, soit dans sa forme, soit par défaut de capacité dans le testateur, est valide par l'exécution qu'en fait volontairement, et en connaissance de cause, l'héritier dont il blesse les droits." Merlin, in his Répertoire vo. Nullité, § 3, no. 12, says : "Du principe que les nullités respectives sont couvertes par le consentement des parties intéressées, il résulte qu'un testament nul, soit dans la forme, soit par défaut de capacité dans le testateur, est valide par l'exécution qu'en fait l'héritier dont il blesse les droits." These quotations show that nullities in a testament, growing out of a defect of form, or a want of capacity in the testator, are not absolute but relative, and therefore cannot be set up by all persons interested, but by those only to whom the succession would devolve should the testament be annulled.

Admitting that the State has an interest in seeing the testament annulled, it certainly has no right to pray for its avoidance on the mere allegation of a relative nullity, which none can set up but those whom the law would have called to the succession, had no testament been made. As was observed by Judge Porter in the case of Spencer v. Grimball, 6 Mart. N. S. 364 : " Invito beneficium non datur, is as well the maxim of law as it is of common sense ; and if the party who is empowered to set aside a contract, does not choose to do it, no other can." The nullity of the will, admitting it to be irregular, either in point of form or through the incapacity of the testator, being relative only, could not be prayed for by the State, whose petition ought to have been dismissed on the exception. Bonne v. Powers, 3 Mart. N. S. 461. Fletcher v. Cavelier, 2 La. 271. Toullier, vol. 7, nos. 554, 564.

Dunod, as reported by Toullier, vol. 7, p. 729, says that every act, the nullities of which are relative only, produces a natural obligation, and Grenier seems to concur in that opinion. After holding that the heir who has paid out the legacies cannot claim them back on the ground that the testament is null, he says, vol. 2, p. 422 : " Il a pu vouloir exécuter le testament malgré la nullité, soit parce qu'ainsi que l'observe Chabrol, les formalités n'ont pour objet que d'assurer la vérité du testament, et que l'héritier, qui a bien voulu executer un testament nul, est censé s'être rendu certain par d'autres moyens de la volonté du testateur, soit parceque, malgré la nullité il subsite une sorte d'obligation naturelle, qu'il doit être libre à l'héritier d'accomplir." This opinion is in harmony with reason and morality. It is founded on our own laws, which provide that those obligations are natural which the law has rendered invalid for the want of certain forms or for some reason of general policy, but which are not in themselves immoral or unjust ; and that there is a natural obligation upon the heirs to execute the donations or other dispositions which the former owner has made, but which are defective for want of form only. C. Code, art. 1750. It is true that natural obligations cannot be enforced by action. Code, art. 1752. But it is equally true that when a party has voluntarily fulfilled a natural obligation, he has no right to revoke his performance of it. Pothier on Obligations, no. 195. The conclusion is irresistible that the party who is bound by a natural obligation cannot be compelled to consider and treat it as null and void, and that, consequently, no third persons can set up a nullity which the party directly interested is, in foro conscientiæ, bound to respect, and cannot be compelled to set up. How, then,

can the State of Louisiana, whose laws make it the duty of the relations of the deceased in France not to disturb his will, since its nullity, if any there be, arises out of a defect of form only, herself pray that that will be annulled, the performance of which, by her own laws, constitutes a natural obligation upon those relations ?

But whether the heirs be morally bound, or not, to leave the testament undisturbed, it must be conceded that the nullities by which the testament could be vitiated, are relative, and can only be set up by the heirs themselves. Even their creditors would have no right to avail themselves of those nullities. Such, at least, is the opinion of Toullier, which, although not concurred in by all the french commentators, must be adopted by our courts, as no provisions similar to those of art. 1167 of the Napoléon Code are to be found in any of our Codes. Toullier 7, no. 564. Court of Cassation, *Bonnecarère* v. *Soulié,* June 11, 1828.

The judgment of the court was pronounced by

Rost, J. This case presents two novel questions. 1. Could *François Xavier Martin,* after he became blind, make any dispositions *mortis causâ,* in the olographic form ? 2. If he could, was the institution of the defendant as his universal legatee, a simulated disposition, made for the purpose of evading the fiscal regulations of the act of 1842, imposing a tax of ten per cent on the value of all the property inherited in Louisiana by foreigners not domiciliated here, and with the secret intention that the disposition should inure, for the whole, or for a part, to the benefit of the foreign relatives of the testator.?

We will first notice the question of capacity.

I. In the case of *Gibson* v. *Foster,* lately determined (*ante* p. 503), after a thorough investigation of the law in relation to nullities, we said : " That, where defects of form only were alleged, we disclaimed all power to extend nullities to cases neither expressly provided for by the lawgiver, nor coming within the legal intendment of art. 12 of the Civil Code, as fixed by the jurisprudence from which it is derived." In the case of the *Union Bank of Louisiana* v. *Morgan, ante* p. 418, we held that the blind are not declared by law incapable of contracting, and that, as a general rule, all persons have that capacity, except those whose incapacity it expressly declared. We thought on those occasions, that incapacities and defects of form are *stricti juris ;* that they cannot be extended from one person to the other, or from one case to the other, and that where the law is silent, courts of justice seldom have authority to invoke considerations of supposed public policy for the purpose of defeating private rights. We are well satisfied with these views and decisions. They settle the jurisprudence of the State on the important subject of nullities.

We are called upon to decree the nullity of a solemn act of last will, neither declared to be null, nor expressly prohibited, by law. The nullity alleged is purely one of form, as it is conceded that the testator, notwithstanding his blindness, might lawfully have made a nuncupative will. It is not, in legal intendment, an absolute nullity, since it may be cured by lapse of time, or by voluntary execution or ratification on the part of the heirs at law, and, if enforced, leaves them under a natural obligation to execute the will. Civil Code, arts. 3507, 1751. 7 Toullier, nos. 554 to 565. It is not asked by the foreign heirs, on the ground that the defendant is a person interposed. One of them has judicially recognised the validity of the will, and the others are silent. The nullity is sued for on behalf of the fisc, exclusively for fiscal purposes, on the assumption that its capacity to maintain the action is the same as that of the heirs.

We will examine the questions presented, on that hypothesis, premising here, that all the authorities cited in argument have reference to cases in which the heirs are parties.

STATE
v.
MARTIN.

Art. 1456 of the Civil Code provides that, all persons may dispose, or receive, by donation *inter vivos* or *mortis causâ*, except such as the law declares especially incapable. The Code further provides that an olographic testament, in order to be valid, must be entirely written, dated, and signed, by the hand of the testator, but is subject to no other formality. The will in this case was made in that form, and was admitted to probate on the sworn declarations of Messrs. *Simon*, *Bullard*, and *Morphy*, the colleagues of the testator on the bench of the late Supreme Court, that it was, in the words of the law, entirely written, dated, and signed by him, they having often seen him write and sign his name. All the formalities required for the validity of olographic wills were strictly complied with. It is therefore incumbent upon the plaintiff to show affirmatively, that the nullity necessarily results from some legal provision in relation to olographic wills, or from the context of our legislation in relation to testaments generally, and the capacity of testators.

It is alleged that the testator must have had assistance of some kind, as it is in proof that he could not have written his will without it, and that the will was not, therefore, entirely written, dated, and signed by himself. He told one of the witnesses that he had written it with the assistance of a rule. We have no doubt it was so. The assistance of a rule, after he became blind, was not greater than that of a pair of spectacles would have been, while he could still see. A testator may avail himself of mechanical and other assistance in the making of his will, provided that assistance does not operate upon the substance of the testament. It is not pretended that it did in this instance. 5 Toullier, no. 47.

It is urged that, blind persons are expressly prohibited from making wills in the mystic form, and that if a will made in that form, and entirely written, dated, and signed by a blind testator, should be rejected as a mystic will, it is absurd to suppose that it could be established in the olographic form. There is nothing absurd in this. By an express provision of the Code, a will, not valid in the form intended, must be maintained, if it fulfills the requisites of either of the other forms. Civil Code, art. 1583. 12 Rob. 35. 6 Mart. N. S. 263.

The analogy drawn from the jurisprudence of France, that the incapacity of the blind to make an olographic will exists though not expressly declared, because the incapacity of blind persons to be witnesses to wills is admitted to exist there though not expressly declared, if it have any force with us makes against the pretensions of the plaintiff. By art. 1584 of the Code, the incapacity of blind persons to be witnesses to wills is expressly declared; but their incapacity to make an olographic will is nowhere to be found.

It is contended that the testator could not read what he had written, and had no means of ascertaining whether his intentions were correctly set down; and that the will does not, by itself, make the proof required, that the dispositions it purports to contain emanate from the testator and embody all his intentions. The law does not require proof that the testator read his olographic will, after writing it; and the fact that he did not, is not a cause of nullity. Moreover the representatives of the fisc forget that they have made two pleas, which are not entirely consistent with each other. For the purpose of terminating this litigation we have overlooked the irregularity of the pleadings; but they cannot take advantage of it, to deny, under the first plea, the fact of all others which they have taken most pains to prove under the second, that the will is in all respects such as the testator intended. The evidence adduced in support of one

branch of the case must necessarily have the effect to which it is entitled on the other; and the plaintiff is precluded from alleging that the intentions of the testator are left in doubt.

A vast number of authorities have been adduced. Those drawn from the spanish commentators, rest upon an express disposition of the Partidas, and can be of no assistance to us. None of the french authorities cited, expressly say that a blind man who can write cannot make an olographic will. Grenier, who goes farther than any other, argues the question as one of inconvenience and danger to the testator. The will, he says, may not be legible; frauds and deceits may be practised on the testator. These arguments would apply with equal force to testaments made in any form, and do not seem to question the right of the testator to resort to the olographic will. Duranton, vol. 9, no. 139. Delvincourt, vol. 2, note 12, p. 309. Boileux, Com. on art. 699 of Code Nap. Rogron, on arts. 977, 978, 979 C. N. Domat, des Testamens, titre 1, sec. 3, § 20. Merlin, Testament. Grenier, Donations, vol. 2, nes. 258, 281. Ricard, Traité des Donations, nos. 142, 1470, 1474. Dénizart, Collection, Testament, no. 160. Pothier, Traité des Donations Testamentaires, ch. 1, art. 4. Partida 6, l. 14, tit. 1. Gomez, Opera Omnia; 3 l. Toro, nos. 51, 52, p. 25. Molina, on the laws of Toro, nos. 69, 70, Madrid edition. Febrero Addicionado, vol. 1, part 1, chap. 1, no. 14.

The authorities cited by the defendant's counsel, on the other hand, unequivocally hold that, when a man can write, he is not incapacitated on account of blindness from making an olographic testament. Coin-Delisle's Commentaries on the Napoléon Code, p. 408, no. 4. Marcadé, vol. 4, p. 48, and page 7, no. 2; page 13, no. 5; page 332, no. 7. Vilarde, Dict. du Notariat, *verbo*, Aveugle. Vazeille, on Donations and Testaments, 498.

It is a singular fact that the researches of the able and diligent counsel who have taken part in the argument of this case, have only enabled them to find in the annals of jurisprudence the single precedent mentioned by Dénizart. The heirs of *Madame de Pressigny*, attacked an olographic will made by her after she became blind, on the ground taken by most of the authorities cited at bar, that a blind person, not being able to write, could not make testamentary dispositions in that form. But the executor maintained that the testatrix could write, although blind, because it was in proof that she had written, and that *ab actu ad posse valet consequentia*. It was further contended by him that, the provisions of the roman law and of the french ordinance of 1735, in relation to wills, having exclusive reference to nuncupative and mystic wills, had not limitatively subjected the blind to one or the other of those two forms. Dénizart, *loco citato*. The capacity was recognized and the will maintained.

The commentators, who combat this opinion, say that it was probably rendered upon peculiar and unknown circumstances, and this, we apprehend, is the key to the principle upon which the question turns. Coin-Delisle, in a passage cited by the appellee, says: " Il est de principe que les incapacités ne s'étendent pas. Aussi avons-nous dit ailleurs que les *incapacités naturelles* n'étaient pas de vraies incapacités, mais des impossibilités physiques, et que les questions sur ce genere de difficultés devaient être jugées *suivant les circonstances*." In England, a similar rule at this day prevails. Lovelase on Wills, nos. 264, 265, 15 Law Library.

In this view of the law we concur. Natural incapacities are not questions of law, but matters *en pais*, depending upon the peculiar circumstances of each case. Most of the commentators relied on by the appellees either say, or in-

STATE
v.
MARTIN.

timate, that a blind man cannot make an olographic will, because he cannot write ; but as no one doubts that the late able presiding judge of the Supreme Court of this State could write, that reason does not create an incapacity as to him.    Should the conflicting authorities adduced have left us in doubt, that of the testator himself would have had great and deserved weight with us.    But we are clearly of the opinion that the incapacity alleged is not established by law, nor to be implied from its provisions, and that it is a mere question of fact. The court of the first instance came to the same conclusion, but considered the physical impossibility established by the notorious helplessness of the testator. Public notoriety cannot outweigh, in our minds, the testimony of the three un-impeachable witnesses upon which the will was admitted to probate, and the uncontradicted evidence adduced on behalf of the plaintiff, that this instrument was in all respects as intended by the testator.

II.  The other ground of nullity alleged by the appellee's counsel, whether called a tacit *fidei-commissum*, or by any other name, presents a question of fraud ; and we agree with them that they are not limited in their proof to the rules of evidence applicable to ordinary cases ; nor is it indispensable for them, under the rule of the civil law, to establish a pact between the testator and the defendant.    It is sufficient that they prove by any description of direct, or circumstantial evidence, the intention of the testator that the legacy, or a part of it, should enure to his foreign heirs, coupled with the certainty that the instituted heir has discovered that intention, and has either executed, or intends to execute, it.    We say, *under the rule of the civil law*, as it is believed the common law never reaches secret intentions, not manifested by outward acts. That limitation is one of the great safeguards of freedom.    It is the rule of our penal jurisprudence ; and, whether it should not also be held to extend to issues of fraud, is a serious question, but a question which the opinion we have formed does not render it necessary to determine.

Taking the rule of the civil law as our guide, although the appellee is not limited by it in the nature of the evidence, that evidence, whatever it be, must make the allegations certain.    In this, as in other cases, fraud is not to be presumed, however probable it may appear.    Should the evidence leave the fact of fraud doubtful, says Merlin, " il faut que le juge ferme les yeux à toute conjecture purement humaine, pour s'en tenir aux simples décisions de la loi.   Chardon, chap. 2, art. 1, nos. 16–20.   Merlin, Répertoire, Fidéi-commis tacite.

The defendant was ordered to answer in open court, during the trial, certain interrogatories propounded by the plaintiff.    The substance of his answer is, that there was no pact or understanding between him and his brother in relation to the transmission of any portion of the property bequeathed ; that his brother gave him no instructions or directions whatever, but simply told him : " I make you my heir.    Dispose of my fortune—it is yours."    The last interrogatory was in these words:  " State whether it is not your intention to transmit, give, or remit, now or at a future time, or at your death, the property left you, or part of the same, to the other heirs of the testator, or to some of them ?    If yea, state the names, and the amounts"—to which he answered : " I have, on that subject, no other intention but that of disposing of my fortune according to my will.    I do not consider myself bound to make, at this moment, a public will.    When I make it, I will follow my own intentions.

It is contended that he has not answered the last question propounded, and that the facts not answered must be taken for confessed.    The answers are

in french, and the manner in which they are made may depend upon the form adopted in the translation of the interrogatory. The declaration of the defendant that, his only intention is to follow his own will, and to make his testament according to its dictates, negatives the idea of a deliberate intention to dispose now of the property in favor of any determinate person. We cannot, therefore, consider the intention to transmit, as judicially admitted. But, if we did, the presumption which usually results from that intention, that the transmission is made in furtherance of the wishes of the testator, would be rebutted by the presumption resulting in this case from the relationship of the defendant and the heirs at law. He is the brother of the testator, unmarried, and much advanced in life. His only legal heirs are the foreign heirs of the testator; and, unless the intention of the latter, that he should transmit the property during his life, is clearly established, he may without danger avow his intention to make, in favor of his nephews and nieces, the disposition which the law will make for him, if he does not. Such a disposition is not only legal, but natural and proper.

Many witnesses have been examined to prove the alleged intention of the testator—from his declarations in private conversations; from the circumstance that he induced his brother to come and live with him; and from the great dislike he had of the law of 1842, which it is alleged he attempted to evade. Judge *Morphy*, one of his associates, states that, from his conversations, he was in doubt whether he sent for his brother to avoid paying the tax to the State, by making him really his universal legatee, or whether the universal disposition in the will was intended merely to evade the tax, without disinheriting the other heirs. Judge *Simon* says that, the impression on his mind was that Judge *Martin* did not absolutely intend to disinherit his foreign relatives, but knows no fact which can authorize that belief. Judge *Bullard* testifies that, when cases in which this tax was involved came before the Supreme Court, the testator expressed his opinion upon the law imposing it, but otherwise never spoke of it; nor does the witness believe he had the intention of evading it himself; when he spoke of it, it was a general question.

Had our minds been brought to the state of doubt in which Judge *Morphy* seems to be, it would be our duty to give the defendant the benefit of that doubt. But the evidence in the record has not produced that result; and the life and character of the testator, as exhibited in the jurisprudence of this State for the last thirty-four years satisfies us, as they did Judge *Bullard*, that he could not, and did not, intend to commit a fraud. It is shown that he was on good terms with his relations; but it is also shown that he repeatedly gave, as a reason for instituting his brother his universal legatee, that he was of the same tastes and habits as himself; that he would be "*un autre lui-même*," and take care of them, as he had been in the habit of doing. It is shown that he often complained of the act of 1842, and that he said it might easily be evaded; but it is in evidence also that, he was in the habit of saying that it was the duty of a man to leave his fortune to his relatives, and to those nearest to him; that he thought his niece, *Blanche Amélie Martin*, rich enough with 60,000 francs, and did not intend to give her any thing else. That, at one time, he requested Judge *Simon* to find for him a plantation worth $100,000, which he wished to purchase, and give to two of his nephews, on condition that they would come to Louisiana, and settle here; and that, not long before his death, when Judge *Simon* told him he had not succeeded in finding a suitable place, he said he was glad of it;

STATE , .
*v.*
MARTIN.

STATE
v.
MARTIN.

that his nephews refused to leave France, and should not have his money. It is in proof that he made similar statements to Judge *Grima*. It is true he was heard to say that the tax was unjust and foolish ; he held it to be an exceptional, and therefore arbitrary, exaction, which those upon whom it operated were not without reasons to complain of. His saying that it might easily be evaded, under the circumstances in which it was said, cannot be taken as proof of his deliberate intention to evade it. Besides, *Blanche Amélie*, and the two nephews who refused to come to Louisiana, his only relatives in France, are the son and the daughter of one of his sisters, who lately died there. He may have been attached to his sister; but he could not have known her children at the time he made his will. Upon what principle of human action can it be explained that a man of great intellect, occupying the highest judicial station of the State, known to us all from our youth as having been a law unto himself, and who, whatever may have been his oddities and faults, justly prided himself on the purity of his life, should have died perpetrating a vile fraud, for the benefit of relatives unknown to him.

There is another view, far more consistent with his character. The love of independence was a passion with him; and the things of this earth, by which independence is secured, had a large share in his affections. His desire that his worldly goods should be kept together after his death, exhibited by the pain he felt at the mere suspicion that his brother would sell them and leave the country, far outweighed in his mind his attachment for those persons. We believe in the sincerity of his anguish. The last looks of the man of wealth, dying without posterity, are cast upon the property he has amassed ; his last hope on earth is, that his succession may live and continue to represent him. The defendant in this case was the instrument selected to give life to that cherished fiction. We have no doubt of his being really universal legatee ; nor that the intentions of the testator were, as he expressed them, that his brother should continue to be, in all respects, "*un autre lui-même.*"

We have examined the questions submitted to us, on the hypothesis that the rights of the fisc were the same as those of the heirs. We do not wish to be understood as conceding that proposition. The fisc has no right to annul a will for defects of form, although the heirs may; nor would it be good policy to do so, if the power existed. The policy of the State, as declared by its laws, recognises the validity of probated wills till they are set aside by the heirs, and limits the time within which this may be done. Under those laws the will had been ordered, in the name of the State, to be executed. The fisc could not, without an express warrant of law, interpose to prevent its execution, for the purposes of gain.

The act of 1842 provides that, *foreign heirs, legatees,* or *donees,* not domiciliated in this State, shall pay a tax of ten per cent on all sums, or on the value of all property, which *they may actually receive* from a succession, after deducting the debts due by it. No one is heir, legatee or donee against his will, or before his acceptance, express or implied. There is no legal rule in relation to heirship, analogous to that of *pater est quem nuptiæ demonstrant* in relation to filiation. Suppose that the other foreign heirs should affirm the validity of the will, as *Blanche Amélie* has done, or that they should all renounce the succession, it would, in either case, devolve upon the defendant, who is already the heir at law for one third, and the State would surely not be entitled to the tax. If it be said that the fisc is exposed to be defrauded, by the connivance of the

heirs with the legatee, the answer is, that this is a *casus omissus*, requiring special legislation. Fiscal laws are in the nature of penal statutes; they act upon things as they find them; and their operation should not be extended to cases not contemplated by their framers. *United States* v. *Eighty-four Boxes Sugar*, 7 Peters, 453.

But should the right of the fisc to interfere, before the acceptance of the heirs and their judicial recognition in that capacity, be nothing more than doubtful, non putamus delinquere eum, qui in dubiis questionibus contrà fiscum facile respondit. L. 10, Digest, *De Jure Fisci.*

The representative of the State has faithfully discharged, what, under the information he had received, he conceived to be an official duty. Upon us devolves the more grateful task to determine that he was misled by that information, and that the name of *François Xavier Martin* stands unsullied by fraud.

It is ordered that the judgment rendered in this case in favor of the State be reversed, and that there be judgment for the defendant, with costs in both courts.